**2015-1415**

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

———————————

MORTGAGE GRADER, INC.,
*Plaintiff-Appellant,*

v.

FIRST CHOICE LOAN SERVICES, INC.,  NYLX, INC.,
*Defendants-Appellees,*

———————————

**Appeal from the United States District Court for
the Central District of California in Case No. 8:13-cv-00043-AG-AN
Judge Andrew J. Guilford**

———————————

## CORRECTED OPENING BRIEF OF APPELLANT MORTGAGE GRADER, INC.

Craig R. Kaufman
Michael Ting
ckaufman@tklg-llp.com
mting@tklg-llp.com
TECHKNOWLEDGE LAW GROUP LLP
100 Marine Parkway, Suite 200
Redwood Shores, CA 94065
Telephone: (650) 517-5225

*Attorneys for Appellant*

May  12, 2015

Form 9

FORM 9.   Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Mortgage Grader, Inc.                v. Costco Wholesale Corp.

No. 15-1415

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellant                certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Mortgage Grader, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Craig R. Kaufman, TechKnowledge Law Group, LLP, Michael C. Ting, TechKnowledge Law Group, LLP
Jason Angell, Frietas, Tseng and Kaufman LLP (no longer counsel of record)

| 3/23/2015 | /s/ Craig R. Kaufman |
|---|---|
| Date | Signature of counsel |
| | Craig R. Kaufman |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF RELATED CASES ..................................................................1

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUES.............................................................................2

STATEMENT OF THE CASE.................................................................................2

    A.    The Asserted Patents....................................................................2

    B.    Relevant Proceedings Below ........................................................4

SUMMARY OF THE ARGUMENT ....................................................................12

ARGUMENT ........................................................................................................14

    A.    Standard of Review.......................................................................14

    B.    The District Court Abused Its Discretion When It Permitted Appellees to Assert a Section 101 Defense.......................................15

    C.    The District Court Should Be Reversed Because The District Court Improperly Resolved Material Factual Disputes When It Granted Summary Judgment...............................................................21

    D.    The Asserted Claims Are Directed To Patentable Subject Matter.....23

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013) .............................................................13, 15, 21

*Bilski v. Kappos*,
    561 U.S. 593 (2010).................................................................................23, 25

*CLS Bank Intern. v. Alice Corp. Pty. Ltd.*,
    717 F.3d 1269 (Fed. Cir. 2013) (*en banc*) .........................................................18

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
    134 S.Ct. 734 (2013)........................................................................................18

*Alice Corp. Pty. Ltd. v. CLS Bank  Intern.*,
    134 S.Ct. 2347 (2014)...............................................................................*passim*

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................21, 22

*Apple, Inc. v. Samsung Elec. Corp.*,
    No. 12-CV-00630-LHK, 2014 WL 1322028 (N.D. Cal. 2014) ........................16

*Arrhythmia Research Tech., Inc. v. Corazonix Corp.*,
    958 F.2d 1053 (Fed. Cir. 1992) ..................................................................15, 21

*Association for Molecular Pathology v. Myriad Genetics, Inc.*,
    133 S.Ct. 2107, 2116 (2013)..............................................................................23

*BuySafe, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ..................................................................25, 26

*Content Extraction and Transmission, LLC v. Wells Fargo Bank,
    N.A.*,
    776 F.3d 1343 (Fed. Cir. 2014) .......................................................................26

*Cybersource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ...........................................................22, 26, 27

-ii-

*Dealertrack v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012) .........................................................................30

*DDR Holdings v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) .........................................................................32

*Engineered Products Co. v. Donaldson Co.*,
  147 Fed.Appx. 979 (Fed. Cir. 2005).............................................................20, 21

*Fort Properties, Inc. v. American Master Lease LLC*,
  671 F.3d 1317 (Fed. Cir. 2012) .........................................................................30

*Horus Vision, LLC v. Applied Ballistics, LLC*,
  No. 5:13CV05460BLF(HRL), 2014 WL 6895572 (N.D. Cal 2014) ...........19, 20

*Lindemann Maschinenfabrik GMBH v. Am. Hoist and Derrick Co.*,
  730 F.2d 1452 (Fed. Cir. 1984) .........................................................................32

*Loyalty Conversion Systems Corp. v. American Airlines, Inc.*,
  No. 2:13-CV-655, 2014 WL 4364848 (E.D. Tex. 2014) (Bryson, J.
  sitting by designation)................................................................................15, 21

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
  132 S.Ct. 1289 (2012).......................................................................................18

*MyMedicalRecords, Inc. v. Walgreen Co.*,
  No. 2:13-CV-00631, 2013 WL 6834639 (C.D. Cal. 2013)...............................16

*Nano-Second Tech. Co., Ltd. v. Dynaflex Int'l*,
  No. CV 10-9176, 2012 WL 2077253 (C.D. Cal. 2012) ....................................16

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
  467 F.3d 1355 (Fed. Cir. 2006) ...................................................................14, 16

*Planet Bingo, LLC v. VKGS LLC*,
  576 Fed.Appx. 1005 (Fed. Cir. 2014)...............................................................26

*SRAM Corp. v. AD-II Eng'g., Inc.*,
  465 F.3d 1351 (Fed. Cir. 2006) ...........................................................14, 22, 23

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1358 (Fed. Cir. 2012) .........................................................................22

*Ultramercial, Inc. v. Hulu LLC*,
  772 F.3d 709 (Fed. Cir. 2014) ...............................................................15, 24, 25

**Statutes**

28 U.S.C. 1295(a)(1)....................................................................................1

28 U.S.C. §§ 1131 and 1338(a)..................................................................1

35 U.S.C. § 101 ..............................................................................*passim*

## STATEMENT OF RELATED CASES

No other appeal from any district court related to the validity or infringement of U.S. Patent Nos. 7,366,694 and 7,680,728 has been before this or any other appellate court. There are no other matters pending in a trial court related to the subject patents.

## JURISDICTIONAL STATEMENT

The trial court had jurisdiction over this action for patent infringement under 28 U.S.C. §§ 1131 and 1338(a). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. 1295(a)(1). The district court entered final judgment that all Asserted Claims of the '694 and '728 patent were invalid.

# STATEMENT OF THE ISSUES

1.    Did the district court abuse its discretion when it permitted Appellees to withdraw their waiver of their Section 101 defense without a proper showing of good cause?

2.    Did the district court err as a matter of law when it improperly resolved disputes of material fact when granting summary judgment for Appellees that the Asserted Claims were invalid under Section 101?

3.    Did the district court err as a matter of law when it concluded that the Asserted Claims were not drawn to patent eligible subject matter?

# STATEMENT OF THE CASE

## A. The Asserted Patents

There are two patents at issue in this action, U.S. Patent No. 7,366,694 and U.S. Patent No. 7,680,728.  A107-123, A125-135.  The '694 patent issued in April, 2008, and the '728 patent issued in March, 2010.[1]  *Id.*  The patents describe and claim novel systems and methods that are designed to solve a problem that existed in the mortgage industry – predatory lending where a mortgage broker or loan officer may steer a borrower into a loan program that is worse for the consumer than warranted by the borrower's credit history.  A114 at col.1:23-36.  The

---

[1] The '694 patent is a continuation-in-part of the '728 patent.  A107.

invention at issue solves this problem using technology – by eliminating the loan officer from the process, the claimed invention allows a borrower to shop for mortgages while avoiding the predatory steering that humans introduce into the equation.

Claim 1 of the '694 patent is representative and provides as follows:

> 1. A computer-implemented system for enabling borrowers to anonymously shop for loan packages offered by a plurality of lenders, the system comprising:
>
> a database that stores loan package data specifying loan packages for home loans offered by the lenders, the loan package data specifying, for each of the loan packages, at least a loan type, an interest rate, and a required borrower credit grading; and
>
> a computer system that provides:
>
> a first interface that allows the lenders to securely upload at least some of the loan package data for their respective loan packages to the database over a computer network; and
>
> a second interface that prompts a borrower to enter personal loan evaluation information, and invokes, on a computer, a borrower grading module which uses at least the entered personal loan evaluation information to calculate a credit grading for the borrower, said credit grading being distinct from a credit score of the borrower, and being based on underwriting criteria used by at least some of said lenders;
>
> wherein the second interface provides functionality for the borrower to search the database to identify a set of loan packages for which the borrower qualifies based on the credit grading, and to compare the loan packages

within the set, including loan type and interest rate, while remaining anonymous to each of the lenders and without having to post a request to any of the lenders, said second interface configured to display to the borrower an indication of a total cost of each loan package in the set, said total cost including costs of closing services not provided by corresponding lenders;

and wherein the computer-implemented system further enables the borrower to selectively expose at least the personal loan evaluation information to a lender corresponding to a selected loan package.

A122 at col.17:23-61. This system, and the corresponding methods, reflects the fundamental value discussed above – they permit a consumer to shop for loans and learn about potential loans that they could obtain without being steered by mortgage brokers or loan officers into loans that are more financially beneficial to the broker/loan officer. In short, the claimed invention eliminates normal human self-interest of the loan officer to maximize his or the bank's compensation.[2]

## B. Relevant Proceedings Below

Mortgage Grader brought this action in January 2013, alleging that Costco's mortgage services platform infringed certain claims of the '694 and '728 patents. A1577-1611. In May 2013, Mortgage Grader amended its complaint to add First

---

[2] Although not relevant to the issues in this appeal, the accused system is the website www.costcofinance.com that is operated by NYLX in cooperation with First Choice Bank and Costco. A1615 at ¶¶15-16. The mortgage services platform receives information from a Costco member who is using the site, and matches the user with appropriate loans anonymously.

Choice and NYLX to the lawsuit.  A1612-49.[3]  Mortgage Grader asserted that Appellees infringed claims 1, 2 and 19 of the '694 patent, and claim 6 of the '728 patent (hereinafter the "Asserted Claims").

### 1. Appellees' Waiver Of Their Section 101 Defense and the Motion To Strike.

The U.S. District Court for the Central District of California is part of the patent pilot program, and the assigned district judge has elected to participate in the program.  www.cacd.uscourts.gov/news/patent-pilot-program.  On August 30, 2013, Judge Guilford promulgated patent rules and made them applicable to this case.  A73.  These rules require early disclosure of both infringement and invalidity contentions in the form of "initial" and "final" contentions.  A65-72. Standing Patent Rule 2.5.4 requires a party charged with patent infringement to state: "Any grounds of invalidity based on 35 U.S.C. § 101, . . ."  A67.  Standing Patent Rule 4.2 requires the submission of final invalidity contentions, but subjects the addition of new arguments or grounds for invalidity to a "good cause" standard:

> Amendments are subject to a good cause standard but do not require prior Court approval where they are made due to a claim construction by the Court different from that proposed by the party seeking amendment, or recent discovery of material prior art that was not discovered,

---

[3] The parties ultimately stipulated to the dismissal of Costco as a defendant because the nature of the financial arrangements between the defendants permitted Mortgage Grader to fully recover its damages from NYLX and First Choice.

> despite diligent efforts, before the service of the Invalidity Contentions.

A71.

In their answer, filed on October 14, 2013, Appellees included their affirmative defenses to Mortgage Grader's claims of infringement. The Fourth and Fifth Affirmative Defenses provide:

> U.S. Patent No. [7,366,694 or 7,680,728] is invalid, inoperable, unenforceable, and void under the Patent Laws of the United states. The alleged invention covered in U.S. Patent No. [7,366,694 or 7,680,728] fails to satisfy the conditions for patentability specified in 35 U.S.C. *including Sections 101*, 102, 103 and 112 thereof.

A1567 (emphasis added). Likewise, Appellees' counterclaims assert that the claims of the '694 and '728 patents are invalid under Section 101. A1571-72 at ¶¶20, 24 (patents are "invalid for failure to comply with the statutory requirements for patentability set forth in 35 U.S.C. *§§ 101*, 102, 103 and/or 112")(emphasis added).

Less than two months later, on December 12, 2013, Appellees abandoned their Section 101 defense in their initial invalidity contentions served pursuant to Standing Patent Rule 2.5.4. A325-334. As required by this rule, Appellees explained their position regarding non-prior art defenses, stating:

> "The Defendants *do not* present any grounds of invalidity *based on 35 U.S.C. § 101*, indefiniteness under 35 U.S.C. § 112(2)/(b), or enablement or written description under 35 U.S.C. §112(1)/(a) of any of the asserted claims at this time."

A332 (emphasis added).

Ten months later, Appellees changed their tune again, attempting to recant their waiver of a Section 101 defense by asserting it in their Final Invalidity contentions served pursuant to Standing Patent Rule 4.2.  A141-154.  In attempting to resuscitate their Section 101 defense, Appellees stated:

> The Defendants informed the Plaintiff's counsel of the intention to challenge the validity of the '694 and '728 patents under *Alice Corp. Pty., Ltd. v. CLS Bank International et al.,* 134 S.Ct. 2347, 2014 U.S. LEXIS 4303 (2014).  The use of the Elite Agents formal application, which was rejected in part under 35 U.S.C. §101, and the newspaper Mortgage Rate Charts are expected to be the primary basis for this challenge.  The good cause for this revision to this statement of Final Invalidity Contentions is caused by the Supreme Court's decision issuing after Defendants Initial Invalidity Contentions.

A151.  Appellees also added new prior art in the form of a patent application owned by NYLX (the Elite Agents provisional and formal applications) and a second patent that had been cited against the NYLX patent application during prosecution of the NYLX patent application.  A149-150.

Mortgage Grader moved to strike Appellees' new prior art and Section 101 defenses.  A74-102.   The district court struck the new prior art defenses, finding that Appellees had not shown good cause to add these new references because they were not diligent in locating prior art owned by or known to their client.  A34-38.

The district court denied the motion to strike the new Section 101 defense, finding that "*Alice* represents a big enough change to justify including a new §101 argument in Appellees' Final Invalidity Contentions."  A43.

### 2. Appellees' Omnibus Motion For Summary Judgment.

Following the district court's denial of the motion to strike their Section 101 defense, Appellees filed a motion seeking summary judgment that the Asserted Claims were invalid for failure to comply with Section 101.[4]  The Appellees argued that the Asserted Claims were invalid because they were directed to patent ineligible abstract ideas because "each of the Asserted Claims is directed to a mental concept" that "can be performed in the human mind or by using pen and paper."  A1030.  Appellees also argued that the claims were invalid because they were "directed to 'organizing human activity'".  A1031.

In support of its invalidity arguments, First Choice and NYLX submitted excerpts from export reports authored by their officers – Howard Conyack, an employee of NYLX (A1131 at ¶3)[5] and Norman Koenigsberg, the President and CEO of First Choice.  A1159 at ¶12.

---

[4] The motion also sought summary judgment that the asserted claims were not infringed by the Costco mortgage services platform. The district court denied the motion for summary judgement of non-infringement. A19-29.

[5] Mr. Conyack is, in fact, the Chairman of Loan Logics (NYLX's successor corporation). www.loanlogics.com/team.html (accessed April 29, 2015).

The Conyack expert report excerpt presents an approximately two page discussion of the fact that newspapers, before the internet, published rate charts from various mortgage lenders. A1135-37 at ¶¶15-20. This section of Mr. Conyack's report does not contain any discussion of invalidity, does not mention the Asserted Claims, and does not apply any recognized legal standard to the Asserted Claims. *Id.* Instead, he explains that the real estate sections of newspapers contain "'Mortgage Rate Charts' wherein banks serving the relevant communities provided basic information for the mortgages they offered." A1136 at ¶16. Mr. Conyack identifies typical examples, such as 30 year fixed rate loans, 15 year fixed rate loans, and 1 year variable rate loans that could be typically shown in those tables. *Id.* at ¶17. Mr. Conyack characterizes these charts as "nothing more than advertisements." A1137 at ¶20.

Mr. Koenigsberg's excerpted report is similar in that it contains a short discussion of the prior existence of newspaper rate charts. A1162-63 at ¶¶47-54. Unlike Mr. Conyack, Mr. Koenigsberg's comments are provided in a section entitled "Invalidity of the Asserted Patents." *Id.* Like Mr. Conyack, Mr. Koenigsberg's report does not contain any invalidity analysis, does not apply any recognized legal test for invalidity to the claims, and indeed does not even mention the Asserted Claims. *Id.* Instead, he simply reviews the history of mortgage charts in the newspaper. *Id.* Mr. Koenigsberg concludes, without detailed

explanation, that the accused Costco system is nothing more than a "computer-implemented manner of borrower review of mortgage rate charts in the papers." A1163 at ¶54.

In opposition to the evidence provided by Appellees' officers, Mortgage Grader submitted the declaration of Jeff Lebowitz, an expert with more than 26 years of experience in the mortgage industry. A1467 at ¶7. Mr. Lebowitz's experience includes both professional experience as a consultant, as well as experience in strategic planning for Fannie Mae. A1467-69 at ¶¶7-17. Mr. Lebowitz submitted his opinion that the claimed invention was not simply computerization of a previously known process – nor was it something that could be performed mentally by a human. A1470-71 at ¶¶23-28. Mr. Lebowitz explained that the Koenigsberg and Conyack discussions of rate tables "do not reflect anything close to the number of products available in the market" and do "not, and cannot, take into account any personal information about the potential borrower." A1471 at ¶22. Mr. Lebowitz explains that the purpose of the invention is to enable the consumer by taking the human out of the equation – i.e. improving the technology – so that borrowers receive more accurate information than they can from human loan officers. A1470-71 at ¶¶23-28. Mr. Lebowitz contradicts Appellees' conclusions that the claimed invention could be "performed mentally by a human", explaining that "[t]hey are wrong, as the whole point of the invention

is to eliminate the loan officer or broker." A1471 at ¶28. Mr. Lebowitz explained that the use of the computer permits selection of appropriate loans without the conflict of interest from a loan officer, and that "the claimed invention is not simply a process that could be performed by human beings." *Id.*

After conducting a hearing, the Court rendered summary judgment that the Asserted Claims were invalid because they were directed to an abstract idea, and lacked the requisite "something else." A11-14. The district court recognized that "defendants assert that the claims fail § 101 because they 'have been done before in the human mind or through use of a pen and paper when a borrower uses the mortgage rate charts found in newspapers' and are 'directed to 'organizing human activity.'" A11. The district court acknowledged Mortgage Grader's contrary view. *Id.* The district court credited Appellees' evidence and then concluded that "none of Plaintiff's arguments show that claim 6 is drawn to something that could not be done by a person." A12.

Having found the claims to be abstract because they could be "done by a person," the district court proceeded to step 2 of the *Alice* test to see if the required "something more" was present. With respect to claim 6 of the '728 patent, the district court concluded that the claim did not even require the use of a computer, and thus, that the requisite "something more" was absent. A13.

For claims 1, 2 and 19 of the '694 patent, the district court acknowledged that these claims required the use of a computer, but – without citing to any record evidence, much less undisputed evidence – also covered things that could be covered by a human, stating:

> The 'interface that allows the lenders to securely upload at least some of the loan package data [specifying the loan type, rate, and required borrower credit grading]' ('694 Patent 17:33-34) could be hand delivery of that information on a sheet of paper. The 'second interface that prompts a borrower to enter personal loan evaluation information' with the 'borrower grading module' ('694 Patent 17:37-39) could be the human broker taking the information by hand and calculating the credit grading by hand or by looking at a table. The borrower and broker could discuss the cost of the available loans and the borrower could decide to selectively expose its information to a lender of interest.

*Id,.* The district court further concluded that the claimed invention did not affect an improvement in any technical field or improve the functioning of a computer. *Id.* In the face of this, the district court concluded that the Asserted Claims were invalid because they did not satisfy Section 101. A14.

## SUMMARY OF ARGUMENT

Actions have consequences. Yet the district court refused to hold Appellees to their affirmative, and inadequately excused, waiver of their Section 101 defense. The waiver occurred two months after Appellees plead invalidity under Section 101 in their answer, and after the Supreme Court had granted *certiorari* in *Alice*

*Corp. Pty. Ltd. v. CLS Bank Int'l.,* 134 S.Ct. 2347 (2014). The district court abused its discretion in permitting Appellees to resurrect their waived defense, where Appellees did not show that they were diligent in pursuing the defense. The district court compounded its abuse of discretion by failing to consider the prejudice to Mortgage Grader caused by Appellees eleventh-hour change of heart regarding Section 101. The district court's order denying Mortgage Grader's motion to strike defendants Section 101 defense should be reversed and this court should issue an order vacating the invalidity judgment because Appellees waived the defense.

Assuming that this Court gets to the merits of the district court's summary judgment decision, it should be reversed for two reasons. First, the district court improperly resolved issues of material fact against Mortgage Grader. While compliance with Section 101 is a legal question, this conclusion can have factual underpinnings. *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013). In this case, the central thesis of the district court's conclusion is that the Asserted Claims could be performed mentally by a human. A11-12. This fact was posited by Appellees' employee experts, and disputed by Mortgage Grader's expert. Because the district court improperly resolved this disputed factual issue, summary judgment is not appropriate and the district court's invalidity judgment should be reversed.

Finally, the district court erred when it applied the *Alice* test for patentable subject matter to the claims. The Asserted Claims do not fit the common categories of inventions that this Court has found to be "abstract ideas." They are not directed to fundamental economic principles, long known. Nor are they directed to methods that could be performed by a human in the absence of a computer. Instead, the invention described and claimed in the '694 and the '728 patents is a system and a method for solving problems that have long existed in the mortgage market – the self-interest of human mortgage brokers and loan officers to steer consumers to loans that are beneficial to the broker, not necessarily the borrower. The claimed invention takes humans out of the process, and thus provides a technological improvement with benefits to the borrower.

## ARGUMENT

### A. Standard of Review

The district court's rulings applying its own case management rules are reviewed for abuse of discretion. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,* 467 F.3d 1355, 1366-67 (Fed. Cir. 2006).

This Court reviews the grant of summary judgment without deference to the district court. *SRAM Corp. v. AD-II Eng'g., Inc.,* 465 F.3d 1351, 1356 (Fed. Cir. 2006).

Whether a patent claim complies with Section 101 is a question of law, which this Court reviews *de novo*. *Ultramercial, Inc. v. Hulu LLC*, 772 F.3d 709, 713 (Fed. Cir. 2014). This legal inquiry has factual underpinnings. *Accenture*, 728 F.3d at 1340-41. *See, also, Arrhythmia Research Tech., Inc. v. Corazonix Corp.*, 958 F.2d 1053, 1055-56 (1992) ("Although determination of [statutory subject matter] may require findings of underlying facts specific to the particular subject matter and its mode of claiming, in this case there were no disputed facts material to this issue."); *Loyalty Conversion Systems Corp. v. American Airlines, Inc.*, No. 2:13-CV-655, 2014 WL 4364848, *4 (E.D. Tex. 2014) (Bryson, J. sitting by designation) ("However, that legal conclusion 'may contain underlying factual issues.")

### B. The District Court Abused Its Discretion When It Permitted Appellees to Assert a Section 101 Defense

This Court need not examine the merits of the district court's Summary Judgment opinion in order to overturn the district court's judgment. Appellees waived their Section 101 defense when they stated that they would not assert the defense in their initial invalidity contentions. A332. The district court abused its discretion when it permitted Appellees to reinstate the defense without good cause, contrary to the district court's own Standing Patent Rules.

The district court's Standing Patent Rules control the timing and requirements for disclosing invalidity defenses. A67 (S.P.R. 2.5), A71 (S.P.R.

4.2). Standing Patent Rule 2.5.4 required the appellees to identify every potential ground for invalidity early in the course of the litigation, including any defense based on non-patentable subject matter under Section 101. A67 ("No later than 14 days after the scheduling conference, each party opposing a claim of patent infringement shall serve on all parties Invalidity Contentions containing …[a]ny grounds of invalidity based on 35 U.S.C. § 101…"). Any amendments to the initial contentions are "subject to a good cause standard". A71 (S.P.R. 4.2.2).

To satisfy the requirement of "good cause" a party must show (1) that it acted diligently; and (2) there is no prejudice to the other party. *O2 Micro Int'l Ltd.,* 467 F.3d at 1363; *Apple, Inc. v. Samsung Elec. Corp.,* No. 12-CV-00630, 2014 WL 1322028, *2 (N.D. Cal. 2014); *Nano-Second Tech. Co., Ltd. v. Dynaflex Int'l*, No. CV 10-9176, 2012 WL 2077253, *1 (C.D. Cal. 2012); *MyMedicalRecords, Inc. v. Walgreen Co.*, No. 2:13-cv-00631, 2013 WL 6834639, at *2 (C.D. Cal. 2013). This Court has held that the party seeking to amend bears the burden of establishing diligence. *O2 Micro Int'l Ltd.,* 467 F.3d at 1366.

On October 14, 2013, Appellees raised an invalidity defense under 35 U.S.C. § 101 in their answer to appellant's second amended complaint both as an affirmative defense and by counterclaim. A1567, A1571 at ¶20, A1572 at ¶24. Two months later, when serving their initial invalidity contentions pursuant to Standing Patent Rule 2.5.4, the Appellees unambiguously waived this defense

when they stated that they "do not present any grounds of invalidity based on 35 U.S.C. § 101…of any of the asserted claims at this time. The final claim construction may require such an assertion of invalidity."[6]    A332    This clear language is an unambiguous waiver of their Section 101 defense.

Ten months later, in September 2014, appellees served their final invalidity contentions and attempted to assert an invalidity defense under Section 101. A151.    Appellees claimed that the amendment to include the new basis for invalidity was justified based on the Supreme Court's intervening *Alice* decision. *Id*.  Mortgage Grader moved to strike Appellees' previously waived Section 101 defense.  The district court denied the motion, finding that the Supreme Court's *Alice* decision made enough changes to the law to constitute good cause.   A43.

The district court abused its discretion in finding the *Alice* decision constituted good cause because it ignores the context surrounding Appellees' affirmative decision to waive the defense.   Under any reasonable standard, the Appellees conduct was not diligent.  Appellees cannot argue they were unaware of the defense, as they plead it in their answer in October 2013.  And yet two months later they affirmatively waived the defense, stating that they were not asserting invalidity under Section 101.   A332.  This waiver should not be excused by the

---

[6] The Appellees made no reference to the district court's claim construction when they served their final invalidity contentions.  A151.

Supreme Court's *Alice* decision given the prominence of Section 101 jurisprudence during the relevant time period.

The Supreme Court's *Alice* decision did not strike the bar unaware like a thief in the night.  Rather, in the fall of 2013, *Alice* and issues of Section 101 were issues of prominence to the patent bar.  When overlaid on the waiver timeline, it is clear that Appellees' waiver should not be excused.  By December 20, 2013, when Appellees waived their Section 101 defense, several important things had occurred:

- March 20, 2012 – The Supreme Court states the test for patentable subject matter in *Mayo*.  *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289 (2012).

- May 10, 2013 – This Court hands down its long awaited *en banc* decision in *Alice*.  *CLS Bank Intern. v. Alice Corp. Pty. Ltd.,* 717 F.3d 1269 (Fed. Cir. 2013) (*en banc*).

- September 4, 2013 – A petition for *certiorari* was filed seeking review of the *Alice* decision.

- December 6, 2013—The Supreme Court grants *certiorari* in *Alice Corp.  Alice Corp. Pty. Ltd. v. CLS Bank Intern.,* 134 S.Ct. 734 (2013).

These events were well covered by the patent bar, and were widely known at the time. *See* Jason Rantanen, *Surprise! The Law of Subject Matter Eligibility*

*Remains Unsettled*, PATENTLYO (September 5**,** 2013)[7]; Dennis Crouch, *CLS Bank v. Alice Corp: Court Finds Many Software Patents Ineligible*, PATENTLYO (May 10, 2013)[8]; *John* Kong, *The Alice in Wonderland En Banc Decision by the Federal Circuit in CLS Bank v. Alice Corp.*, IPWATCHDOG (May 14, 2013)[9]

Based on these facts, the District Court's excusal of Appellees' lack of diligence is an abuse of discretion.    Appellees plainly were not diligent in preserving the Section 101 defense.  To the contrary, they affirmatively waived it just two months after pleading it.   The historical context is such  that their waiver would make no sense, absent a conscious, tactical decision.  A diligent party would have set forth the theory of invalidity under Section 101 that Appellees presumably had when they plead the defense and simply noted that the outcome of *Alice* may necessitate amendment or revision of their theory.   Appellees intentionally chose not to do so.  The district court should have held them to this choice.

Indeed, the Appellees' conduct with respect to their Section 101 defense is analogous to that of the defendant in *Horus Vision, LLC v. Applied Ballistics, LLC*, No. 5:13CV05460BLF(HRL), 2014 WL 6895572, *2 (N.D. Cal 2014).  In *Horus,* the defendant asserted a Section 101 defense in their answer, but later dropped it

---

[7] http://patentlyo.com/patent/2013/09/surprise-the-law-of-subject-matter-eligibility-remains-unsettled.html

[8] http://patentlyo.com/patent/2013/05/cls-bank-v-alice-corp-court-finds-many-software-patents-ineligible.html

[9] http://www.ipwatchdog.com/2013/05/14/the-alice-in-wonderland-en-banc-decision-by-the-federal-circuit-in-cls-bank-v-alice-corp/id=40344/

from their amended answer. *Id.* In attempting to re-assert the Section 101 defense via amended invalidity contentions, defendants, just like Appellees here, only argued that *Alice* was a significant decision, but did not explain why it made a Section 101 defense newly available. *Id.* The district court held that this was insufficient to establish good cause and denied defendants' motion to amend. *Id.* Here, Appellees, just like the defendant in *Horus,* were clearly aware that a Section 101 defense was available to them before *certiorari* was granted in *Alice.* Appellees plead a Section 101 defense in their answer, and chose to waive it by not asserting it in their Initial Invalidity Contentions. That should end the inquiry.

Compounding the district court's abuse of discretion was its failure to consider the prejudice to Mortgage Grader by allowing a belated amendment of invalidity contentions to include a previously waived defense. A41-43. Mortgage Grader litigated this case for over eight months with the understanding that Appellees had affirmatively waived their Section 101 defense. Had Appellees not affirmatively waived the Section 101 defense, appellants would have had eight months to not only take discovery on the defense, but to address the underlying issues surrounding the defense during claim construction. The district court's failure to address this issue constitutes an abuse of discretion. *Engineered Products Co. v. Donaldson Co.*, 147 Fed.Appx. 979, 987-88 (Fed.Cir. 2005)

(Court's failure to properly consider prejudice in allowing Appellees to assert a new defense was an abuse of discretion.)

The district court abused its discretion when it permitted Appellees to reinstate their Section 101 defense. The district court's judgment should be reversed, Appellees should be held to have waived their Section 101 defense, and this case should be remanded for further proceedings.

### C. The District Court Should Be Reversed Because The District Court Improperly Resolved Material Factual Disputes When It Granted Summary Judgment

Summary judgment is not appropriate if there are disputed material facts. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ("More important for the present purposes, summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). While the overall conclusion in the Section 101 inquiry is one of law, this Court, as well as judges of this Court sitting by designation in the district court, have found that the Section 101 inquiry has factual underpinnings. *Accenture,* 728 F.3d at 1340-41. *See, also, Arrhythmia Research*, 958 F.2d at 1055-56 (1992); *Loyalty Conversion Systems*, 2014 WL 4364848, *4 (Bryson, J. sitting by designation).

As explained above, the core issue in Appellees' motion, and the central thesis of the district court's invalidity opinion, is that the claimed invention could

be performed mentally, or on a piece of paper, and thus the Asserted Claims were merely an abstract idea.  A12, *citing, Cybersource Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1373 (Fed. Cir. 2011).  Whether a process is a mental process, or could be performed using pen and paper is, and should be a question of fact.  To the extent that this analysis constitutes comparing a claim to an activity, it is no different from classic questions of fact like anticipation or infringement.

To the extent that Appellees' evidence is sufficient to present a *prima facie* case that the claimed invention could be performed mentally, that evidence was contradicted by Mortgage Grader's declaration evidence.  *Compare,* A1135-37, A1162-63 with A1469-71.  This is a fundamental factual dispute teed up by the parties' respective experts, and it is material because it is central to the issue being resolved.  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1361 (Fed. Cir. 2012) (stating that "a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'") (citing *Anderson*, 477 U.S. at 248.

The district court improperly credited the evidence submitted by Appellees and concluded that the claimed methods could be performed manually. A12-14. This it cannot do.  *See Anderson,* 477 U.S. at 255 (stating that "the drawing of legitimate inferences from facts are jury functions, not those of a judge"); *SRAM*

*Corp.*, 465 F.3d at 1358.  Because the district court improperly resolved disputed material facts, its grant of summary judgment should be reversed.

### D. The Asserted Claims Are Directed To Patentable Subject Matter

Section 101 of the Patent Act defines the subject matter that is eligible for patent protection and specifically provides that a "new and useful process, machine, manufacture, or composition of matter," may be the subject of a patent. *Alice*, 134 S.Ct. at 2354.  This broad grant of patentable subject matter, however, has three implicit exceptions: "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Id., citing, Association for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S.Ct. 2107, 2116 (2013).  The Supreme Court has interpreted Section 101 and its predecessors in light of these exceptions for more than 150 years.  *Id.*  While this exclusionary principle applies to inventions that otherwise fit within the broad statutory grant of Section 101, the Supreme Court has cautioned that this exclusionary principle must be treated carefully "lest it swallow all of patent law."  *Id.*  Importantly, in neither *Alice* nor *Bilski* did the Supreme Court eliminate the possibility of patent protections for computer software or business method patents *per se*.  *Bilski v. Kappos*, 561 U.S. 593, 606-607 (2010) (stating that "[s]ection 101 similarly precludes the broad contention that the term 'process' categorically excludes business methods.").

Here, there is no question that the Asserted Claims of the '694 patent are directed to a new or useful machine ('694 system claims 1 and 2) or a process that uses a computer ('694 claim 19). A14. Likewise, asserted claim 6 of the '728 patent also recites a method performed by a computer system, and thus is also within the nominal categories set forth in Section 101.[10]

The only question presented below was whether the Asserted Claims run afoul of the "abstract idea" exclusion for statutory subject matter. A5-14. For the reasons set forth herein, the Asserted Claims are not abstract, and to the extent they could be considered abstract, they contain the necessary something more to make them patent eligible. The district court erred when it so found to the contrary, and its grant of summary judgment should be reversed.

### 1.  The Current Standard For Section 101

In *Alice*, the Supreme Court reaffirmed a two-part test for patentable subject matter. 134 S.Ct. at 2355. In the first step, the Court must determine whether the claims are directed to one of the patent-ineligible concepts – in this case, an abstract idea. *Alice,* 134 S.Ct. at 2355; *Ultramercial*, 772 F.3d at 714. If the Court concludes that the claims are directed to an abstract concept, the court must ask "[w]hat else is there in the claims before us?" *Id.* In answering this question, the

---

[10] To the extent that the district court found that claim 6 of the '728 patent does not require the use of a computer, it erred as explained more fully below. *See, supra* at pp. 30-32.

court should consider the elements of each claim both individually and "as an ordered combination" in order to determine whether combination of elements "'transform the nature of the claim' into a patent eligible application." *Id*. While *Alice* makes clear that the mere addition of a "generic computer," whatever that means, is not sufficient to satisfy the "transformation" step, the Supreme Court otherwise provides little guidance as to what that something more is, or should be.

### 2.  The Asserted Claims are not Directed To An Abstract Concept

The Supreme Court, in *Alice,* did not provide a precise test for step one of the eligibility analysis – in defining the parameters of an impermissible "abstract idea."  Instead, it concluded that the claimed concept of "intermediated settlement" was "a fundamental economic practice long prevalent in our system of commerce" and that such practices were abstract.  134 S.Ct. at 2356.  The same was true in *Bilski,* where the concept of risk hedging was also a long known economic process, and thus deemed to be an abstract idea.  561 U.S. at 611.

In the ten months since *Alice* was decided, this Court has applied the *Alice* test to computer implemented inventions a number of times, and has latched onto notions of "long prevalent economic concepts" to find that claim sets were abstract.  *See, e.g., Ultramercial*, 772 F.3d 709 (claims to methods of offering copyrighted media for free in exchange for watching an advertisement were a long prevalent economic concept); *BuySafe, Inc. v. Google, Inc.*, 765 F.3d 1350 (2014)

(claims to a third party guarantee of a sales transaction were a long prevalent economic concept); and *Content Extraction and Transmission, LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343 (Fed. Cir. 2014) (data collection, recognition and storage were long known functions).

Likewise, this Court has held that claims that could be performed mentally by a person, or with a pencil and paper, are directed towards an "abstract concept." *Planet Bingo, LLC v. VKGS LLC*, 576 Fed.Appx. 1005, *2 (2014) (claims to methods of managing bingo games consisted "solely of mental steps which can be carried out by a human using pen and paper"); *CyberSource*, 654 F.3d at 1373 ("Such a method that can be performed by human thought alone is merely an abstract idea and is not patent eligible under § 101."). The district court found that the Asserted Claims fit into this latter category – and accordingly found the claims to be abstract. A11-12. In so doing, it erred.

The district court's analysis is flawed because it disregards the true nature of the claimed invention and, as explained above, it improperly credited the disputed evidence of record. To support their argument, Appellees argued that the Asserted Claims are abstract because "[a]ll of the claims can be performed in the human mind or by using pen and paper" and that this has been done for decades. A1030-31. This argument, which was accepted by the district court, draws on theories of patentable subject matter that existed before *Alice*. *Cybersource*, 654 F.3d at 1376-

77 (Pre-*Alice* decision finding non-patentable subject matter where the claimed invention could be performed mentally).[11]

The record evidence on this point is the excerpts from the reports of Appellees' employee experts, Messrs. Koenigsberg and Conyack.  This evidence, which explains that mortgage rate charts existed in newspapers prior to the claimed invention, does not establish that the Asserted Claims could be performed mentally.  Neither Mr. Koenigsberg nor Mr. Conyack explain how their assertions of fact tie into the claim, or even mention the claims at all.  A1135-37 at ¶¶15-19; A1160-61 at ¶¶37-38, 42.  Nor do they identify any "abstract idea" that is allegedly embodied by the claim.  *Id.*  Instead, they state simply that in the past, people could look at mortgage tables and make phone calls.  Nothing more.  But this is not the claimed invention.  Nor is it equivalent to any proper distillation of the essence of the claimed invention.  Nor, as explained above, is it undisputed.

In opposition to this evidence, the record also contains the declaration of Jeff Lebowitz.  Mr. Lebowitz's declaration explains the true nature of the claimed inventions – which requires the use of a computer not merely to automate an existing process – but rather to create a solution to problems that could not be

---

[11]  The Appellees' and district court's reliance on pre-*Alice* authority, such as *Cybersource* reinforces the conclusion that the district court abused its discretion when it found that the Supreme Court's opinion in *Alice* constituted "good cause" sufficient to permit Appellees to undo their waiver of the Section 101 defense. *See, infra* at pp. 15-21.

solved by any other means.     A1470-71 at ¶¶23-28.   In short, the point of the asserted claim is not to automate a human task, but to eliminate the human and his inherent bias from the process, removing the temptation of unscrupulous brokers or loan officers to steer borrowers into mortgage programs that were the best (i.e. provided the most compensation) for the broker not the consumer. *See, e.g.,* A114 at 1:50-63; A1470-71 at ¶¶23-28.  The claimed invention is not simply automating a "pen and paper" task of looking at the newspaper with a general purpose computer, and thus the claim does not recite a mere "abstract idea."   The problem solved by the claimed invention is not simply "automating" a manual process, and thus, is not something that could have simply been performed mentally.  A1471 at ¶28.

The district court erred when it credited Appellees' evidence and reached its conclusions that the claims were abstract.   The district court erred when it cavalierly dismissed the factual dispute by contending that the claims did not require perfect anti-discrimination.  This reads more than necessary into the claims, and is irrelevant.  The claimed invention is a technological invention that permits anti-discrimination to be achieved in a way that was impossible in the past. Perfection is not required.

Nor is the claimed invention is a fundamental economic process performed by humans for years.  To the contrary, it is a process designed to eliminate

problems caused by the presence of humans in the loan shopping process because humans, by their very nature, cannot perform them in a manner to best serve the consumer.  A1470-71 at ¶¶ 23-28.  This is not simply the automation of a known process – this is a new and technological improvement designed to protect consumers.  *Id.*  Because the claims do not preempt a "fundamental economic practice long prevalent in our system of commerce," they are not directed to an abstract idea.

### 3.  The Claimed Inventions Have That "Something Else"

The existence of "something else" is the nominal second question from the Supreme Court's *Alice* analysis – whether there is "something more" that converts an otherwise abstract idea into a concrete and patentable claims.  As explained above, the claimed invention is not directed to an abstract idea, and thus, there should be no need to proceed to this step, but to the extent that the Court considers it, the "something more" is present.

The core of the district court's abstractness conclusion was that the Asserted Claims were not "drawn to something that could not be done by a person."  A12.  This conclusion is likewise central to the district court's treatment of the second step. A12-14.  To the extent that the district court's conclusion is that the claims read on actions of a human, that conclusion is wrong for the reasons set forth above.

But the district court's analysis contains additional errors. For claim 6 of the '728 patent, the district court wrongly concludes that "[p]atent claim 6 doesn't even expressly require a computer." A12. This conclusion is inconsistent with the plain language of claim 6. While claim six does not use the word "computer" – the claim does include limitations that make it clear that the claimed method is performed on a computer system, which distinguishes it from the claims in cases such as where the patent owners conceded that a computer was unnecessary. *See Dealertrack v. Huber*, 674 F.3d 1315, 1333-1334 (Fed. Cir. 2012); *Fort Properties, Inc. v. American Master Lease LLC*, 671 F.3d 1317, 1323-1324 (Fed. Cir. 2012).

For example, claim 6, limitation (a) provides:

(a)     *Receiving, over a network,* personal information of a borrower, said personal information including financial information of the borrower, and including information regarding objectives of the borrower in seeking a loan, said personal information obtained, at least in part, *via an online form completed by the borrower*;

A135 at col. 12:32-37 (emphasis added). The use of on-line forms and networks necessarily implicates a computer, and the district court's conclusion to the contrary is simply incorrect.

Likewise, claim 6, limitation (c) also require the use of a computer because it provides for "programmatically generating a credit grading for the borrower using the selected underwriting criteria." A135 at col. 12:41-45. Programmatic

-30-

generation of the credit grading requires a computer, not just a human being with a pencil and paper.  Because claim 6 of the '728 patent does require a computer, the district court's conclusion to the contrary is erroneous.

The district court further erred when it concluded that claims 1, 2 and 19 of the '694 patent could be performed by humans, reaching specific factual conclusions not proven by Appellees.

In reaching its conclusion that the asserted '694 claims lacked that "something more" required by *Alice,* the district court concluded that the following specific claim limitations were directed to "things that could be done by a human:"

- "interface that allows the lenders to securely upload at least some of the loan package data [specifying loan type, rate and required borrower credit grading]" ('694 Patent 17:33-34)

- "second interface that prompts a borrower to enter personal loan evaluation information" with the "borrower grading module" ('694 Patent 17:37-39)

A13.  The only record citations are those of the claim language itself.  *Id.*  The district court cites no other evidence – indeed because there is no other evidence – to support these factual conclusions.  Neither the Conyack nor the Koenigsberg expert report excerpts provide any support for these specific factual conclusions made by the district court.  *See,* A1129-1154, A1155-1180.  Nor did Appellees

present any arguments on this point. A1025-34, A1524-28. Thus, the district court erred when it found facts that are unsupported by record evidence, and used those facts to invalidate the '694 claims. *Lindemann Maschinenfabrik GMBH v. Am. Hoist and Derrick Co.*, 730 F.2d 1452, 1458 (Fed. Cir. 1984) (stating that an appellate court has a duty to reverse a judgment that is unsupported by evidence in the record). The district court cannot cure Appellees' failure of proof by supplying facts to support its conclusion that the Asserted Claims were invalid. Because of this error, the district court's summary judgment of invalidity for the '694 patent should be reversed.

Finally, the district court erred when it required that the Asserted Claims lacked that "something else" because they did not "improve the functioning of the computer" or "solve a challenge particular to the internet." A13, *citing Alice,* 134 S.Ct. at 2359 (for improvement of computer) and *DDR Holdings v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014) (for improvement of the internet). While both of these examples are technical improvements that are sufficient to possess that "something else" they are not, and should not, be viewed as the only possible categories of patentable subject matter in the field of computers because the Supreme Court has not been so limiting. *See generally Alice*, 134 S.Ct. 2347.

In this case, determination of the "something more" requires a resolution of the factual disputes underpinning this matter – whether the claimed invention is

can be performed by humans without a computer. As explained above, this is a factual dispute for resolution by the jury. Once so resolved, the correct law can be applied to the factual findings and a conclusion reached. To do so now would be premature and procedurally improper.

To the extent that this Court concludes that there are no factual disputes, which it should not, and that the claims are directed to "abstract ideas," which they are not, the Asserted Claims nonetheless possess the "something more" necessary to pass the *Alice* test. The Asserted Claims provide a technological improvement in mortgage shopping. As explained in the Lebowitz declaration, the inventions solve real problems that existed with the human model – and that could not be resolved without technology. A1470-71 at ¶¶21-28.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The district court abused its discretion when it permitted Appellees to recant their waiver of their Section 101 defense in this action. It compounded the error when it improperly resolved disputed fact issues against Mortgage Grader and then erroneously concluded that the Asserted Claims did not satisfy Section 101. The district court's order permitting Appellees to raise the Section 101 defense, and its judgement of invalidity should be reversed. The case should be remanded to the district court for trial, and the district court should be directed that Appellees have waived their Section 101 defense and may not raise it in this action.

Dated:  May 8, 2015                    Respectfully submitted,

*/s/ Craig R. Kaufman*
Craig R. Kaufman
Michael Ting
TECHKNOWLEDGE LAW GROUP LLP
100 Marine Parkway, Suite 200
Redwood Shores, CA 94065
Tel. 650-517-5225

*Attorneys for Appellant*

ADDENDUM 1

LAW OFFICE OF KENNETH ALAN REED
KENNETH A. REED (SBN133567)
406 W 4th Street
Santa Ana, California 92701
Telephone 714-953-7400
Facsimile 714-953-7412
kenneth@kennethreedlaw.net

LEVY & GRANDINETTI
PAUL GRANDINETTI (*pro hac vice*)
REBECCA J. STEMPIEN COYLE (*pro hac vice*)
1120 Connecticut Avenue, N.W., Suite 304
Washington, District of Columbia 20036
Telephone 202-429-4560
Facsimile 202-429-4564
mail@levygrandinetti.com

Attorneys for Defendants,
FIRST CHOICE LOAN SERVICES, INC., and
NYLX, INC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| MORTGAGE GRADER, INC., | Case No. 8:13-cv-00043-AG (ANx) |
| Plaintiff, | **FINAL JUDGMENT** |
| vs. | |
| FIRST CHOICE LOAN SERVICES, INC., and NYLX, INC., | |
| Defendants. | |

In light of the Court's January 12, 2015, Order Granting In Part Defendants' Omnibus Motion For Summary Judgment, the Court **ORDERS** that judgment be entered as follows:

1.      Judgment is entered against the Plaintiff Mortgage Grader, Inc., and in favor of the Defendants First Choice Loan Services, Inc. and NYLX, Inc.

2.      The Clerk of Court shall close this case.

**IT IS SO ORDERED.**

Dated:   February 4, 2015

ANDREW J. GUILFORD
UNITED STATES DISTRICT JUDGE

ADDENDUM 2

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MORTGAGE GRADER, INC.,      )      CASE NO. SACV 13-00043 AG (ANx)
                            )
                Plaintiff,  )
                            )
v.                          )      ORDER GRANTING IN PART
                            )      DEFENDANTS' OMNIBUS MOTION
                            )      FOR SUMMARY JUDGMENT
                            )
COSTCO WHOLESALE            )
CORPORATION, FIRST CHOICE   )
LOAN SERVICES, INC., and NYLX, )
INC.                        )
                            )
                Defendants. )
_____ )

# **INTRODUCTION**

Plaintiff Mortgage Grader, Inc. ("Plaintiff") alleges that Defendants Costco Wholesale Corporation ("Costco"), First Choice Loan Services, Inc. ("First Choice"), and NYLX, Inc. ("NYLX") (collectively, "Defendants") have infringed U.S. Patent Nos. 7,680,728 ("'728 Patent") and 7,366,694 ("'694 Patent"), both titled "Credit/Financing Process" (collectively, the "Asserted Patents" or "patents-in-suit"). (Second Am. Compl., Dkt. No. 33.) The Asserted Patents cover computer implemented systems and methods for online mortgage shopping.

On November 3, 2014, Defendants filed an omnibus motion for summary judgment of (1) invalidity of all asserted claims under 35 U.S.C. § 101, (2) noninfringement of the '728 Patent, (3) noninfringment of the '694 Patent, (4) no induced infringement by Costco, and (5) no infringement of method claims due to divided infringement ("Motion"). (Dkt. No. 99.) On November 17, 2014, Plaintiff filed an opposition ("Opposition"). (Dkt. No. 124.) On November 24, 2014, Defendants filed a reply ("Reply"). (Dkt. No. 131.)

The Motion is GRANTED IN PART and DENIED IN PART. Most significantly, the patents-in-suit fail 35 U.S.C. § 101.

# **LEGAL STANDARD**

Summary judgment is appropriate where the record, read in the light most favorable to the non-moving party, shows that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156 (1970)).

The burden initially is on the moving party to show the absence of a genuine issue of material fact or that the non-moving party will be unable to make a sufficient showing on an essential element of its case for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. Only if the moving party meets its burden must the non-moving party produce evidence to rebut the moving party's claim. *Id.* If the non-moving party establishes the presence of a genuine issue of material fact, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

## ANALYSIS

## 1.   35 U.S.C. § 101 – PATENTABLE SUBJECT MATTER

### 1.1   Legal Standard

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "[T]his provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). The Supreme Court has "described the concern that drives this exclusionary principle as one of pre-emption." *Id.* That is, "[l]aws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work," and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws. . . . *see* U.S. Const., Art. I, § 8, cl. 8 (Congress 'shall have Power . . . To promote the Progress of Science and useful Arts')." *Id.* (some internal citations, quotations, and modifications omitted).

1    "Accordingly, in applying the § 101 exception, we must distinguish between patents that

2    claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into

3    something more, thereby 'transform[ing]' them into a patent-eligible invention." *Id.* (citations

4    omitted). The Supreme Court has established a two-part test to make that distinction. "First, we

5    determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so,

6    we then ask, '[w]hat else is there in the claims before us?'" *Id.* at 2355 (quoting *Mayo Collaborative*

7    *Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012)). "To answer that question, we

8    consider the elements of each claim both individually and 'as an ordered combination' to determine

9    whether the additional elements 'transform the nature of the claim' into a patent-eligible

10   application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297-98). "We have described step two of this analysis

11   as a search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient

12   to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible

13   concept] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294).

14   As the Court previously noted in *Ameranth, Inc. v. Genesis Gaming Solutions, Inc.*, No. SACV

15   11-00189 AG, 2014 WL 7012391, at *3 (C.D. Cal. Nov. 12, 2014), other judges of this Court have

16   recognized that the two steps of the *Alice/Mayo* test "are easier to separate in recitation than in

17   application." *Wolf v. Capstone Photography, Inc.*, No. CV 13-09573 CAS, Dkt. No. 49 at 17, 2014 U.S.

18   Dist. LEXIS 15627, at *29 (C.D. Cal. Oct. 28, 2014) (quoting *Eclipse IP LLC v. McKinley Equip. Corp.*,

19   No. SACV 14-00742 GW, 2014 WL 4407592, at *2-3 (C.D. Cal. Sept. 4, 2014) ("Describing this as a

20   two-step test may overstate the number of steps involved.")). But it is clear that "the mere

21   recitation of a generic computer cannot transform a patent-ineligible abstract idea into a

22   patent-eligible invention." *Alice*, 134 S. Ct. at 2358.

23   Recitation of generic computer implementation does not transform an abstract idea into

24   patentable subject matter because it is insufficient for patent eligibility purposes to either state an

25   abstract idea "while adding the words 'apply it'" or to limit the use of an abstract idea "to a

26   particular technological environment." *Id.* (quoting *Mayo*, 132 S. Ct. at 1294, *Bilski v. Kappos*, 561

27   U.S. 593, 610-611 (2010)). "Stating an abstract idea while adding the words 'apply it with a

28   computer' simply combines those two steps, with the same deficient result. Thus, if a patent's

4

1    recitation of a computer amounts to a mere instruction to 'implemen[t]' an abstract idea 'on . . . a

2    computer,' that addition cannot impart patent eligibility." *Id.* (citations omitted).  Similarly, "the use

3    of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101."

4    *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (citing *CyberSource Corp. v. Retail*

5    *Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011) ("the use of the Internet to verify a credit card

6    transaction does not meaningfully add to the idea of verifying the transaction.")).

7

8    ### 1.2    Application

9

10    Defendants argue that "[a]s in the *Alice Corp.* decision and its progeny, there is nothing novel

11    or otherwise patentable about the Asserted Claims."  (Mot. 5.)  This statement, focusing on novelty,

12    is perhaps an odd opening for a patentable subject matter attack.  It likely results from the Supreme

13    Court's emphasis in *Alice* and *Bilski* that the abstract idea at issue in each of those cases was "a

14    fundamental economic practice long prevalent in our system of commerce."  *Alice*, 134 S. Ct. at

15    2356; *Bilski*, 561 U.S. at 611.  When the Court emphasizes how long something has been around,

16    readers' minds naturally drift to the requirements of novelty and non-obviousness found in 35

17    U.S.C. §§ 102 and 103.

18    In fact, given (1) that the idea in *Alice* was old, and (2) "the ubiquity of computers," *Alice*, 134

19    S. Ct. at 2358, it seems that *Alice* could have been decided the same way under § 103.  But where the

20    abstract idea at the heart of the claim is new, the Supreme Court's exceptions to § 101's otherwise

21    sweeping coverage—"anything under the sun that is made by man," *Diamond v. Chakrabarty*, 447

22    U.S. 303, 309 (1980)—are much more important constraints.  In the case of a new abstract idea (or

23    newly discovered law of nature or physical phenomenon) the exceptions to § 101 aren't just

24    hammering a nail with a shoe.  They are tools uniquely capable of preventing or invalidating a patent

25    that otherwise passes §§ 102 and 103.

26    But the Supreme Court has not reserved § 101 for when §§ 102 and 103 fail.  Thus,

27    Defendants are justified in calling for a § 101 determination in this case.  And here, the § 101 shoe

28    fits.  The asserted claims are as follows:

*'728 Patent*

6. A method of assisting a borrower in obtaining a loan, the method comprising:

(a) receiving, over a network, personal information of a borrower, said personal information including financial information of the borrower, and including information regarding objectives of the borrower in seeking a loan, said personal information obtained, at least in part, via an online form completed by the borrower;

(b) selecting, based on said information regarding objectives of the borrower, underwriting criteria to be used to generate a credit grading for the borrower;

(c) programmatically generating the credit grading for the borrower using the selected underwriting criteria, wherein the selected underwriting criteria includes objective criteria used by one or more lenders capable of providing the loan;

(d) outputting information regarding the credit grading, and information regarding a plurality of lenders capable of providing the loan, to the borrower; and

(e) subsequently to steps (a)-(d), in response to receiving authorization from the borrower, sending the credit grading and at least some of the personal information of the borrower to a particular one of said lenders selected by the borrower;

wherein steps (a)-(e) are performed by a third party evaluator that does not provide the loan, and is performed such that none of the received personal information of the borrower is released to any of the lenders without specific authorization from the borrower, whereby the method enables the borrower to assess its borrowing ability and to select a lender for providing the loan without exposing any personal information to any of the lenders, wherein the method comprises the third party evaluator selecting and applying the underwriting criteria of a particular lender, as obtained confidentially from said particular lender.

***'694 Patent***

1. A computer-implemented system for enabling borrowers to anonymously shop for

    loan packages offered by a plurality of lenders, the system comprising:

a database that stores loan package data specifying loan packages for home loans

    offered by the lenders, the loan package data specifying, for each of the loan

    packages, at least a loan type, an interest rate, and a required borrower credit

    grading; and

a computer system that provides:

    a first interface that allows the lenders to securely upload at least some of the

        loan package data for their respective loan packages to the database

        over a computer network; and

    a second interface that prompts a borrower to enter personal loan evaluation

        information, and invokes, on a computer, a borrower grading module

        which uses at least the entered personal loan evaluation information to

        calculate a credit grading for the borrower, said credit grading being

        distinct from a credit score of the borrower, and being based on

        underwriting criteria used by at least some of said lenders;

wherein the second interface provides functionality for the borrower to search the

    database to identify a set of loan packages for which the borrower qualifies

    based on the credit grading, and to compare the loan packages within the set,

    including loan type and interest rate, while remaining anonymous to each of

    the lenders and without having to post a request to any of the lenders, said

    second interface configured to display to the borrower an indication of a total

    cost of each loan package in the set, said total cost including costs of closing

    services not provided by corresponding lenders;

and wherein the computer-implemented system further enables the borrower to

    selectively expose at least the personal loan evaluation information to a lender

    corresponding to a selected loan package.

7

2. The system of claim 1, wherein the second interface comprises a set of web pages of a web site.

19. A computer-implemented method, comprising:

receiving, over a computer network, personal data entered by a borrower, said
      personal data comprising loan evaluation data;

automatically generating or causing the generation of a credit grading for the
      borrower such that the credit grading is dependent upon the loan evaluation
      data entered by the borrower, said credit grading being distinct from a credit
      score obtained from a credit bureau, and being generated at least partly using
      underwriting criteria of one or more lenders;

identifying a set of loan packages for which the borrower qualifies based on said
      credit grading, each loan package including home loan information provided
      by a lender, and including guaranteed closing cost information for closing
      services not provided by the lender, wherein the set of loan packages is
      identified without requiring the borrower to post a request to any lender;

outputting information regarding the set of loan packages, including the guaranteed
      closing cost information for closing services not provided by the lender, to the
      borrower via a user interface that enables the borrower to at least compare
      total costs of the loan packages for which the borrower qualifies, said user
      interface additionally providing functionality for the user to select and apply
      for one of said loan packages; and

in response to a request from the borrower in association with a selected loan
      package, communicating information of the borrower to a corresponding
      lender.

Defendants contend that "[t]he Asserted Claims are all directed to the fundamental abstract idea of a method . . . for users to assess their borrowing ability for a loan without revealing their identities to the lenders until they are ready." (Mot. 5.)  Defendants assert that these claims fail § 101 because they "have been done before in the human mind or through use of a pen and paper when a borrower uses the mortgage rate charts found in newspapers" and are "directed to 'organizing human activity.'" (Mot. 8 (citing Coyle Decl., Dkt. No. 99-10 at ¶¶ 15-19; Koenigsberg Rep., Dkt. No. 104 at ¶¶ 37-38, 42).)  Defendants also argue that "even if the 'credit grading' is the purported 'novel' aspect" to which the claims are directed, "the claims still remain abstract ideas," because the method is "not tied to a specific structure or machine." (*Id.*)  Defendants argue that "[t]here is no 'innovative concept' in any of the Asserted Claims that 'transforms' the abstract ideas of the claims into patent-eligible claims," because the use of the computer in the claims is "purely conventional." (*Id.*)

Plaintiff responds that the claimed process can't be done mentally and that, to the contrary, "the point of this invention is to take the human out of the loop, removing the temptation of unscrupulous brokers to steer borrowers into mortgage programs that were the best (i.e. provided the most compensation) for the broker not the consumer." (Opp'n 8; Lebowitz Decl., Dkt. No. 117 at ¶ 28.)

### 1.2.1  **Mayo** *Step 1*

For step 1 of the *Mayo* analysis, the Court agrees with Defendants that the claims are directed to the idea of allowing users to assess their borrowing ability without revealing their identities to the lenders until they wish to do so.  For step 2 of the *Mayo* analysis, the Court agrees that the claims lack an "inventive" concept sufficient to transform that abstract idea into a patentable invention.  Plaintiff's arguments to the contrary don't account for the actual content of the claims.

As to *Mayo* step 1—the nature of the abstract idea—the claims are directed to anonymous loan shopping, and not necessarily the problem created by a mortgage originator

1  who might have a conflict of interest. '728 Patent claim 6 contains no conflict-free

2  requirement, and nothing in the architecture of the claim prevents a conflict. Instead, what it

3  requires is that the broker not reveal the potential borrower's information to the lender until

4  specifically authorized by the borrower. Similarly, what the '694 Patent's claims require is not

5  an unconflicted loan broker, but instead, a system where the borrower is anonymous to the

6  lender until the borrower has been informed of the cost of the loan based on the borrower's

7  credit grading, and the borrower then chooses to expose its identity to a lender.

8      Even in a computerized human-free method, the computer could be programmed to

9  interact only with lenders that have paid to be in the system, even where better terms are

10 available to the borrower elsewhere, or to suggest terms that advantage the broker over the

11 borrower. And even had claim 6 specified scruples, that would not show that it mandated a

12 human-free method. It would just be a method infringed by the honest loan broker and not

13 the avaricious one. In short, none of Plaintiff's arguments show that claim 6 is drawn to

14 something that could not be done by a person. *See CyberSource Corp. v. Retail Decisions, Inc.*,

15 654 F.3d 1366, 1373 (Fed. Cir. 2011) ("Such a method that can be performed by human

16 thought alone is merely an abstract idea and is not patent-eligible under § 101.").

17

18      *1.2.2   Mayo Step 2*

19

20      As to *Mayo* step 2—"[w]hat else is there in the claims before us?," 132 S. Ct. at

21 1297—the claims contain no "'inventive concept'—i.e., an element or combination of

22 elements that is sufficient to ensure that the patent in practice amounts to significantly more

23 than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*,

24 132 S. Ct. at 1294). First, while Plaintiff argues that the claims cover a special system that

25 enables the human to be taken out of the loop, '728 Patent claim 6 doesn't even expressly

26 require a computer. Instead, it describes a process "wherein steps (a)-(e) are performed by a

27 third party evaluator that does not provide the loan." ('728 Patent 12:54-55.) Thus, nothing

28 in the claim requires that the human "be taken out of the loop."

1    True, claim 6 requires borrower information to be received "over a network," but that

2    could be any kind of a network, including a telephone network. Even assuming that it refers

3    to a computer network, that doesn't show the absence of a human. For example, this Order

4    is distributed to its human readers over a network. Nor does the limitation that personal

5    information be obtained "at least in part, via an online form" require the absence of a

6    human. Further, "[t]hat a computer receives and sends the information over a

7    network—with no further specification—is not even arguably inventive." *buySAFE, Inc. v.*

8    *Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014); *see also Ultramercial*, 772 F.3d at 716 ("the

9    use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under

10   § 101.").

11   Unlike the '728 Patent's claims, the '694 Patent's claims do expressly require the use

12   of a computer. But like the '728 Patent's claims, the '694 Patent's claims also cover things

13   that could be done by a human. The "interface that allows the lenders to securely upload at

14   least some of the loan package data [specifying the loan type, rate, and required borrower

15   credit grading]" ('694 Patent 17:33-34) could be hand delivery of that information on a sheet

16   of paper. The "second interface that prompts a borrower to enter personal loan evaluation

17   information" with the "borrower grading module" ('694 Patent 17:37-39) could be the

18   human broker taking the information by hand and calculating the credit grading by hand or

19   by looking at a table. The borrower and broker could discuss the cost of the available loans

20   and the borrower could decide to selectively expose its information to a lender of interest.

21   Nothing in the '694 Patent's claims "purport[s] to improve the functioning of the

22   computer itself." *Alice*, 134 S. Ct. at 2359. They do not "effect an improvement in any other

23   technology or technical field." *Id.* Nothing in the '694 Patent's claims covers an "inventive

24   concept" "sufficient to provide any 'practical assurance that the process is more than a

25   drafting effort designed to monopolize the [abstract idea] itself.'" *Ultramercial*, 772 F.3d at

26   716, (quoting *Mayo*, 132 S. Ct. at 1297). Nor do the claims solve a challenge particular to the

27   internet, which the Federal Circuit held sufficient in *DDR Holdings, LLC v. Hotels.com L.P.*,

28   No. 2013-1505, 2014 WL 6845152, *10 (Fed. Cir. Dec. 5, 2014) ("these claims stand apart

because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."). Nor are the claims adequately tied to "particular machines." *See DealerTrack, Inc. v. Huber*, 657 F. Supp. 2d 1152, 1156 (C.D. Cal. 2009), *aff'd*, 674 F.3d 1315 (Fed. Cir. 2012).

Therefore, the Court GRANTS summary judgment that '728 Patent claim 6 and '694 Patent claims 1, 2, and 19 are invalid for failure to satisfy 35 U.S.C. § 101. Given this holding, the Court need not address the other issues presented by the Motion, but does so in the interest of completeness in Sections 2-5.

## 2. NON-INFRINGEMENT OF THE '728 PATENT

### 2.1 Legal Standard

Determining patent infringement is a two step process. *Cybor Corp. v. FAS Techs, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). "First, the court determines the scope and meaning of the patent claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Id.* (citations omitted). Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999)).

If the moving party meets this initial burden, the burden shifts to the party asserting infringement to set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted).

1  "[A] party does not meet this evidentiary threshold merely by submitting the affidavit of an

2  expert who opines that the accused device meets the claim limitations." *Novartis*, 271 F.3d at

3  1051.

4      "Whether an accused device or method infringes a claim either literally or under the

5  doctrine of equivalents is a question of fact." *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202,

6  1207 (Fed. Cir. 2001) (citing *Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n*, 109 F.3d 726, 731

7  (Fed. Cir. 1997)). "A patentee claiming infringement must present proof that the accused

8  product meets each and every claim limitation." *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d

9  1305, 1310 (Fed. Cir. 2001); *see Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1370 (Fed.

10  Cir. 2000) (affirming district court's grant of summary judgment of no literal infringement in

11  the absence of even one claim limitation).

12

13      **2.2    Application**

14

15          ***2.2.1   "Credit Grading" and "Personal Information"***

16

17              *2.2.1.1 Literal Infringement*

18

19      Defendants contend that Plaintiff "cannot show that [ ] the required and distinct

20  elements of 'personal information' and 'the credit grading' exist in the accused website."

21  (Mot. 11.) Defendants argue that "personal information" and "credit grading" are two

22  separate and distinct terms that appear in steps (a) and (e) of claim 6 that must be infringed

23  by different elements of the accused system. (Mot. 13 (citing '728 Patent 1:56-58; 12:49-52;

24  *see also* Reply 7-9.) Plaintiff responds that overlap between "personal information" and

25  "credit grading" does not mean that both limitations cannot be met. (Opp'n 13.)

26      Plaintiff's expert, Lebowitz, identifies the infringing "credit grading" as resulting from

27  "the combination of LTV [loan to value ratio], loan amount, and credit score." (Lebowitz

28  Rep., Dkt. No. 107 at ¶ 118; *see also* Walker Rep., Dkt. No. 108 at ¶ 31 ("the select statement

beginning at line 166 combines the parameters discussed above (FICO, LoanAmount, LTV) [ ] which is used to identify lender information that affects availability and pricing of the loans."); ¶ 60 ("the NYLX system[, or Costco platform,] combines LTV, PropertyValue, cr.MinValue (i.e. FICO), DownPayment, among others, as parameters for pricing calculations.  Such combinati[o]n is performed automatically when the user selects 'See Results.'").)  Lebowitz identifies the infringing "personal information" as including, but not limited to, "name, **credit score**, **home value**, down payment, **loan amount**, and phone number" and "information regarding objectives of the borrower in seeking a loan."  (*Id.* at ¶ 113 (emphasis added to elements that overlap with credit grading inputs).)

Therefore, Plaintiff has identified a set of personal information and a credit grading that is generated from a subset of the personal information.  Nothing in the '728 Patent or its claims requires the absence of overlap between the credit grading and the personal information.  Defendants have thus not shown that they are entitled to summary judgment of no literal infringement of the '728 Patent.

### 2.2.1.2 *Infringement Under the Doctrine of Equivalents*

Plaintiff argues that if the information transmitted to the lender in '728 Patent, claim 6, step (e) is not a credit grading, then it is equivalent to a credit grading.  (Opp'n 17 (citing Lebowitz Rep., Dkt. No. 107 at ¶¶ 115, 118).)  Plaintiff then clarifies that its equivalence theory applies only to the small part of step (e) concerning "sending the credit grading" to a lender.  (Opp'n 16.)  Defendants argue that this doctrine of equivalents argument fails because (1) it would vitiate the claim language and (2) it fails the function-way-result test. (Mot. 16.)

Whether a doctrine of equivalents theory would vitiate a claim element is "a legal determination that 'the evidence is such that no reasonable jury could determine two elements to be equivalent.'" *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir.

2012). According to Defendants, Plaintiff's doctrine of equivalents argument would vitiate the claim limitation for three reasons: (1) claim 6 requires the credit grading be generated programmatically based on objective underwriting criteria, a requirement that the equivalents theory does not account for; (2) claim 6, step (d) requires outputting information regarding credit grading to the borrower, but the doctrine of equivalents theory has the grading generated later, by the lender, in step (e), and (3) credit grading must be distinct from personal information, but the equivalents theory conflates them. (Mot. 16-17.)

None of these arguments establish Defendants' entitlement to summary judgment. First, Defendants have not explained why the doctrine of equivalents theory vitiates the limitation of programmatically generating a credit grading using objective underwriting criteria. Second, the step (d) argument is puzzling: the credit grading is generated in step (c). Information regarding the grading is outputted to the borrower in step (d), and if the borrower wants, to the lender in step (e). It is unclear how it would be the case, as Defendants argue, that if something equivalent to the credit grading, rather than the credit grading itself, were sent to the lender in step (e), that it would be impossible for information regarding something equivalent to the credit grading to be outputted to the borrower in step (d). Third, for the reasons discussed in Section 2.2.1.1, overlap between the personal information and the information used to generate the credit grading does not show non-infringement.

Therefore, Defendants have not shown that Plaintiff's theory vitiates the claim limitations in question. The Court now moves to Defendants' second argument: that Plaintiff's equivalents theory fails the "function-way-result" test.

"That a claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result in a substantially different way." *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 n.6 (Fed. Cir. 1987). Defendants argue that Lebowitz incorrectly identifies the function

1    of the credit grading as "allow[ing] the lender to evaluate the credit worthiness of a given

2    borrower," but that the '728 Patent's specification makes clear that the purpose of the credit

3    grading was to provide the borrower with an evaluation of his borrowing ability.  (Mot. 18

4    (quoting Lebowitz Rep., Dkt. No. 107 at ¶ 118).)

5        Defendants read too much into Lebowitz's equivalents theory.  Lebowitz's report

6    states that (1) a credit grading is the combination of loan-to-value, loan amount, and credit

7    score, and (2) the potentially equivalent information sent to the lender is the credit range,

8    loan amount, and home value, which serves substantially the same function as using a credit

9    grading.  (Lebowitz Rep., Dkt. No. 107 at ¶ 118.)  This is because "[t]he Credit Range

10   provides the lender with an approximation of the borrower's FICO score . . ." and "LTV can

11   be calculated using the Loan Amount and Home Value  . . ." leading to "the same result as

12   the use of a credit grading."  (Lebowitz Rep., Dkt. No. 107 at ¶ 118.)  Whether that

13   potentially equivalent information is used on the lender end or the buyer end of the system,

14   Plaintiff has explained why it is equivalent to a credit grading.

15       Therefore, Defendants have not shown that Plaintiff's theory fails the function-way-

16   result test.

17

18       **2.2.2   "'Underwriting Criteria"**

19

20       Defendants argue that Plaintiff has no evidence that the accused method meets the

21   requirement of '728 Patent step (b) of "selecting, based on said information regarding

22   objectives of the borrower, underwriting criteria to be used to generate a credit grading for

23   the borrower."  (Mot. 19 (emphasis omitted).)  Defendants argue that Plaintiff's expert,

24   Walker, merely refers to a broad eight page section of the specification regarding

25   "parameters," which are all borrower information, not lender underwriting criteria.  (Mot.

26   20.)  While Walker does acknowledge that lenders can upload lender information retrieved

27   during the loan pricing analysis, Defendants argue that Walker: (1) never ties this to the credit

28

grading step; (2) never explains when, where, or how the lender information is later retrieved, and (3) does not tie this to step (b) of claim 6. (Mot. 21 (citing Walker Report, Dkt. No. 108 at ¶ 33).) In a responsive declaration submitted with Plaintiff's opposition, Walker points out where his report shows that step (b) is satisfied by the accused software. (Walker Decl. in Supp. of Opp'n, Dkt. No. 126 at ¶¶ 6-12.) Walker's report discusses in detail the platform's use of information entered by the borrower to calculate loan offers. (Walker Rep., Dkt. No. 108 at ¶¶ 9-17, 23; *see also* '728 Patent 1:56-58; 12:38-45, 62-64.)

As shown by Defendants' Reply, this issue turns on the interpretation of source code quoted in Walker's Report, and the use of an "AND" connector to join certain database fields, including "TransactionTypeID," "MaxLTV," and "MinCredit." (Reply 13.) The Court is not in a position to say that Walker's reasoned and factually-specific interpretation is incorrect as a matter of law. Therefore, there is a genuine issue of material fact as to whether the borrower-submitted information is underwriting criteria.

### 2.3    Conclusion

The Court DENIES the Motion as to non-infringement of the '728 Patent.

## 3.    NON-INFRINGEMENT OF THE '694 PATENT

Defendants argue that Plaintiff fails to establish that the Defendants' website contains certain elements of claims 1, 2, and 19: "that (1) lenders are provided with the ability to 'securely upload' data, (2) anonymity exists at any time for the borrower from all of the lenders, or (3) underwriting criteria used by one or more lenders are used to generate or calculate [a] credit grading." (Mot. 22.) Here, the underwriting criteria fails for the same reason as for the '728 Patent, so the Court does not address it further in this Section.

### 3.1 "Securely Upload"

Defendants focus on the limitation present in claim 1 requiring the capability for lenders to "securely upload at least some of the loan package data." Defendants argue that their system provides no capability to "upload" anything (as opposed to manually entering data), nor is their system actually "secure," because the information can be readily viewed and edited by Defendant First Choice. (Mot. 24 (citing Pollack Rep., Dkt. No. 109 at ¶ 48, 152, 154; Koenigsberg Rep., Dkt. No. 104 at ¶ 128).) The Court addresses the "securely" and "upload" aspects of this limitation in turn.

#### 3.1.1 "Securely"

As to Defendants' argument that the upload is insecure because First Choice has access to the data, first, it is undisputed that users enter a username and password to access the website. (Lebowitz Rep., Dkt. No. 107 at ¶¶ 78-80 ("a lender must provide a user name and log in before access can be granted" . . . "the use of unique logins and passwords is a commonly accepted way of ensuring security in web based systems"); Walker Rep., Dkt. No. 108 at ¶¶ 47-48 ("When lenders log into the accused system, they must provide credentials such as a user name and password. A POSITA . . . would understand that the requirement of providing credentials in order to access a site (and upload underwriting criteria) would mean that the uploading process is secure and confidential.").

Second, Defendants fail to establish that First Choice's access means an absence of security. Defendants do not show that, even under their definition, the upload itself is insecure, as opposed to the security of the data after the upload. Thus, Defendants only argue that First Choice can alter the data **after** it has been uploaded. (Mot. 24.) Also, the process of limiting the availability of information to certain users, as Defendants do, is itself

1    an indication of security.  (Koenigsberg Rep., Dkt. No. 104 at ¶ 129 ("managers can see

2    more information than other users").)

3         Third, First Choice's access to the data does not show insecurity.  It is usually the case

4    that the entity with authority for a secure location has access to it.  The Courthouse is not

5    insecure because the U.S. Marshals who secure it have keys to all of the doors.  Defendants

6    present the testimony of a First Choice employee who states that First Choice uses its access

7    to the other lenders' data to maintain quality control.  (Koenigsberg Rep., Dkt. No. 104 at ¶

8    128.)  There is nothing "insecure" about data that is so used, and the Court does not

9    understand First Choice to be arguing that it uses its access for improper purposes.

10        As to the question of whether an "upload" occurs at all, the parties agree that lenders

11   input information on a screen and that the information is transferred to First Choice, but

12   disagree about whether that constitutes an "upload."  Where the parties "present a

13   fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."

14   *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

15        The claim requires "a first interface that allows the lenders to securely upload at least

16   some of the . . . loan packages to the database over a computer network."  ('694 Patent claim

17   1.)  The specification only uses the term "upload" twice, once in the label for the "loan

18   package upload module" in Figure 4, and once in the following sentence: "After applicable

19   loan programs have been determined by the user, the loan program data can be uploaded to

20   the borrower computer and be displayed via the borrower Web site 404."  ('694 Patent

21   15:10-13.)  Neither of these uses is particularly instructive.

22        Defendants rely on eight dictionary definitions.  (Dkt. No. 99-20.)  They are:

23

24        1. Dictionary.com: "to transfer (software, data, character sets, etc.)

25        from a smaller to a larger computer."

26

27

28

2. Merriam-Webster: "*computers*: to move or copy (a file, program, etc.) from a computer or device to a usually larger computer or computer network."

3. PC.net: "While downloading is receiving a file from another computer, uploading is the exact opposite. It is sending a file from your computer to another system. Pretty straight forward. It is possible to upload and download at the same time, but it may cause slower transfer speeds, especially if you have a low bandwidth connection. Because most files are located on Internet servers, people generally do a lot more downloading than uploading."

4. TechTerms.com: [duplicate of PC.net].

5. Webopedia: "To transmit data from a computer to a bulletin board service, mainframe, or network. For example, if you use a personal computer to log on to a network and you want to send files across the network, you must upload the files from your PC to the network."

6. Macmillan Dictionary: "to send documents or programs from your computer to a larger system using the Internet."

7. Oxford Dictionary of British and World English: "Transfer (data) from one computer to another, typically to one that is larger or remote from the user or functioning as a server: 'you can upload your prepared text' 'software is uploaded and downloaded.'"

8. About.com: "An upload involves sending a copy of a file to a remote network location. For example, Web publishers upload files to their Web server."

Defendants do not attempt to show that these dictionary definitions are from the time of the invention, such that they would be evidence of the meaning "that the term would

have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). But even keeping that defect in Defendants' evidence in mind, many of the definitions Defendants cite do not require an entire "file" to be sent, and instead recognize that transferring "data" constitutes an upload. So even based only on Defendants' proffered definitions, "upload" is not limited to transfer of files, but includes transfer of data.

While not disagreeing with Defendants' definitions, Plaintiff also submits a definition from The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000), which is superior to Defendants' proffered definitions because (1) it is a technical dictionary, *see Phillips*, 415 F.3d at 1318, and (2) it is from the time of the invention. *See id.* at 1313. The IEEE Dictionary provides the following definition: "(A) To transfer some collection of data from some storage location to a computer memory. (B) To transfer some collection of data from the memory of a small computer to the memory of a relatively large computer; for example, to transfer data from a microcomputer to a mainframe computer." (Opp'n 22; Walker Decl., Dkt. No. 126 at ¶ 13, Ex. 2.) This further supports Plaintiff's position that Defendants' system involves uploading.

Defendants have therefore not shown that they do not practice the "securely uploading" requirement of the claims.

### 3.2    Anonymity

Defendants argue that they do not meet the "anonymous" requirement because the borrower's information is provided to First Choice and Costco during the shopping process, so the borrower is not anonymous before selecting a lender. (Mot. 24.) Defendants argue that First Choice has "immediate access" to the complete borrower-entered information regardless of whether First Choice is selected as a lender. (Mot. 25-26 (citing Dkt. No. 106 at

1-2, 60-61, 64-65; Lebowitz Rep., Dkt. No. 107 at ¶¶ 72, 86; *see also* Pollack Rep., Dkt. No. 109 at ¶ 61).)

Disputed issues of material fact preclude entry of summary judgment on this limitation. The accused platform itself informs users that "[t]he information entered by Costco members will only be shared with the lenders you request a quote from." (Lebowitz Rep., Dkt. No. 107 at ¶ 119.) The testimony on this issue is potentially in conflict. *Compare* Lebowitz Rep. Dkt. 107 at ¶¶ 72, 86 ("First Choice has access to borrower information. That information is not disclosed to First Choice or any other lender during the borrower's evaluation and comparison of different loan packages.") *with* Alexander Tr., Dkt. No. 127 at 44:8-16 (First Choice has access to borrower information before selecting a lender.).

While First Choice may have access to the data, Defendants have not established that First Choice always uses that data in violation of the promise it makes to its customers. And even if it occasionally violates that promise (Defendants emphasized testimony from its employee, Alexander, who stated that First Choice "usually" looks at the data in aggregate format, which would maintain anonymity, Reply 16; Alexander Tr., Dkt. No. 127 at 44:21-45:20), that would not show that Defendants never infringe.

Defendants have therefore not shown that they do not practice the anonymity requirement of the claims.

### 3.3    Conclusion

The Court DENIES the Motion as to non-infringement of the '694 Patent.

## 4.    INDUCED INFRINGEMENT BY COSTCO

### 4.1    Legal Standard

1      A person who "actively induces" another to infringe a patent is liable as an infringer

2 under 35 U.S.C. § 271(b). "To establish liability under section 271(b), a patent holder must

3 prove that once the defendants knew of the patent, they 'actively and knowingly aid[ed] and

4 abett[ed] another's direct infringement.'" *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293,

5 1305 (Fed. Cir. 2006) (emphasis and citation omitted). "It must be established that the

6 defendant possessed specific intent to encourage another's infringement and not merely that

7 the defendant had knowledge of the acts alleged to constitute inducement." *Manville Sales*

8 *Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990).

9      "[S]pecific intent may be inferred from circumstantial evidence where a defendant has

10 both knowledge of the patent and specific intent to cause the acts constituting infringement."

11 *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1342 (Fed. Cir. 2008). It can be shown

12 by the defendant's receipt of a charge of infringement by the plaintiff. *Aro Mfg. Co. v.*

13 *Convertible Top Replacement Co.*, 377 U.S. 476, 489-491 (1964). And that charge of infringement

14 can be made by service of a complaint. *In re Bill of Lading Transmission & Processing Sys. Patent*

15 *Litig.*, 681 F.3d 1323, 1345 (Fed. Cir. 2012).

16

17    **4.2**   **Application**

18

19      Defendants argue that Plaintiff only accuses Costco of induced infringement under 35

20 U.S.C. § 271(b), but with no evidence that Costco encouraged the direct infringement of the

21 Asserted Patents. (Mot. 29.) Plaintiff only asserts direct infringement against NYLX, not the

22 Costco members who are the direct infringers in Defendants' framing of the issue. (Mot. 30-

23 31 (citing Dkt. No. 99-5 at 2).) Count three of the Second Amended Complaint alleged that

24 Costco provides through its website "mortgage loan services provided through an

25 arrangement with First Choice and NYLX" and that "Costco has induced others, including

26 at least NYLX and Costco's members, to directly infringe the '694 and '728 patents [by]

27

28

1    encouraging them to shop for mortgages using the infringing NYLX pricing engine through

2    www.costco.com." (Dkt. No. 33 at ¶¶ 30-31.)

3         The induced infringement theory here is simple and adequate. Plaintiff is now

4    pursuing a direct infringement case only against NYLX, not Costco's members. But NYLX

5    allegedly infringes by performing the accused method or operating the accused system for

6    Costco's members. While Costco does not itself directly infringe, it induces the alleged

7    infringement by actively recruiting its members and directing them to NYLX through

8    Costco's website, pursuant to the agreement between the Defendants. For each customer

9    that Costco provides, NYLX runs the accused method on the accused system. Defendants

10   have not shown any defect in the theory that in doing so, Costco actively induces NYLX's

11   infringement.

12        The Court DENIES the Motion as to no induced infringement by Costco.

13

14   **5.    DIVIDED INFRINGEMENT OF METHOD CLAIMS**

15

16        **5.1    Legal Standard**

17

18        "[W]here the actions of multiple parties combine to perform every step of a claimed

19   method, the claim is directly infringed only if one party exercises 'control or direction' over

20   the entire process such that every step is attributable to the controlling party, i.e., the

21   'mastermind.'" *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008) (citing

22   *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380-81 (Fed. Cir. 2007)). In *Limelight*

23   *Networks, Inc. v. Akamai Technologies, Inc.*, the Supreme Court held that the rules for divided

24   infringement apply equally to both direct and indirect infringement claims, and that because

25   "*Muniauction* (which, again, we assume to be correct) instructs that a method patent is not

26   directly infringed . . . unless a single actor can be held responsible for the performance of all

27   steps of the patent," that an indirect infringement claim requires a single direct infringer. 134

28

S. Ct. 2111, 2119 (2014). Thus, for any type of infringement claim, the patentee must show that a single actor practices every limitation of the asserted claims.

### 5.2 Application

Claim 6 of the '728 Patent and claim 19 of the '694 Patent are the method claims asserted against Defendants. (Mot. 32.) Defendants argue that no single party performs every step of the claims, and that Plaintiff has failed to show the necessary control for NYLX to be liable for direct infringement under a divided infringement option. (Mot. 32, 35.) Defendants assert that the claims require a borrower, and that the borrower must be in possession of the borrower's data. (Mot. 34 (citing '728 Patent Figs. 2A, 2B; 2:38-39; 3:31-34; 4:52-58; 5:1-5, 37-40, 51-58, 66-67; 8:59-61; 12:30; '694 Patent Figs. 2A, 2B, 3; 2:34-36, 48-50; 4:66-5:9; 7:1-3; 10:3-8).) Plaintiff responds that when claims, as drafted, "place all of the processing steps on a single party, incidental interactions with users should not create divided infringement." (Opp'n 29-30.)

Plaintiff is right. Claim 6 of the '728 Patent and claim 19 of the '694 Patent do not present any divided infringement problems. Each step of each claim is an action performed by the third party evaluator, not by the borrower:

19. A computer-implemented method, comprising:

> **receiving**, over a computer network, personal data entered by a borrower, said personal data comprising loan evaluation data;

> **automatically generating or causing the generation** of a credit grading for the borrower such that the credit grading is dependent upon the loan evaluation data entered by the borrower, said credit grading being

distinct from a credit score obtained from a credit bureau, and being

generated at least partly using underwriting criteria of one or more

lenders;

**identifying** a set of loan packages for which the borrower qualifies based on

said credit grading, each loan package including home loan information

provided by a lender, and including guaranteed closing cost information

for closing services not provided by the lender, wherein the set of loan

packages is identified without requiring the borrower to post a request

to any lender;

**outputting** information regarding the set of loan packages, including the

guaranteed closing cost information for closing services not provided

by the lender, to the borrower via a user interface that enables the

borrower to at least compare total costs of the loan packages for which

the borrower qualifies, said user interface additionally providing

functionality for the user to select and apply for one of said loan

packages; and

in response to a request from the borrower in association with a selected loan

package, **communicating** information of the borrower to a

corresponding lender.

'694 Patent claim 19 (emphasis added); *see also* '728 Patent claim 6 (similarly requiring a single party to "receiv[e ]," "generat[e]," "select[ ]," "output[ ]," and "send[ ]" information.).

Thus, this case is not like *Muniauction*, where one step required a bidder to input information, while the majority of the remaining steps required actions by the auctioneer. 532 F.3d at 1328-29. Indeed, as Plaintiff notes, the claims here follow the Federal Circuit's express guidance on avoiding claims drafted to require multiple infringers:

1   The concerns over a party avoiding infringement by arms-length cooperation can

2   usually be offset by proper claim drafting.  A patentee can usually structure a claim to

3   capture infringement by a single party.  *See* Mark A. Lemley et al., *Divided Infringement*

4   *Claims*, 33 AIPLA Q.J. 255, 272-75 (2005).  In this case, for example, BMC could have

5   drafted its claims to focus on one entity.  **The steps of the claim might have**

6   **featured references to a single party's supplying or receiving each element of**

7   **the claimed process.**  However, BMC chose instead to have four different parties

8   perform different acts within one claim.  BMC correctly notes the difficulty of

9   proving infringement of this claim format.  Nonetheless, this court will not

10  unilaterally restructure the claim or the standards for joint infringement to remedy

11  these ill-conceived claims.

12

13  *BMC*, 498 F.3d at 1381 (Fed. Cir. 2007) (emphasis added), overruled on other grounds by *Akamai*

14  *Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012), in turn overruled by *Limelight*

15  *Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111 (2014).

16  The claims here are drafted exactly as *BMC* stated would avoid the divided infringement

17  problem.  The claims recite elements requiring only the actions of one entity to infringe.  *See also*

18  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011) ("That other parties are

19  necessary to complete the environment in which the claimed element functions does not necessarily

20  divide the infringement between the necessary parties.  For example, a claim that reads 'An

21  algorithm incorporating means for receiving e-mails' may require two parties to function, but could

22  nevertheless be infringed by the single party who uses an algorithm that receives e-mails.").

23  Therefore, the Court DENIES the Motion as to divided infringement.

24

25

26

27

28

**DISPOSITION**

For the foregoing reasons, the Motion is GRANTED IN PART. The '728 and '694 Patents are invalid under 35 U.S.C. § 101. The Motion is otherwise DENIED.

IT IS SO ORDERED.

DATED: January 12, 2015

_____

Andrew J. Guilford
United States District Judge

ADDENDUM 3



UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

MORTGAGE GRADER, INC.,

        Plaintiff,

v.

COSTCO WHOLESALE
CORPORATION, FIRST CHOICE
LOAN SERVICES, INC., and NYLX,
INC.

        Defendants.

CASE NO. SACV 13-00043 AG (ANx)

ORDER GRANTING IN PART
PLAINTIFF'S MOTION TO STRIKE
DEFENDANTS' NEW PRIOR ART
AND SECTION 101 DEFENSES AND
CONTINGENT MOTION FOR
SUMMARY JUDGMENT

## **INTRODUCTION**

Plaintiff Mortgage Grader, Inc. ("Plaintiff") alleges that Defendants Costco Wholesale Corporation ("Costco"), First Choice Loan Services, Inc. ("First Choice"), and NYLX, Inc. ("NYLX") (collectively, "Defendants") have infringed U.S. Patent Nos. 7,680,728 ("'728 Patent") and 7,366,694 ("'694 Patent"), both titled "Credit/Financing Process" (collectively, the "Asserted Patents"). The Asserted Patents cover computer implemented systems and methods that allow individuals to shop for mortgages online.

Plaintiff filed a Motion to Strike Defendants' New Prior Art and Section 101 Defenses and Contingent Motion for Summary Judgment (the "Motion"). The Motion asks the Court to (1) strike from the Final Invalidity Contentions two prior art references that Defendants argue anticipate the patents, or alternatively, to decide that one of them is not actually prior art, and (2) strike from the Final Invalidity Contentions Defendants' contention that the asserted claims fail 35 U.S.C. § 101. (Dkt. No. 64 at 1.)

Defendants filed an opposition to the Motion on October 6, 2014. (Dkt. No. 89.) Plaintiff filed a reply on October 13, 2004. (Dkt. No. 91.) The Motion is GRANTED IN PART, as to the prior art references, AND DENIED IN PART, as to the 35 U.S.C. § 101 defense.

## **BACKGROUND**

On August 15, 2014, Defendants served their Final Invalidity Contentions. (Dkt. No. 66-3.) On September 24, 2014, Defendants filed four motions for summary judgment: (1) for non-infringement by Costco (Dkt. No. 74), (2) for invalidity of both Asserted Patents (Dkt. No. 75); (3) for non-infringement of the '728 Patent (Dkt. No. 76), and (4) for non-infringement of the '694 Patent (Dkt. No. 80). On the same date, Plaintiff filed this Motion and a motion for summary judgment on Plaintiff's Fifth Counterclaim, for patent misuse. (Dkt. Nos. 64 and 62.)

On September 29, 2014, the Court struck Defendants' motions and ordered Defendants to file a single consolidated motion, the briefing schedule and page limits for which would be provided

1  when this Motion is decided.  (Dkt. No. 83.)  The Court does so in Section 3.  The Court also

2  ordered the Parties to discuss resolution of Plaintiff's motion for summary judgment on

3  Defendants' patent misuse defense.  (Dkt. No. 83.)  The parties did so, and to Defendants' credit,

4  they agreed to dismiss that defense.  (Dkt. No. 92.)

6  **LEGAL STANDARD**

8  Standing Patent Rule 4.2 provides for Final Invalidity Contentions—if different from the

9  Preliminary Contentions—to be served no later than 28 days after service of the Final Infringement

10  Contentions.  S.P.R. 4.2.  The rule further provides that "[t]he deadlines provided in this rule do not

11  excuse the requirement to supplement disclosures and discovery responses promptly.  If a party

12  receiving Final Invalidity Contentions believes that amendments were made without good cause, it

13  may move the Court to strike them."  *Id.*  "Amendments are subject to a good cause standard but

14  do not require prior Court approval where they are made due to a claim construction by the Court

15  different from that proposed by the party seeking amendment, or recent discovery of material prior

16  art that was not discovered, despite diligent efforts, before the service of the Invalidity

17  Contentions."  S.P.R. 4.2.2.

18  Patent rules, such as the Court's Standing Patent Rules, require "both the plaintiff and the

19  defendant in patent cases to provide early notice of their infringement and invalidity contentions,

20  and to proceed with diligence in amending those contentions when new information comes to light

21  in the course of discovery.  The rules thus seek to balance the right to develop new information in

22  discovery with the need for certainty as to the legal theories."  *O2 Micro Int'l Ltd. v. Monolithic Power*

23  *Sys., Inc.*, 467 F.3d 1355, 1365-66 (Fed. Cir. 2006).  "Good cause" for amendment requires a

24  showing of diligence.  *Id.* at 1366; *see also* S.P.R. 4.2.2.

25  The Asserted Patents were filed before March 16, 2013, so the pre-America Invents Act

26  version of 35 U.S.C. § 102 applies.  It provides:

A person shall be entitled to a patent unless -

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent.

* * *

(e) the invention was described in — (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent . . . .

35 U.S.C. § 102 (2002).

## ANALYSIS

### 1.  NEWLY ASSERTED PRIOR ART REFERENCES

There are two newly asserted prior art references at issue.  The first is provisional U.S. Patent Application No. 60/180,013 (the "Elite Provisional Application").  It was filed on February 3, 2000. (Mot. 7.)  Howard Conyack, NYLX's CEO and expert in this case, was one of the five inventors of the Elite Provisional Application.  (Kaufman Decl. in Supp. of Mot. ("Kaufman Decl.") Ex. 7, Dkt. No. 69-1 at 6.)  On February 5, 2001, the same group of inventors filed non-provisional U.S. Patent Application No. 09/777,179 ("Elite Parent Application"), now abandoned, claiming priority to the Elite Provisional Application.  (Kaufman Decl. Ex. 8-1, Dkt. No. 71-1 at 2, 5, and 80.)  On July 1, 2005, Conyack alone filed a continuation-in-part of that application, No. 11/174,440 ("Elite CIP Application"), claiming priority to the Elite Provisional Application.  Conyack assigned the Elite CIP Application to NYLX on April 13, 2007.  (Kaufman Decl. Ex. 13, Dkt. No. 70-5.)

The second prior art reference at issue is U.S. Patent Application No. 2004/0002915, filed by Russell McDonald on May 1, 2003 and published on January 1, 2004 (the "McDonald Application"),

which later matured into U.S. Patent No. 7,315,841 (the "McDonald Patent"). (Mot. 1.) On January 30, 2006, the USPTO rejected claims in the Elite Parent Application as unpatentable over the McDonald Application, and the applicants abandoned the Elite Parent Application. (Kaufman Decl. Ex. 8-1, Dkt. No. 71-1 at 81-95.) On February 26, 2008, the USPTO rejected claims in the Elite CIP Application as unpatentable over the McDonald Patent (Kaufman Decl. Ex. 8-2, Dkt. No. 72-1 at 154), and the applicant abandoned the Elite CIP Application. (Kaufman Decl. Ex. 10, Dkt. No. 70-2.)

Defendants' Final Infringement Contentions identified 16 new prior art references, but Plaintiff states that it focuses on the Elite Provisional Application and the McDonald Application because they are the ones Conyack relies upon in his expert report. (Mot. 11.) Plaintiff mentions in a footnote that "[o]f course, the other 14 new prior art references should also be stricken." (*Id.* at n.4.) If so, Plaintiff should have addressed them. "[A]rguments raised in footnotes are not preserved." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (citations omitted). "A footnote is the wrong place for substantive arguments on the merits of a motion . . . ." *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 935 n.1 (N.D. Cal. 2008). Because the other new prior art references are not adequately raised by the Motion, the Court does not consider them.

## 1.1 Timely Amendment of Contentions

Plaintiff argues that both the Elite Provisional Application and McDonald Application have been long known to Defendant, as shown by the facts that (1) NYLX's CEO and expert in this case, Conyack, was an inventor of the Elite Provisional Application, and (2) the USPTO used the McDonald Application as a reference to reject two of Conyack's NYLX patent applications: the Elite Parent Application, rejected on April 28, 2006, and the Elite CIP Application, rejected on February 26, 2008. (Mot. 1-2; Kaufman Decl. Ex. 8-1, Dkt. No. 71-1 at 5, 120-28; Kaufman Decl. Ex. 8-2, Dkt. No. 72-1 at 150-164.)

1    Defendants respond that they did not discover the prior art references at issue or "appreciate

2    their relevance" by the time they served their S.P.R. 2.5 Invalidity Contentions on December 20,

3    2013.  (Opp'n 3; Decl. of Alicia M. Choi ("Choi Decl."), Dkt. No. 89-2 at ¶ 20.)  Choi, a patent

4    attorney, is not counsel of record in this case, but worked on aspects of the invalidity research and

5    drafting.  Choi first became aware of a predecessor company to NYLX in 2009.  (Choi Decl., Dkt.

6    No. 89-2 at ¶ 3.)  In 2011 she was asked to prepare and file a patent application on behalf of that

7    predecessor entity for an invention by Conyack and Allen Pollack.  (*Id.* at ¶ 6.)  When working on

8    that application, Choi did not believe any of Conyack's previous patent activity was relevant, so did

9    not "investigate his past patent matters any further."  (*Id.* at ¶ 7.)

10   Fast-forwarding to this case, Choi says that in mid-March of 2013, Conyack, on behalf of

11   NYLX, asked her law firm to "minimize its activities" because Conyack thought he could reach a

12   settlement with Plaintiff.  (*Id.* at ¶ 8.)  Choi also offers a number of irrelevant hearsay statements,

13   but some relevant ones, including that counsel of record for Defendants in this case were also asked

14   to "minimize their activities" in April 2013 because of ongoing attempts to settle.  (*Id.* at ¶ 10.)  Choi

15   states that in the summer of 2013, NYLX merged with another firm, and that the officers and

16   managers of the surviving company were primarily from the other company, such that the new

17   management did not have the historical knowledge of NYLX or an in-depth understanding of the

18   software.  (*Id.* at ¶ 14.)

19   Choi states that between the summer of 2013 and December 20, 2013, she and counsel for

20   Defendants requested prior art from NYLX and Conyack, but that "NYLX and its personnel

21   expressed a lack of awareness of any such prior art."  (*Id.* at ¶ 15.)  Defendants requested and

22   received a prior art search from a professional patent search firm in November, 2013, but that did

23   not identify the prior art at issue.  (*Id.* at ¶¶ 16-18.)  Choi is also "aware that personnel of"

24   Defendant's counsel conducted a prior art search during late 2013 that did not identify the prior art

25   at issue.  (*Id.* at ¶ 19.)

26   It was not until April 24, 2014 that Defendants' counsel had an in-person meeting with

27   Pollack, a programmer who coordinated the development of the accused software.  (*Id.* at ¶ 21.)  At

28   that meeting, Pollack stated that Conyack had filed a patent application sometime in the late 1990s

or early 2000s for software "similar" to the accused software." (*Id.*) Defendants' counsel obtained the prosecution histories for the Elite Provisional Application and the Elite Parent Application on April 25, 2014, and obtained the McDonald Patent on April 28, 2014. (*Id.* at ¶ 23.) Those references were disclosed to Plaintiff's counsel through an interrogatory response on May 5, 2014 and document production on May 23, 2014. (*Id.* at ¶ 24.) Defendants continued to develop their theories of invalidity in the late spring and early summer of 2014, and internally discussed the relevance of the prior art at issue. (*Id.* at ¶ 25.)

On July 1 and 2, 2014, Conyack and Pollack disclosed that the Elite software that was the subject of the Elite Provisional and Parent Applications was commercially available in the autumn of 1999. (*Id.* at ¶ 28.) Choi states that "[t]he multiple layers and interfaces of the [accused] software obfuscated the relevance to me of the Elite Agents software," but that she prepared a chart comparing the Elite Parent Application to the asserted claims over a period of time beginning on the July 4th, 2014 holiday and continuing though July 23, 2014. (*Id.* at 29-30.) Defendants' Final Invalidity Contentions were not fully developed until August 15, 2014. (*Id.* at 31.)

The "good cause" requirement under S.P.R. 4.2 for amendment requires a showing of diligence. S.P.R. 4.2.2; *O2 Micro*, 467 F.3d at 1366. Defendants' efforts to discover NYLX's own prior art and prior art in its prosecution files were not diligent. Choi herself was working with Conyack on patent matters as early as March 2011. (Choi Decl. at ¶¶ 6-7.) That NYLX shrugged off inquiries from its own lawyers and instructed them to "minimize their activities" is the opposite of diligence. (*Id.* at ¶¶ 7-8.) *See O2 Micro*, 467 F.3d at 1367 (holding that "on-going negotiations," the need to "digest and marshal" the evidence, and the need to "analyze and respond" to information did not excuse the "over three-month delay" between learning the information and amending the infringement contentions). There is no reason that the in-person meeting that Defendants finally arranged in April, 2014, could not have occurred months before the December 20, 2013 Preliminary Invalidity Contentions. NYLX entered this case in May 2013. (Dkt. Nos. 14-16.)

The prior art at issue is NYLX's own patent application and a prior art reference cited by the USPTO in rejecting two of NYLX's patent applications. As discussed in Section 2, Defendants

argue that the claims of the Asserted Patents are so simple as to constitute a mere abstract idea that fails 35 U.S.C. § 101. For purposes of invalidity, the issue is not comparing the asserted claims to whatever "layers and interfaces" there are in the Accused Software, but instead, comparing the asserted claims to the prior art. If Defendants' Accused Software is relevant to this question, it is in the sense that from the outset, Defendants should have known that if prior versions of that software predated the patents in suit, they were likely to be highly relevant, as Defendant belatedly argues.

Due to the lack of diligence, the Court finds no good cause to amend the contentions to include the Elite Provisional Application and the McDonald Application. The Court therefore STRIKES those two prior art references from Defendants' Final Invalidity Contentions.

## 1.2    Prior Art Status of the Applications

Given the holding in Section 1.1, the Court need not address the prior art status of the stricken prior art, but does so here for completeness. Defendants argue that the Elite Provisional Application is prior art under 35 U.S.C. §§ 102(a) and (e). Plaintiff disagrees.

Plaintiff argues that the Elite Provisional Application is not prior art under 35 U.S.C. § 102(a) because it was confidential when filed and remained so for more than five years, only becoming available to the public in December 2005, three years after the applications for the Asserted Patents were filed. (Mot. 3, 18 (citing Kaufman Decl. Ex. 9, Dkt. No. 70-1).) Plaintiff is correct that the Elite Provisional Application was not prior art under the "described in a printed publication in this or a foreign country" prong of § 102(a) at the time of the invention.

But Defendants argue that § 102(a) is satisfied by the **use** of the system described in the Elite Provisional Application, under the "known or used by others in this country" prong of § 102(a). (Opp'n 18-19.) Defendants argue that the "Elite [ ] Provisional Application offers the evidence of the public use of the Elite Agents software through the screen shots provided to the U.S. Patent and Trademark Office in 2000." (*Id.* at 19.) Plaintiff responds that the Final Invalidity Contentions do

1   not disclose such public use, and instead cite only the filed application.  (Mot. 18-19 (citing

2   Kaufman Decl. Ex. 3, Dkt. No. 66-3 at 3-4).)

3          Plaintiff is right.  Defendants now, in opposition to the Motion, attempt to explain why the

4   Elite Provisional Application is evidence of prior public use, but that is of no moment when the

5   **Final** Invalidity Contentions do not disclose that position.  And while the Elite Provisional

6   Application may be some evidence of prior use, the screen shots are not the dispositive, self-

7   contained, evidence of such use that Defendants suggest.  So it is not fair to say that Plaintiff was

8   put on notice of the prior use theory through mere identification of the Elite Provisional

9   Application.

10          Defendants argue that the screen shots show an internet website uniform resource locator

11   ("URL"), one of which is https://qf1.quickfinance.com/v1/authorize.asp.  (Kaufman Decl. Ex. 7,

12   Dkt. No. 69-1 at 15.)  The inclusion of such a screen shot does not itself prove public use.  First, the

13   URL could be included in a screen shot from a system that was not actually connected to the

14   internet.  Second, Defendants ignore that the Elite Provisional Application states that various layers

15   of security protect the system: "The product web servers utilize Microsoft Internet information

16   Server (IIS) software which maintains individual session states using built in session handling.

17   Access to the Elite Agents System **is secured by a proprietary login system requiring a user id**

18   **and password**."  (*Id.* at 13 (emphasis added).)

19          Thus, according to the application, the system was password protected, and the application

20   provides no indication that any member of the public actually used it.  In any event, Defendants

21   may not convert a patented/printed publication item of prior art into a public use item of prior art

22   by argument after serving their Final Invalidity Contentions.

23          Next, Plaintiff argues that the Elite Provisional Application does not qualify as prior art

24   under Section 102(e) because that section applies only to patents and applications that are published

25   under 35 U.S.C. § 122(b), and provisional applications are not so published.  (Mot. 3, 20.)

26   Defendants respond that Plaintiff misconstrues the Final Invalidity Contentions, and that what

27   Defendants really contend is that the Elite CIP Application was published, and that it is entitled to

28

the Elite Provisional Application's priority date insofar as the CIP contains the material in the Provisional.  (Opp'n 1-2, 21-22.)

In reply, Plaintiff acknowledges that "[i]f Defendants had cited the Elite [ ] CIP Application as prior art – which is undisputedly an application published under Section 122(b) – then it would be prior art as of its earliest filing date for disclosures that are supported by the priority document." (Reply 9-10 (citing *In re Giacomini*, 612 F.3d 1380, 1383 (Fed. Cir. 2010) (holding that "filing date" for § 102(e) is the priority date of the earliest-claimed application that provides written description report for the claimed invention)).)  But Plaintiff points out that Defendants did not cite the Elite CIP Application in their Final Invalidity Contentions, instead only citing the Elite Provisional Application.  (*Id.* at 10.)

Plaintiff is correct.  In their Final Invalidity Contentions, Defendants did not state that they were relying on the Elite CIP Application to the extent it is supported by the Elite Provisional Application.  Instead, they stated that they were relying on the Elite Provisional Application.  But the Elite Provisional Application is not prior art under § 102(e).  Defendants must live with the theories that they disclosed.

Finally, this is not only an issue of compliance with the rules, nor a mere § 102(e) technicality. It is not true that, as Defendants argue, the Elite Provisional Application is purely a subset of what appears in the Elite CIP Application.  This is not the type of information that a Court should have to ferret out, but a comparison of the two documents shows that there is material in the Elite Provisional Application that does not appear in the Elite CIP Application.  The term "Elite Agents System" appears throughout the Provisional, and nowhere in the CIP.  The term "RDBMS" appears several times in the Provisional, and nowhere in the CIP.  The provisional provides that "Upon submission of the Contour Secure Online Application form, the data is automatically sent by a program on Contour's server to the Elite Agents E-mail Server as a standard text attachment to an email message."  (Kaufman Decl. Ex. 7, Dkt. No. 69-1 at 29.)  The closest thing in the CIP is "Upon submission of the secure online application, the data is automatically prepared for exportation to the processing center 180 via the borrower service center database 330 and the loan processing database 240."  (Kaufman Decl. Ex. 9, Dkt. No. 70-1 at 28.)  In light of these and many

1    other items that appear in the Provisional but not the CIP, it is not true that disclosing the

2    Provisional is the same thing as disclosing the CIP to the extent it is supported by the Provisional.

3         The Court therefore GRANTS summary judgment that the Elite Provisional Application is

4    not prior art under 35 U.S.C. §§ 102(a) or 102(e).

5

6    **2.    NEWLY ASSERTED SECTION 101 DEFENSE**

7

8         Plaintiff argues that in their initial invalidity contentions, Defendants specifically stated that

9    they "do not present any grounds of invalidity based on 35 U.S.C. § 101" "at this time," but that

10   "[t]he final claim construction may require such an assertion of invalidity." (Kaufman Decl. Ex. 4,

11   Dkt. No. 66-4 at 8.)  That was after Defendants pled in their Answer that the Asserted Patents were

12   "invalid for failure to comply with the statutory requirements for patentability set forth in 35 U.S.C.

13   §§ 101, 102, 103 and/or 112." (Dkt. No. 34 at ¶¶ 20, 24.)

14        Generally, where a party raises invalidity defenses in its answer, "it cannot claim it was

15   diligent in asserting them [only] in its second round of invalidity contentions over five months [here,

16   ten months] later." *MyMedicalRecords, Inc. v. Walgreen Co.*, 2:13-CV-00631 ODW, 2013 WL 6834639,

17   at *4 (C.D. Cal. Dec. 23, 2013).  Defendants argue that their delay is excusable because between

18   their initial and final invalidity contentions, the Supreme Court decided *Alice Corp. Pty. Ltd. v. CLS*

19   *Bank Int'l*, 134 S.Ct. 2347 (2014).  (Opp'n 12.)  Defendants acknowledge that "*Alice* [] did not 'create'

20   35 U.S.C. § 101," but argue that "it did create and mandate a markedly different, and stricter,

21   analysis for applying Section 101." (*Id.* at 13.)

22        *Alice* has certainly prompted renewed focus on litigating § 101 defenses.  The same was true

23   of *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (en banc) and *Bilski v. Kappos*, 561 U.S. 593 (2010).

24   Indeed, as Plaintiff points out, this very Court decided two of the major § 101 cases between the

25   Federal Circuit and Supreme Court's *Bilski* decisions: *Dealertrack, Inc. v. Huber*, 657 F. Supp. 2d 1152

26   (C.D. Cal. 2009) and *Fort Properties, Inc. v. American Master Lease, LLC*, 609 F. Supp. 2d 1052 (C.D.

27   Cal. 2009).  (Reply 5.)  And an argument can be made that *Alice* is only a modest advance, since (1) it

28   declined to "labor to delimit the precise contours of the 'abstract ideas' category in this case

1    [because i]t is enough to recognize that there is no meaningful distinction between the concept of

2    risk hedging in *Bilski* and the concept of intermediated settlement at issue here," and (2) *Bilski* had

3    already rejected the machine-or-transformation test as the sole test for § 101.  *Alice*, 134 S.Ct. at

4    2357; *Bilski*, 561 U.S. at 658-660.

5         But *Alice* did provide significant additional clarity on the effect, or lack of effect, of requiring

6    the use of a computer in the claims.  Indeed, Courts and commentators have hailed *Alice* as a

7    significant change.  Defendants collect many of those appraisals.  (Opp'n 12-14.)  They include:

8

9         • *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354 (Fed. Cir. 2014) (noting *Alice*

10           provided "the new Supreme Court authority in this delicate area" of Section 101).

11

12        • *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, CV 2:13-655, 2014 WL 4364848, at *6

13           (E.D. Tex. Sept. 3, 2014) (Bryson, J. sitting by designation) ("On one important issue,

14           the Supreme Court in [*Alice*] went beyond *Bilski*.  The claims in *Bilski* did not require

15           the use of computers, while the claims in [*Alice*] did. Significantly, the Court held that

16           the introduction of a computer into the claims did not render the claims in [*Alice*]

17           patentable.").

18

19        • *Eclipse IP LLC v. McKinley Equip. Corp.*, CV 14-00154 GW, 2014 WL 4407592, at *3

20           (C.D. Cal. Sept. 4, 2014) ("*Alice* did categorically establish a clear rule that had

21           previously been subject to debate: 'mere recitation of a generic computer cannot

22           transform a patent-ineligible abstract idea into a patent-eligible invention.' 134 S.Ct. at

23           2358.  And before *Alice*, it was unclear to some, including the USPTO, that the

24           framework set forth in *Mayo* applied to abstract ideas as well as to the law of

25           nature/natural phenomena at issue in *Mayo*.").

26

27        • *Gametek LLC v. Zynga, Inc.*, CV 13-2546 RS, 2014 WL 4351414, at *3 (N.D. Cal. Sept.

28           2, 2014) ("It is particularly relevant here that the substantive law in this area was

unsettled at the time of the prior Order. The Supreme Court had granted certiorari on the directly-applicable question of '[w]hether claims to computer-implemented inventions—including claims to systems and machines, processes, and items of manufacture—are directed to patent-eligible subject matter within the meaning of 35 U.S.C. § 101 as interpreted by this Court?' . . . While ultimately agreeing with the Federal Circuit, the decision in *Alice Corp.* provided additional clarity regarding computer system applications, an issue upon which the Federal Circuit, sitting en banc, had failed to provide a majority opinion.").

In short, *Alice* represents a big enough change to justify including a new § 101 argument in Defendants' Final Invalidity Contentions. The Court therefore DENIES the Motion to Strike Defendants' § 101 Defense.

### 3. BRIEFING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; CONTINUED TRIAL DATE

The Court previously struck the briefing on Defendants' four motions for summary judgment as exceeding the motion page limits, noting that it is the responsibility of the parties to prioritize issues in their briefs. (Dkt. No. 83.) The Court stated that it would provide the briefing schedule and page limitations for Defendants' consolidated motion when it ruled on the present Motion. The Court does so now.

Defendants' single consolidated motion for summary judgment, not to exceed 35 pages in length, shall be filed no later than November 3, 2014. Plaintiff's opposition, not to exceed 35 pages in length, shall be filed no later than November 17, 2014. Defendants' reply, not to exceed 20 pages, shall be filed no later than November 24, 2014. Defendants shall notice the hearing for January 12, 2015. Given that schedule, the Court continues the Pretrial Conference to February 9, 2015. Trial is continued to February 24, 2015.

**DISPOSITION**

The Elite Provisional Application and McDonald Application are STRICKEN from Defendants' Final Invalidity Contentions.  No evidence, at summary judgment or trial, will be admitted concerning those references.  The Elite Provisional Application is not prior art under 35 U.S.C. § 102(a) or 102(e).

The Motion is otherwise DENIED.

IT IS SO ORDERED.

DATED: October 27, 2014

_____

Andrew J. Guilford
United States District Judge

ADDENDUM 4

US007366694B2

(12) **United States Patent**

Lazerson

(10) Patent No.: **US 7,366,694 B2**

(45) Date of Patent: **Apr. 29, 2008**

(54) **CREDIT/FINANCING PROCESS**

(75) Inventor: **Jeffrey M. Lazerson**, Laguna Niguel, CA (US)

(73) Assignee: **Mortgage Grader, Inc.**, Laguna Niguel, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1127 days.

(21) Appl. No.: **10/207,344**

(22) Filed: **Jul. 29, 2002**

(65) **Prior Publication Data**

US 2003/0036996 A1     Feb. 20, 2003

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/139,418, filed on May 6, 2002.

(60) Provisional application No. 60/312,919, filed on Aug. 16, 2001, provisional application No. 60/327,026, filed on Oct. 3, 2001, provisional application No. 60/362,314, filed on Mar. 5, 2002.

(51) **Int. Cl.**
  *G06Q 40/00*     (2006.01)

(52) **U.S. Cl.** ...................................... **705/38**

(58) **Field of Classification Search** ................. 705/38, 705/39, 42

  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,930,776 A | 7/1999 | Dykstra et al. |
| 5,940,812 A | 8/1999 | Tengel et al. |
| 5,966,699 A | 10/1999 | Zandi |
| 5,995,947 A | 11/1999 | Fraser et al. |
| 6,014,645 A | 1/2000 | Cunningham |
| 6,029,149 A | 2/2000 | Dykstra et al. |
| 6,088,686 A | 7/2000 | Walker et al. |
| 6,105,007 A | 8/2000 | Norris |
| 6,148,293 A | 11/2000 | King |

(Continued)

OTHER PUBLICATIONS

"LoansDirect Advances Online Lending Technology With the Industry's First 100% Online Mortgage." Business Wire. New York. Feb. 17, 2000. p. 1.*

(Continued)

*Primary Examiner*—Hani M. Kazimi
*Assistant Examiner*—Daniel Kesack
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear LLP

(57)     **ABSTRACT**

A method for a borrower to obtain and/or evaluate desired financial services is disclosed. Personal information from the borrower is obtained and recorded. The personal information includes reasons that the borrower wants to obtain the financing. Financing evaluation information based on pre-established and objective criteria used by at least one established financial institution that provides financing of the type sought by the borrower is obtained and recorded. A credit grading for the borrower is determined based on the personal information, and the financing evaluation information. The credit grading is determined by an independent entity that will not provide the financing to the borrower. The financing may be a loan, such as a mortgage loan or an auto loan or the financing may be the issuance of a credit card or a line of credit. The independent entity also compiles a comparison of closing costs associated with the financial transactions, and can optionally provide an estimate of those costs for one, and preferably for a variety of providers of the desired financing.

**37 Claims, 5 Drawing Sheets**



# US 7,366,694 B2

Page 2

---

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,208,979 | B1 | 3/2001 | Sinclair |
| 6,289,319 | B1 | 9/2001 | Lockwood |
| 6,321,202 | B1 | 11/2001 | Raveis, Jr. ..................... 705/1 |
| 6,385,594 | B1 | 5/2002 | Lebda et al. |
| 6,438,526 | B1 | 8/2002 | Dykes et al. |
| 6,470,338 | B1 | 10/2002 | Rizzo et al. |
| 6,505,176 | B2 | 1/2003 | DeFrancesco, Jr. et al. |
| 6,587,841 | B1 | 7/2003 | DeFrancesco et al. |
| 6,611,816 | B2 | 8/2003 | Lebda et al. |
| 6,691,094 | B1 | 2/2004 | Herschkorn |
| 2001/0005829 | A1 | 6/2001 | Raveis, Jr. ..................... 705/1 |
| 2001/0037302 | A1 | 11/2001 | Raveis, Jr. et al. ............ 705/9 |
| 2001/0047282 | A1 | 11/2001 | Raveis, Jr. ..................... 705/7 |
| 2002/0023051 | A1 | 2/2002 | Kunzle et al. |
| 2002/0049624 | A1 | 4/2002 | Raveis, Jr. ..................... 705/8 |
| 2002/0077964 | A1* | 6/2002 | Brody et al. ................. 705/38 |
| 2002/0077970 | A1 | 6/2002 | Lebda et al. |
| 2002/0103789 | A1 | 8/2002 | Turnbull et al. |
| 2003/0208412 | A1* | 11/2003 | Hillestad et al. .............. 705/26 |

### OTHER PUBLICATIONS

Sichelman, Lew., "RESPRO trade group forges plan to simplify loan costs." The San Diego Union-Tribune. San Diego, California: Feb. 7, 1999. p. H3.*

Grant E. Mitchell, "Will RESPA Reforms Bring Bundling to Settlement Services?" *Mortgage Banking*, May 2002 issue, p. 87-90.

John Hagel III and Marc Singer, "*Net Worth: Shaping Markets When Customers Make The Rules*," Harvard Business School Press, pp. 10, 13-20, 23-30, 42, 43, 49-52, 112-170, 183-184, 231, 242 (1999).

Seth Godin, "*Permission Marketing-Turning Strangers into Friends, and Friends into Customers*," Simon & Schuster, Chapter Two, pp. 40-52 (1999).

Pierce, R., "*Beneficial National Bank Partners Widely, Pioneers the Web to Deliver Loans*," Journal of Retail Banking Services, vol. XIX, No. 3, pp. 1-5 (1997).

"*E-Business Real-Estate Web Sites, The Web Brings Real-Estate Transactions Home*," Informationweek.com, dated Apr. 10, 2000.

Lamb, E., "*How the Internet affects consumers, banks and business*," Community Banker (Oct. 2000).

Shacklett, M., "*Effective Software Integration is the Key to Making it all Happen*," Credit Union Magazine, pp. 49-53, (Apr. 2001).

Rose, S., Article Summary "*Money, Where to Refi Online*," Time Incorporated, (Dec. 1998).

Kiesnoski, K., *E-Decisioning IBC Creates 'Virtual Loan Committee*,' Community Bank Systems + Technology; Oct. 1999; 36, 10; p. 50.

Office Action issued on Apr. 24, 2007 in U.S. Appl. No. 10/139,418 (the parent of the present application).

Office Action issued on Oct. 3, 2007 in U.S. Appl. No. 10/139,418 (the parent of the present application).

Office Action issued on Aug. 22, 2007 in U.S. Appl. No. 10/139,418 (the parent of the present application).

\* cited by examiner

START

OBTAIN AND RECORD PERSONAL
INFORMATION INCLUDING FINANCIAL
INFORMATION AND REASONS THAT THE
BORROWER WANTS TO OBTAIN THE
FINANCING ⌐100

OBTAIN AND RECORD FINANCING EVALUATION
INFORMATION USED BY AT LEAST ONE
ESTABLISHED LENDER THAT MAY PROVIDE
LOAN ⌐102

DETERMINE CREDIT GRADING (BY AN
INDEPENDENT AGENCY THAT WILL NOT
PROVIDE LOAN TO BUYER) FOR BORROWER
BASED ON PRE-ESTABLISHED AND OBJECTIVE
CRITERIA, THE PERSONAL INFORMATION AND
THE FINANCING EVALUATION INFORMATION ⌐104

END

Fig. 1

Case 8:13-cv-00043-AG-AN   Document 66-1   Filed 09/24/14   Page 5 of 18   Page ID #:758



Fig. 2A

Case 8:13-cv-00043-AG-AN   Document 66-1   Filed 09/24/14   Page 6 of 18   Page ID #:759



Fig. 2B

CONSUMER WANTS SOME TYPE OF FINANCING (E.G., MORTGAGE)
ONLINE
FAX
MAIL
PHONE
IN PERSON
200
202
204
CONSUMER ANSWERS A SERIES OF FINANCE RELATED QUESTION AND CONFIGURATION QUESTIONS (E.G., GOALS, NEEDS, WANTS, ETC.)
CONSUMER PROVIDES INFORMATION SUFFICIENT TO APPLY FOR A LOAN WITH COMMONLY USED UNDERWRITING STANDARDS, SYSTEMS AND CRITERIA
ALL LEGAL DISCLOSURES FROM CONSUMER'S STATE, DOWNLOADABLE FORMS, ELECTRONIC SIGNATURE AVAILABLE IN ADDITION TO MAIL, FAX OR IN PERSON APPLICATION
300
DETERMINE CREDIT GRADING MORTGAGE LOAN APPROVAL OR CREDIT PRE-APPROVAL
LOAN # GIVEN
PIN # GIVEN
302
THIRD PARTY (E.G., INDEPENDENT AGENCY) CAN PROVIDE DATA (E.G., LOAN TERM, RATE, ANY CONDITIONS AND DATA ON CLOSING COST) IN A COMPARABLE FORMAT (WRAPPING THE DATA)
306
CONSUMER (BORROWER)
308
LENDER
214
1. CONSUMER CAN NEGOTIATE ON HIS OWN FOR A MORTGAGE ARMED WITH PRE-APPROVAL/ APPROVAL
2. CONSUMER CAN SHOP ANONYMOUSLY THROUGH THE ASSISTANCE OF A SEARCH ENGINE (WITH PRE-APPROVAL/APPROVAL)
3. CONSUMER CAN SHOP OPENLY WITH PRE-APPROVAL THROUGH COOPERATING AGENCY
A

Fig. 3



Fig. 4

US 7,366,694 B2

## CREDIT/FINANCING PROCESS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of U.S. patent application Ser. No. 10/139,418 filed May 6, 2002, the entire contents of which are hereby incorporated by reference, which claims the benefit of provisional application No. 60/312,919, filed Aug. 16, 2001, the entire contents of which are hereby incorporated by reference, U.S. provisional application 60/327,026 filed Oct. 3, 2001, the entire contents of which are hereby incorporated by reference, and U.S. provisional application 60/362,314 filed Mar. 5, 2002, the entire contents of which are hereby incorporated by reference.

### BACKGROUND OF THE INVENTION

The present invention relates generally to financial transactions including a method for a borrower to evaluate and/or obtain financing, e.g., a loan or a credit card.

Shopping for financing (e.g., a loan, such as a mortgage) can be a complicated time-consuming process. The mortgage industry has been slow to empower borrowers in order to save them time, make their lives easier, and help them determine their best loan options. Because of this, borrowers, and in particular, credit-impaired borrowers, are often overcharged. The Coalition of Responsible Lending has stated that ten million borrowers have been overcharged up-front fees of over $9,000,000,000, which equates to ten million borrowers being overcharged an average of over $900 each. The practice of offering borrowers loans at rates that are higher than warranted by the credit history of the borrower is sometimes referred to as predatory lending. Predatory lending is a very difficult and challenging problem to recognize in practice as many lenders may use procedures that conceal the nature of the predatory practices.

There are newspaper or Internet referral sites which publish interest rates for one or more lenders. However, the user must interact individually with each prospective lender. It is very time consuming for a borrower to investigate each of the potential lenders. Furthermore, each prospective lender typically runs a credit report on the borrower, causing there to be multiple inquiries on the borrower's credit report. The basis for an adverse decision is often unknown.

There is thus a need for a way to help a borrower to avoid predatory lending and paying higher than justified loan rates.

### BRIEF SUMMARY OF THE INVENTION

One aspect of the present invention may be regarded as a method for reducing predatory lending when a borrower seeks financing. Personal information is obtained and recorded regarding the reasons that the borrower wants to obtain the financing. Loan evaluation information is obtained and recorded. The loan evaluation information is preferably based on, or the same as the criteria used by at least one established financial institution that may provide financing to the borrower. A credit grading is determined for the borrower based on pre-established and objective criteria, the personal information and the loan evaluation information. The credit grading is performed by an entity that is not loaning money to the borrower.

The financing sought by the borrower may be a loan. The loan may be, for example, a mortgage loan, a personal loan, an auto loan, or a student loan. The financing sought by the buyer may also be a credit card.

The credit grading information may be provided to the borrower so the borrower can use the information to evaluate his financing options, e.g., different loans.

The credit grading information may be provided to at least one financial institution. The financial institution evaluates providing financing to the borrower based on the credit grading information. The credit grading information may be provided to a plurality of financial institutions or to others authorized by the borrower. The information provided by the borrower is preferably, but optionally handled in a confidential manner and not disclosed to others. The credit score or grade is also preferably handled in a confidential manner and is not disclosed unless authorized by the borrower.

### BRIEF DESCRIPTION OF THE DRAWINGS

These, as well as other features of the present invention, will become apparent upon reference to the drawings, wherein:

FIG. 1 is a flow diagram illustrating an exemplary method for a user to obtain financing in accordance with the present invention;

FIGS. 2A-2B shows a block diagram illustrating further detail of various aspects of the method illustrated in FIG. 1;

FIG. 3 is a flow diagram illustrating an exemplary method for a user to obtain financing in accordance with the present invention; and

FIG. 4 is a block diagram illustrating a computer and database arrangement to implement the features described herein.

### DETAILED DESCRIPTION

An improved way for borrowers to shop for financing (e.g., loans, such as mortgage or auto loans or credit cards) is provided. A person or a group of people (borrower(s)) are interested in receiving financing, such as a mortgage for a home. The mortgage could be a purchase, refinance or cash-out refinance home loan. It could be first, second or third mortgage lien. For purposes of illustration herein, a mortgage will be used in illustrating and describing the present invention. However, it will be appreciated that the loan can be another type of loan, such as an auto loan, a personal loan, a student loan, etc. or that the financing may not be a loan at all, but may be directed to obtaining a credit card or arranging other types of financial credit, for example, a line of credit.

A series of questions are asked of the borrower in order to correlate the most appropriate financing with the borrower's desires. Credit and financial information is also acquired from the borrower. That information is compared with financing qualification criteria and/or credit qualifying criteria in order to provide a borrower with an impartial credit evaluation or loan evaluation based on the submitted information. That credit evaluation or loan evaluation can be used as a check against commercial lenders offering loans to the borrower to allow the borrower to compare against the loan rate or credit rating offered to the borrower by lenders in order to ensure the borrower receives the most desirable loan based on the credit available to that borrower.

Referring now to the drawings wherein the showings are for purposes of illustrating preferred embodiments of the present invention only, and not for purposes of limiting the same, FIG. 1 is a flow diagram illustrating an exemplary method for obtaining a mortgage. FIGS. 2A-2B are a block diagram illustrating in further detail various aspect of the method illustrated in FIG. 1.

US 7,366,694 B2

3

The logic of FIG. **1** moves from a start block to block **100** where the user is asked a series of questions, either verbally, or visually, for example, in a written format. In exemplary embodiments, this process is performed over the Internet by viewing questions on a computer display and sending responsive information. The responsive information may be sent over the Internet, e.g., by filling out and submitting the information in an online form, via attached documents, via scanned documents, etc. It will be appreciated that the user could also answer the question in person, over the phone, via facsimile, via postal mail, etc. In more detail, as shown in block **200** of FIG. **2**A, the borrower(s) answer a series of configurative questions. These questions relate to goals, needs, wants, etc. of the borrower. The precise questions will vary but are directed toward achieving one or more specific purposes. These questions are optional, but are preferred. The purpose of these questions is twofold. First, the questions allow the potential borrower(s) to focus on exactly what the borrower(s) is/are trying to accomplish. For example, the primary interest might be to obtain funds to purchase real or personal property, to improve monthly cash flow, to reduce payment, to obtain a different type of loan, to alter the monthly loan amount or other terms of the loan, or to refinance and obtain various amounts of cash. Second, the questions make clear to the loan processor and/or eventual lender exactly what the borrower(s) objectives are in seeking the financing so the most appropriate types of loans and terms can be offered to the borrower(s).

Prior to finalizing a loan amount, various items, especially some or all of the items typically involved in calculating closing costs can be verified with the borrower(s) to be certain that the loan being put in place is the loan most suitable to what the borrower(s) wants. As with the prior questions, these questions can be answered over the phone, on-line, through the mail, by fax, in person, etc. Illustrative closing cost items include but are not limited to, one or more of points and fees being charged, type of loan product (conventional loans, jumbo loans, conforming loans, F.H.A., V.A., etc.), lien position, purpose of loan, etc. A more complete illustration is provided regarding the alternative embodiment of FIGS. **3**-**4**.

The logic of FIG. **1** proceeds to block **102** where financial evaluation information is obtained and recorded from at least one financial institution from which the borrower may obtain the loan, financing, credit, etc.

In addition to providing the information from the configurative questions, the borrower(s) provide information sufficient to apply for a loan. This may alternatively comprise actually applying for a loan or financing independently and separately from any person or entity that is a mortgage credit grantor or mortgage arranger (block **202**). This application can be done over the phone, on-line or with a live customer service representative assisting the telephone applicant(s). It can also be done through the mail, in person, by fax, or through a global communications system, such as the Internet.

The loan application can also be done with the assistance of a loan processing service that helps answer questions of the borrower, acquire information, and generally assist the borrower in the application process (block **206**). There may or may not be a fee charged for this application portion of the service. Loan processors can help explain to potential lenders various aspects of the borrowers credit history that may appear undesirable. They may help consolidate prior loans, to remove or explain adverse credit ratings, or claims, and make the borrower's credit appear more desirable. Some of these aspect involve credit correction which is discussed

4

in further detail later. While the assistance of a third party can be used in the loan application process, the borrower(s) may attempt to apply on his own. The information from this loan application is provided to the same entity having the responses to the configurative questions.

Often, the borrower(s) may be aware of something that needs to be corrected or questioned regarding the credit report of the individual borrower or borrower. The borrower(s) may be aware of this before or become aware of this during the mortgage application process. The borrower could go directly to a credit correction company or be referred by the loan processor to a credit correction company (block **208**). There may or may not be a fee charged for this service. The information given to any credit correction company is preferably, but optionally, provided to the same entity that has the responses to the configurative questions.

The purpose of the credit correction is to resolve anything having an adverse effect on the consumer's credit and that is typically achieved by removing incorrect information, closing accounts that the borrower sees no useful purpose in keeping open, negotiating settlements of amounts owed to creditors as well as negotiating the reduction or removal of negative items on the credit report. The credit correction could also coordinate among creditors and the three major credit bureaus (Experian, Transunion and Equifax) to correctly portray outstanding balances, public records items, tax liens, judgments, collections, charge-offs and, in conjunction with Fair Isaac's Company (FICO), all to improve the credit scores of the borrower. Any results of the credit correction are preferably, but optionally, provided to the same entity that has the responses to the configurative questions, especially if the results alter the credit worthiness of the borrower.

The logic then moves to block **104** where a credit grade or score is determined. In conjunction with the previously answered configurative questions, the borrower's mortgage or other financial application will be evaluated based upon objective, pre-set underwriting criteria. One or more, and preferably all, of the credit history, credit score(s), equity, down payment, income, assets, job history and stability could be considered. The criteria need not be inclusive of all lender's criteria. The mortgage credit evaluation system is preferably based upon commonly used industry evaluation systems, including one or more of Fannie Mae, Freddie Mac, F.H.A., V.A., Ginnie Mae, private mortgage insurance companies, or combinations of those evaluation systems. It could also be based upon individual lender's evaluation systems if those are different from the above-mentioned systems. For example, Washington Mutual Bank has significant market share in the United States. The institution may have its own evaluation process, possibly not commonly used within the industry. The results of the evaluation are based on objective, pre-set underwriting criteria provided to the borrower. In exemplary embodiments of the invention, the borrower is provided with his or her credit report and credit grades or scores. The borrower could also be provided with an electronic appraisal of the property. This information could be provided to the borrower via the Internet or via another method, such as via facsimile or mail.

For other types of financing, other financial criteria will apply. For example, a bank's criteria for a credit card, for a line of credit. The criteria is preferably that criteria used by a recognized institution providing the financing desired by the borrower, and the criteria will vary with the institution and the type of criteria involved.

The purpose of would-be borrower(s) knowing independently of any interested mortgage credit grantor or arranger

US 7,366,694 B2

is for the borrower(s) to independently know their borrowing strength and ability. If the borrower(s) know that they have an excellent grade in the mortgage credit granting system, they are armed with valuable information that can help them to negotiate the most favorable terms, e.g., interest rates. See block 212 of FIG. 2A. This may also allow the borrower(s) to receive a better loan suited to their particular needs, preferably, but optionally, as indicated by the borrower's responses to the personal configurative questions. This may not necessarily mean the most favorable interest rate. For example, while a borrower may be able to get 90% cash-out, it may be more valuable to the borrower to get only 80% cash-out. The 90% cash-out will probably carry a less favorable interest rate or more points, or both.

The would-be borrower preferably receives a credit pre-approval from the entity having the responses to the configurative questions and the other above identified information. Alternatively, the would-be borrower receives a full loan approval from the entity having the responses to the configurative questions and the other above identified information. The difference between these two alternatives is that the pre-approval gives a loan amount and loan terms that the borrower is currently eligible for. The actual loan approval means that the borrower(s) have everything in place; a specific property, specific interest rate and loan amount, appraisal, title report, escrow/attorney (closing agent), paperwork, proof of income, assets (if needed), for that particular loan program, and any other required paperwork that might be needed to complete the transaction. The borrower(s) is/are issued a loan number and personal identification (PIN) number.

The approval or pre-approval will be good (locked) for a certain number of days. The number of days will vary based on a variety of circumstances. A loan number is preferably, but optionally, issued in conjunction with commonly used underwriting standards, systems, and criteria. For example, FANNIE MAE might issue a loan number. That loan number could be the loan number issued for the borrower(s) credit pre-approval or loan approval. A personal identification number (PIN) can be used for privacy protection. Preferably, but optionally, the borrower(s), through their PIN number, control who can look at their file. Thus, preferably the borrower's credit information can be owned or controlled by the borrower. No one has access to the borrower's identity or information without the borrower releasing the information. Even when submitting credit information and the other information discussed herein to a lender, the borrower(s) can submit, at least preliminarily, the information to the lender or mortgage broker using a PIN number and thus maintain further confidentiality.

One purpose of the lender not knowing the exact identity of the borrower(s), at least initially, is to protect the time invested by the borrower(s) in responding to sales calls that might result from releasing the identity of the borrower(s). It also protects the borrower(s) privacy, the confidentiality of the information involved, and security of the borrower(s) until the borrower(s) actually decides and chooses who the lender or mortgage broker will be to perform the loan origination task. By maintaining the identity of the borrower(s) in confidence or even in secret through a PIN number, it is possible to force lenders to at least initially evaluate potential borrower(s) on objective criteria, and that can reduce profiling, discrimination, predatory lending, subjective selection to achieve other undesirable and unlawful goals that might arise if the borrower(s) identity were known.

One purpose for the lender or mortgage broker using this intermediary is to ideally offer the guaranteed interest rate and closing costs to those borrowers that are loan approval capable. Lenders/mortgage brokers do not have to guarantee interest rates up front. This process will assist mortgage originators by not having to log in and guarantee interest rates to borrowers that cannot qualify for that lender's/ mortage broker's loan approval criteria.

Using this approval or pre-approval information, the borrower(s) can shop on their own. The borrower(s) can shop anonymously through a computerized search engine. Or, the borrower(s) can shop openly with the assistance of a cooperating agency. See block 214.

The borrower(s) may be able to access current interest rate and fee surveys of lender/mortgage companies to compare that information with what the applicant is being quoted by others. See block 212. The borrower(s) may also be able to find out how much the lender/mortgage company is paying for the money being loaned to the borrower or used to provide other financial services to the borrower or applicant. This is similar to finding out what a car dealer pays the manufacturer for the car. Additionally, the mortgage applicant(s) or borrower(s) can analyze the data in a comparable format (wrapping the data). This can help to determine the most beneficial loan or other financial arrangement. This usually, but not always means, the lowest interest rate, the lowest credit rate, any balloon payments, etc. that meets the applicant's personal requirements. But the wrapped data that is presented in a format to allow comparison, such as a spreadsheet format, advantageously includes the term (duration) of the mortgage(s), loan or financial commitment; interest rate, the annual percentage rate (APR), note rate (which could be different than the start rate or the interest rate), loan amount, total closing costs, total summation of category/provider costs (i.e., mortgage broker, lender, closing agent, title etc.), interest rate; the interest rate adjustment period(s); future interest rate(s), if known (i.e., fixed rate buydowns or graduated payment mortgages), starting interest rate, lifetime cap or maximum rate, margin, index, guaranteed interest rate lock period, prepayment penalty term and dollar amount of penalty, index history, description of index, and other related information. The wrapped data also preferably, but optionally, includes the borrower's credit risk scoring or credit rating as determined by various institutions, including industry ratings such as FICO (Fair Isaacs & Co.), and private ratings from lending institutions and/or mortgage insurance companies. As discussed below, in a further embodiment the independent third party can present the wrapped data to the borrower(s), with the wrapped data being provided free, as part of the services of the third party, or for a fixed or variable fee.

After receiving the credit report, loan approval or loan pre-approval, the borrower can go to negotiate a loan on his or her own behalf with any mortgage originator(s) that may financially benefit by packaging and/or funding the borrower's loan. See block 214. The borrower authorizes the mortgage originator to pull-up the approval findings using the pre-approval/approval authorization number. The mortgage originator negotiates a rate and fees for the borrower to be charged, knowing that the loan is already pre-approved and in the belief that the information inputted from the loan application is accurate. The mortgage originator will likely make any mortgage or financing subject to verification of information inputted from the loan application. The rate and fees charged are typically based upon the credit grading of the approval.

US 7,366,694 B2

7

With authorization from the borrower, the mortgage originator then collects the information needed from the loan approval findings. The borrower(s) is/are simply handing over the package of required items that the pre-approval/approval has specified. See block 216. The lender formally examines the loan file. The lender locks in interest rate. Upon satisfactory receipt of accurate and valid information (quality control), the file is formally lender approved. The loan documents are drawn. The borrower(s) sign the loan documents. The loan is funded. See block 218. Other types of financial assistance will have different processes that vary with the nature of the transactions involved, such as a credit card, line of credit, etc.

The information compiled by the entity having the answers to the configurative questions can also be used for goods or services related to the purpose for which the borrower is obtaining financing or for helping the borrower obtain such goods or services. See block 220. Thus, the borrower(s) may also need other industry services. Some examples are a closing agent, title company, real estate agent, home inspector, termite company and utility hook-up, all of which are related to a home purchase. A system and method for identifying third party vendors for goods and services related to real estate transactions is disclosed in U.S. Pat. No. 6,321,202, the complete contents of which are incorporated by reference herein. The borrower(s) could find those needed services through this credit granting system, by having the entity with the answers to the configurative questions provide the information to the borrower, or provide the identity of the borrower to providers of the appropriate goods or services. It will be appreciated that these related services are dependent upon and vary with the type of loan or financing being obtained by the borrower. For example, in the case of an auto loan, related services might include auto security devices, etc. There may or may not be a charge for providing contact information for these needed goods and/or services.

After the borrower(s) go through the credit granting process, they may or may not have actually had a loan funded. Within this mortgage credit granting system, there is opportunity for providing future reminders or information on the borrowers' credit report and credit scores, property value, interest rates, borrowing power, etc. The borrower(s) may wish to access information about his/their own property (ies), credit, borrowing power, etc. This could be done by paying or not paying a fee for unlimited usage, periodically sent to borrower(s) (subscription service) or on a per transaction basis. See block 224.

Additionally, the borrower(s) may periodically receive informational bulletins for the purpose of maintaining a relationship between the borrower and the entity having the answers to the configurative questions. See block 226. This could be communicated by fax, Internet, e-mail, delivered mail or by phone, or other communication devices now existing or developed in the future.

The borrower could also access marketing services by giving permission to receive advertising, be contacted about a specific product or service related to home ownership. The borrower could also initiate communication with a related product or service (Agency Service) that can be accessed as part of this credit granting system. There may or may not be a fee charged for this service whether it is the borrower of vendor.

This above method is not designed to be used to actually negotiate mortgages. It could be used to do this, but preferably, it is designed to give the borrower information about their credit grading. The credit grading includes a grading

8

based on combinations of a variety of factors, including various combinations of a credit report for the borrower, borrower income, borrower assets, borrower liabilities, property appraisal, title report, and whatever criteria a particular lender deems appropriate. If borrowers know that they are acceptable based on commonly used credit-granting standards/systems/criteria (e.g., Fannie Mae, Freddie Mac, F.H.A., V.A., etc.) that typically offer the lowest rates and fees, it makes them less vulnerable to be victimized by predatory lenders and/or mortgage originators that charge unreasonably high rates and fees to a good quality borrower. Similarly, this process allows an applicant to evaluate an aspect of their finances based on accepted criteria used in the trade for the particular financial aspect in question, and enables the applicant to use the resulting information to the advantage of the applicant

Borrower privacy is preferably, but optionally, an important critical component to this credit granting system. Preferably, no entity gains access to the borrowers' information without the clear consent of the borrower. Any entity that receives business through this system (e.g., loan processor, credit correction company) is thus preferably contractually obligated to maintain the borrower's privacy. Likewise, affiliated entities having access to borrower information are preferably precluded by agreement from releasing information about that borrower unless the borrower gives permission to do so. Preferably, the information may only be released as specifically instructed by the borrower(s).

There is thus advantageously provided a method by which an applicant seeking financing can provide information to a third party evaluator that will render an independent evaluation of the applicant for the requested financing based on objective criteria used by at least one established entity that can provide the financing sought by the applicant. The applicant can then use that independent evaluation for his/her/its own purposes. Preferably, the applicant will use the evaluation to obtain the desired financing, to negotiate more favorable terms on the financing, or to guard against terms less favorable than are believed to be otherwise available to a person having the independent evaluation.

More preferably, the applicant also provides information relating to the reasons for seeking the financing. That information is preferably, but optionally used by the third party evaluator to select criteria more applicable to the desires of the applicant, or to direct the applicant to financial institutions more likely to suit the applicant's needs or the applicant's desires, or to allow a financial institution to evaluate the applicant's financial requests, or any combination of these. Further, this information can be provided to third party providers who can provide goods or services to the applicant which goods or services are related to the use to which the applicant intends to put the financing.

There is thus provided a method by which a third party can acquire information from an applicant and compare the information with predetermined criteria and provide an evaluation relating to a financial matter. The evaluation can be used to avoid predatory lending, is preferably used to obtain financing in the form of financial assistance to the applicant, and is more preferably used to obtain a financial loan, and is still more preferably used to obtain home mortgage financing. In the mortgage context, the service will preferably provide persons seeking mortgages with information about the amount of money they should be able to borrow based upon current rates. By establishing appropriate arrangements between the third party evaluator and the person providing the mortgage or other financial service, a pre-approval could even be granted by the third party, such

US 7,366,694 B2

9      10

as a mortgage pre-approval. Such pre-approval would be subject to the later agreement by the lender or provider of other financial services after verification of the information provided by the borrower or other person seeking financial services.

The method described herein is advantageously implemented by inputting the information from the applicant into a computer, into an electronic device, or into another device which compares at least some of the information to predetermined criteria used by an established entity, be it a person, business or organization, that provides financial services of the type sought or needed by the applicant. Preferably, the criteria is stored in memory and the applicable criteria is selected by the computer automatically or by a person manually, based in part upon personal information provided by the applicant as to the reasons for requesting the financial service. Advantageously, the evaluation also includes specifics on the financial services desired, such as appropriate fee and interest rate ranges based on the loan amount and loan program for a home loan mortgage. A tentative pre-approval can also be provided by the third party evaluator subject to verification of the accuracy of the information provided by the person seeking the financial services.

Advantageously the criteria for providing the requested financial service (e.g., mortgage) is obtained from several providers, preferably the major providers of the desired financial service (e.g., Freddie Mac, Fannie Mae, FHA, VHA, etc). The disclosure and use of the financial criteria will typically be confidential between the third party evaluator and the provider of the desired services. Moreover, the disclosure of the financial criteria preferably includes computer software allowing automated application of the criteria by the third party evaluator. If access to the actual criteria used by providers of the desired service is not available, then in appropriate circumstances software or criteria closely mimicking the desired service provider's criteria can be used. For example, in the home mortgage area if Freddie Mac loan criteria is not available, then loan criteria from Countrywide could be used.

Advantageously, but optionally, the configuration information is also provided to the third party evaluator, and that information is used to help select the financial service providers most likely to provide the service desired. The computer database is preferably, but optionally used to assist in the evaluation is desirably programed to narrow the financial sources based on the requirements of the person seeking the financial services.

The comparison results in an evaluation that is preferably printed or provided in other tangible form or in a form visually perceptible by the applicant, as for example, a visual display on a computer screen or video monitor. Advantageously, the person seeking the financial services will be provided with an evaluation from the major suppliers of the desired financial services. For example, a credit rating from the three major providers (Experian, Transunion, Equifax) could be provided.

The method described herein can advantageously be used online, with the person seeking financial services filling out his or her own application and transmitting the information over the Internet. The third party evaluator will receive the information and use a computer to search for the requestor's best options based upon the information provided by the requester and based upon the requestor's specific needs or special requests as identified by the configuration questions. The third party evaluation, in the home loan context, advantageously provides credit reports and scores, loan approval

findings and an AVM (automated valuation model) if there is a specific property in question.

Because the requester (the person seeking the financial services) owns all of the personal information provided to the third party evaluator, and because the information is provided over secured lines and methods of transmittal, the information is confidential and preferably will not be released without permission from the requester. This differs from many, if not all, of the current home loan situations in which the lender owns the application (and thus the information on the application) for a home loan. Indeed, having the lender own the credit information is required by law in order to regulate lenders and inhibit fraud committed by lenders upon borrowers seeking home loans.

The requestor/borrower can then shop for a loan anonymously through any of a variety ways. Once the requestor/borrower finds an acceptable choice, the third party sends the evaluation and some or all of the financial information obtained from the requester and some or all of the configuration information, to the provider selected by the requester. This allows the confidential information to be sent only to the person or persons specifically identified by the requestor/borrower. This contrasts significantly with current Internet based loan systems in which financial information is simultaneously submitted to a plurality of predesignated, potential lenders in the hope that one of them will offer to make a loan after internally evaluating the loan request.

Upon receipt of the third party evaluation, the requestor/borrower may also decide to wait and attempt to improve the credit rating or evaluation. Credit problems can be cleared up, debt can be consolidated, etc. Because the evaluation is confidential, there is no adverse report to later hinder the requestor/borrower and there are fewer credit checks showing up on the requestor's credit. There are disadvantages to having a large number of credit checks on a person's credit.

The present method envisions that the person seeking the financial services will incur a legal obligation to pay, and will actually pay the third party for rendering an independent evaluation based on objective criteria. The payment by the person seeking the service is different than reimbursing appraisal fees or the costs of credit reports, and constitutes payment for services rendered. The payment is preferably an out-of-pocket payment by cash, check, money order, credit card etc.

But the payment can in some circumstances be made by the person providing the financial services. An example would be when the third party provides the person seeking the desired financial services with the identification of one or more providers of the desired financial services and the person desiring the financial services actually obtains the services from the provider. In that case, a preexisting arrangement may exist under which the person providing the financial services pays for the evaluation by the third party, gives a financial credit to the person seeking the service, or provides a separate payment to the third party. Moreover, the person providing the financial services may pay the third party evaluator for referring the person seeking the financial services. Because the third party is preferably independent, these payments from the providers are transfers between separate legal entities that have no ownership affiliation, and they must comply with regulatory disclosure requirements. Despite the existence of such financial reimbursements for providing leads to lenders or to other service providers, the third party evaluators are still considered independent. If the third party evaluator is a full time employee of an entity providing the desired financial services or if the third party evaluator receives a percentage commission from an affili-

US 7,366,694 B2

11

ated company based on the loans funded through this program, then the third party would most likely not be considered independent. Either an independent third party, or an affiliated/interested third party could be used, but the affiliated/interested third party is less desirable.

The above description is given in the context of an individual obtaining financial services, using a home loan as an example. The method provided herein is equally applicable to any person, when person is understood to mean any human, as well as any legal entity such as a corporation, partnership, limited liability company, etc.

A further embodiment of this invention is illustrated in FIG. 3. Blocks with the same numbers as blocks in FIGS. 2A and 2B (e.g. block numbers less than 300) are the same as described regarding FIGS. 2A and 2B, above unless noted otherwise, so their descriptions are not repeated. Block 300 performs same functions as former block 210 and everything previously described relative to block 210 applies to block 300. But block 300 also includes the data acquisition step of block 302. As reflected by block 302, additional information is acquired, preferably, but not necessarily by an independent agency. The acquired information preferably involves wrapped data on the loan term, rate and any conditions, as well as wrapped data on closing costs. The wrapped data of block 302 is advantageously provided by the same party that performs the functions of block 300, but two separate parties could be used for the functions of each block.

The wrapped data is advantageously, but optionally, presented in a format to allow comparison, such as a spreadsheet format. The wrapped data on the loan term, rate and conditions advantageously includes the term (duration) of the mortgage(s), loan or financial commitment; the interest rate; the interest rate adjustment period(s); future interest rate(s) if known (i.e., fixed rate buydowns or graduated payment mortgages), starting interest rate, lifetime cap or maximum rate, margin, index, guaranteed interest rate lock period, prepayment penalty term and dollar amount of penalty, index history, description of index, and other related information. Advantageously, some or all of these loan aspects, especially the rate and lifecap, are guaranteed unless an observable and verifiable index or other appropriate data or means s a change in interest rates.

The wrapped data on the closing costs will vary with the nature of the financial transaction involved, but for a home loan include such information associated with title, and these fees include Title Insurance, title insurance endorsements, title insurance premiums/fees, title surveys, messenger fees and reconveyance fees, title insurance fees. There are also a number of charges associated with the closing agents, and these include, but are not limited to, closing agent escrow officer fees, attorney fees, title company closing agent/officer charges, notary fees, recording fees, messenger fees, payoff demand fee(s), facsimile fees, prepaid interest for a certain number of days in the month of the closing.

There are additional charges associated with loan origination fees, and these include, but are not limited to loan origination fees or loan points, discount points, mortgage broker points/fees, processing fees, credit report charges, credit report updating charges, credit report correction fees and costs, underwriting fees, loan document fees, tax services, wire transfer charges, flood zone certification costs, recording fees, automated computer appraisal charges, human on-site appraisal fees, drive-by appraisals, automated computer appraisals, property hazard/fire insurance costs for a specified amount of time, mortgage insurance for a specified time period and/or until the mortgage is paid down to a

12

certain loan to value or until there is a certain amount of increased property value through appreciation or through a combination of both, biweekly or other note modification set-up fees, interest rate note modification, term of note modification, relocking at the same or different interest rate or renewal of rate lock guarantee under a different loan than the original guaranteed loan program, home warranty policy fees, termite inspection fee and termite report charges, roof inspection fees, geological inspection report fee, mold, contamination, natural hazards inspection fee and report charges, mortgage life insurance, disability insurance, mortgage unemployment insurance costs.

There are additional fees associated with real estate agencies, and these include but are not limited to real estate agent commissions, administrative fees for home buyers, home sellers or both. Selling costs may include all tile insurance and closing agent related fees. Mortgage broker. Further, there may be fees associated with mortgage brokers, and these include but are not limited to fees associated with a borrower agreement for mortgage broker to receive a specified amount of the lender rebate, and any yield spread premium or service release premium in lieu of or in addition to the mortgage broker directly charges points or fees to the borrower for arranging the loan. Finally, there may be extraneous, but nonetheless appropriate charges, such as fees associated with the independent third party's efforts, charges for the configuration questions, charges for transmitting, verifying, and guaranteeing some level of accuracy of the information and costs quoted by the third party. As always seems to be the case, there are probably some unexpected fees.

To the extent some of the above are referred to as fees or charges when they should be costs, or vice versa, they all represent money charged to and paid by the borrower(s) and may generally be referred to as fees, or costs or charges. The wrapped information is preferably presented in the above groupings, but various combinations of itemizations can be used, depending on the financial transaction involved and fees associated therewith. Moreover, there may be conditions associated with some or all of the above fees, and advantageously, but optionally, those conditions are also are enumerated for comparison. Further, it is desirable, but optional, to include a total sum of the associated costs for a bottom-line comparison.

This wrapped data is preferably compiled based on information from one or more agencies providing the services. These fees from the various providers may be based on standard fees, or the independent third party may reach agreements with one or more providers for a fee reduction for any of a variety of reasons, including volume discounts.

Advantageously, but optionally, the various above itemized costs associated with the wrapped information, or at least the total cost, is guaranteed or locked-in to be the fee maximum charged for a fixed period of time, such as 30 days, but the time can vary. Preferably from the third party's viewpoint, the costs of some or all of the wrapped data are guaranteed but within a predetermined variance rate, such as 5%, preferably 10%, and more preferably 15%. That permissible variance may apply to some or all of the wrapped data, but is more likely to apply to only some specific items, such as for example, per diem interest, hazard insurance, and escrow impounds. This guarantee of costs is preferably provided by the third party. This guarantee of costs allows the borrower(s) to comparatively evaluate the advantages of using various entities in the wrapped data to provide the loan.

US 7,366,694 B2

13

Alternatively, the wrapped data relating to costs or rates or combinations thereof can be presented in the form of a good faith estimate. Such good faith estimates preferably include the wrapped cost data with the interest rate and preferably the terms associated therewith being guaranteed for a predetermined time. In a further alternative, various aspects of the loan terms are guaranteed unless an observable and verifiable index or other appropriate data or means warrants a change in interest rates. All of this wrapped data is preferably included in block **302**.

This wrapped data is preferably provided to the borrower by the independent third party so the borrower(s) can comparatively evaluate which lender to use, and to evaluate and more accurately predict the fixed costs associated with the financial transaction. The usefulness of the wrapped data to the borrower is enhanced if the wrapped cost data is provided for a plurality of lenders or mortgage brokers or providers of the various services. This wrapped data is preferably compiled in a computer, and forms a data structure of comparative cost information for one or more businesses providing the various services needed. The information can be provided in a printed format, or transmitted electronically to the borrower(s) or other appropriate entities by other means now known or developed in the future.

Some or all of this wrapped data of block **302** can also be provided to either the borrower via block **306** or to the lender or provider of the financial services sought by the borrower (s) as in block **308**. Such information can be provide to the lender as in block **308** without confidential restriction and thus disclosing confidential information about the borrower (s) to the lender. Alternatively, only the borrower(s) PIN number, or minimal information on the borrower(s) may be disclosed for the reasons discussed above regarding block **210** in FIG. **2A**. The use of PIN numbers or other identifying indicia associating a borrower with a credit evaluation and optionally with a guaranteed cost quotation, allows the borrower to shop anonymously and compare lenders or other providers of the desired financial services. Advantageously, the information, guarantees such as rate locks and cost locks for fixed time periods, is all done by computer so the borrower(s) do not have to leave the privacy of their residence.

Referring to block **308**, that block can represent receipt by one or more lender or provider of the desired financial services sought by the borrower. That block can also represent mortgage brokers in a home loan situation. The lender or broker can accept a registration number or PIN number instead of specific borrower identifying information in order to guarantee an interest rate and optionally but preferably to also guarantee closing costs (as discussed above regarding block **302**) for a specified number of days. Such guarantee is preferably, but optionally, subject to validation of all required loan approval documentation and information at a later date. Various ranges of borrower information can be provided from none (via the PIN number), to the borrower's name, to full identity of the borrower and the borrower credit, to the responses to the configuration questions, or any combinations thereof.In order to provide the most useful information to the user, current information from lenders is needed and information from the borrower relative to the amount of loan and desired loan terms is needed, thus information is transmitted both to and from the lender (block **308**) and the consumer (block **306**), as reflected by the arrows in FIG. **3**. Because some of the information from the lender and consumer overlaps with the information provided

14

relative to block **300**, it is preferable, but not necessary, to have the functions of blocks **300** and **302** performed by the same entity.

This process allows the borrower to shop several lenders without disclosing the borrower's identity, yet allows the lender confidence that the borrower qualifies for the loan. This process is especially useful to the borrower if the credit grading of block **300** includes data from a variety of lenders, and if the cost wrapping of block includes data from a variety of lenders and other service providers.

In the sequence of FIG. **3**, the third party providing the services of block **300** is preferably an independent third party, as defined above. Alternatively, the party providing the services of block **300** may provide a mortgage. Such a third party packager advantageously signs an agreement to provide a package that includes a loan at a specified rate and term, thus locking in the loan rate and terms. The closing costs of block **302** may or may not also be locked-in. A lender preferably also signs the agreement or ratifies the agreement after the borrower accepts the terms, with the lender agreeing to provide the loan. The lender agrees only subject to underwriting approval and appraisal etc., or other verifications of information appropriate to the financial transaction involved. As the mortgage is provided by or arranged by the third party, the third party providing some or all of the services of block **300** could lock in the loan rate and terms. Optionally, but preferably, the third party could also lock some or all of the costs as discussed regarding block **302**, with or without the variations on some or all of the costs as discussed regarding block **302**. Such third parties could optionally guarantee a specified loan rate with a guaranteed price for all settlement costs, which could be attractive to borrowers if the loan rate is low as the closing costs are predictable, and in fact are guaranteed.

Preferably, but optionally, the third party packager of block **300** is an independent third party that merely provides credit gradings, answers to configuration questions, or buyer pre-qualifications to the lenders or other mortgage brokers or other packagers as described in the immediately preceding paragraph, and that provides the various functions described relative to block **300**.

The embodiment shown in FIG. **3**, may also include any or all of the functionality shown in FIG. **2B** as indicated by connector A.

As discussed below, in a further embodiment the independent third party can present the wrapped data to the borrower(s), with the wrapped data being provided free, as part of the services of the third party, or for a fixed or variable fee.

Referring to FIG. **4**, a diagram is shown that illustrates one way in which the various steps described above can be achieved using a computer system that is preferably a distributed system. The independent third party has a computer accessible site **400** that is preferably accessible through the Internet **410**, or through other data transfer means now known or developed in the future. The lender(s) each also preferably have a computer accessible site **402** that is preferably accessible through the Internet **410**, or through other data transfer means now known or developed in the future, with some of the currently known communication means being discussed above. One or more borrowers, or their representatives optionally, but preferably also each have a computer accessible site **404** associated with each individual borrower or borrower representative, with the site **404** being preferably accessible through the Internet **410**, or through other data transfer means now known or developed

A120

US 7,366,694 B2

in the future, with some of the currently known communication means being discussed above.

The site **404** provides a user interface using web pages which facilitate the user in providing information to and receiving information from the third party website **400**. For example, the borrower can set up an account which includes a PIN number for accessing the site. Web pages including forms for the borrower to enter information, such as the purpose of the loan, borrower's income information, etc. are provided to the borrower via the borrower site **404**. After applicable loan programs have been determined by the user, the loan program data can be uploaded to the borrower computer and be displayed via the borrower web site **404**. The borrower is able to compare the various loan packages without exposing personal information to any of the lenders. Preferably, but optionally, the loan package information is displayed in a spread sheet type format.

The third party site **400** has or has access to a database **406** that is preferably, but optionally accessible through a web site or through other data transfer means now known or developed in the future, with some of the currently known communication means being discussed above.

The database **406** preferably contains a data structure comprising a searchable database of information provided or compiled in response to one or more of blocks **100, 102, 302** and **220**. Rather than have all information consolidated in a single database, plural databases can be used, either partitioned within a single structure or distributed spatially. Preferably, database **406** contains information from lenders supplied in response to blocks **100** and/or **102**, and contains cost data supplied in response to block **302** and/or **220**.

Access to the database is preferably controlled by the third party, especially regarding loan provider criteria of block **102** and cost data of block **302**, although in appropriate circumstances the lender(s) or service providers whose data is contained in the database **406** may have direct access to their own information in order to update the information. Preferably only the third party extracts information from the database **406** through a search engine that may be located with the database **406** or on the third party's web site **400** in the event that the database **406** and the equipment operating the web site **400** are spatially separated such as being in different geographic locations.

The third party's site **400** also preferably has access to or contains a credit grading module **408** to allow the third party to analyze information, such as evaluating borrower input from block **100** and/or **102** relative to the lender requirements in database **406** or with the cost data from block **302** and/or **220**. This searching and analysis is advantageously achieved through a loan search engine that is preferably at site **400**, but that could be located elsewhere and accessible from the site **400**. Thus, the credit grading module **408** is advantageously executed by a server associated with web site **400** running a loan search engine that compares borrower information with lender criteria and loan and closing cost information. The exact nature of the information analyzed will vary with the nature of the financial transaction involved. Alternatively, the module could be in the form of a downloadable program that borrowers can execute on their own computers or information processors.

The third party preferably sends the analyzed search results in a manner and in a form deemed appropriate by the third party and in compliance with the privacy requirements of the various parties providing information contained in the database **406**. The search results are preferably, but optionally transmitted via the Internet **410**, or distributed as otherwise described above.

As mentioned, the borrower(s) or their representatives can input appropriate information to the database **406** directly via the Internet **410**, or with third party transcription assistance through phone, fax, mail, etc. or through other means described above or developed in the future. Preferably the borrower supplied information is reviewed, monitored, analyzed or processed in some manner by the third party or by an entity managing the database **406** in order to ensure the integrity, accuracy and completeness of the information provided by the borrower.

The lender site **402** also preferably has access to consumers through the Internet **410**, as shown, or through other means described herein or later developed. The lender site **402** preferably has software allowing borrowers to provide information as in blocks **100** and/or **102**. The lender site **402** can transmit that information to the third party site **400** for processing by the third party as described herein. The third party operating the site **400** can be and is preferably independent, but could be part of the same company as the lender **402** transmitting the information, or could have contractual agreements to process information for such lender(s). The computer interconnection and the access to the information on one or more databases as described herein, allows implementation of the various financial transactions described herein.

In a further way to use the this system and process, a borrower can enter various loan criteria that are of importance to the borrower (e.g., monthly payment or closing costs) into the borrower's computer or the third party's processing equipment at site **400**, and search for a loan for which the borrower qualifies. That allows the borrower direct access to the analytical and search capabilities of the credit grading module **408**, and the database **406**. This assumes that borrower information of the type obtained in block **100** and/or **102** has been obtained and is used in the analysis and search. But the borrower's credit grading need not be actually disclosed to the borrower to conduct such searching and analysis. The credit grading could be stored on site **400** or otherwise provided to or determined by module **408** without providing that information to the borrower. This withholding of the credit grading information can inhibit uses from reverse engineering the credit grading algorithm in order to game the system. That assumes that the credit grading algorithm is not publicly known, or is not readily available or is not known to the borrower.

As a further way to use the system and process described herein, after finding a suitable loan through the search engine associated with site **400** (whether the search is done by the borrower or the third party), the borrower could select a loan package and apply for a loan. The information could be transmitted over the Internet **410** or other computer linkages, or as otherwise described herein or developed later. In connection with such loan application, some or all of the information associated with the borrower that is stored in or accessible by site **400**, can be transmitted to or accessible by the lender providing the loan package selected by the borrower. This loan package preferably has a guaranteed loan rate (via block **302**). The costs associated with the loan are preferably, but optionally also guaranteed, preferably by the lender but possibly by an unrelated party that provides or arranges the various services associated with the closing of the loan transaction.

As shown in FIG. **4**, the third party web site **400** and the lender web site **402** may be separate and distinct web sites. However, it will be appreciated that a single web site may be

17

used in which the user interface(web pages) displayed and available functions depend on whether the user is a borrower or a lender.

Although Internet web sites are shown, other types of interactive systems and user associated interfaces could be used. For example, borrowers and lenders could access the system via an online services network (America Online, Microsoft Network, etc), an interactive television system, a touch-tone telephone interface, e-mail, a telephone-based voice recognition system such as "Tellme," or other ways of transmitting information now known or developed in the future.

While an illustrative and presently preferred embodiment of the invention has been described in detail herein, it is to be understood that the inventive concepts may be otherwise variously embodied and employed and that the appended claims are intended to be construed to include such variations except insofar as limited by the prior art. Further, the various features of this invention can be used alone, or in varying combinations with each other and are not intended to be limited to the specific combination described herein.

What is claimed is:

1. A computer-implemented system for enabling borrowers to anonymously shop for loan packages offered by a plurality of lenders, the system comprising:

a database that stores loan package data specifying loan packages for home loans offered by the lenders, the loan package data specifying, for each of the loan packages, at least a loan type, an interest rate, and a required borrower credit grading; and

a computer system that provides:

a first interface that allows the lenders to securely upload at least some of the loan package data for their respective loan packages to the database over a computer network; and

a second interface that prompts a borrower to enter personal loan evaluation information, and invokes, on a computer, a borrower grading module which uses at least the entered personal loan evaluation information to calculate a credit grading for the borrower, said credit grading being distinct from a credit score of the borrower, and being based on underwriting criteria used by at least some of said lenders;

wherein the second interface provides functionality for the borrower to search the database to identify a set of loan packages for which the borrower qualifies based on the credit grading, and to compare the loan packages within the set, including loan type and interest rate, while remaining anonymous to each of the lenders and without having to post a request to any of the lenders, said second interface configured to display to the borrower an indication of a total cost of each loan package in the set, said total cost including costs of closing services not provided by corresponding lenders;

and wherein the computer-implemented system further enables the borrower to selectively expose at least the personal loan evaluation information to a lender corresponding to a selected loan package.

2. The system of claim 1, wherein the second interface comprises a set of web pages of a web site.

3. The system of claim 1, wherein the computer-implemented system is operated by a third party evaluator that is independent of said lenders, and the borrower grading module comprises software confidentially provided to the

18

third party evaluator by at least one of the lenders, said software allowing for automated application of the underwriting criteria.

4. The system of claim 1, wherein the loan package data specifies an interest rate and all fees for at least one guaranteed-cost loan package.

5. The system of claim 1, wherein the loan package data for at least some of the loan packages includes guaranteed closing costs.

6. The system of claim 1, wherein the second interface displays information about the loan packages in a spread sheet format.

7. The system of claim 6, wherein the information about the loan packages comprises loan term, loan rate, loan conditions and loan closing costs.

8. The system of claim 1, wherein the borrower grading module calculates the credit grading, at least in-part, using at least one lender-specific loan evaluation system of a particular lender.

9. The system of claim 1, wherein the borrower grading module calculates the credit grading based in part on a borrower credit rating obtained from a credit bureau.

10. The system of claim 1, wherein the borrower grading module calculates the credit grading based on objective criteria used by a plurality of lenders.

11. The system of claim 1, wherein the computer-implemented system outputs the credit grading to the borrower.

12. The system of claim 1, wherein the second interface presents to the borrower closing cost information for a loan, said closing cost information compiled by a third party that does not provide the loan.

13. The system of claim 1, wherein the second interface additionally provides functionality for the borrower to apply for a selected loan.

14. The system of claim 1, wherein the borrower grading module generates the credit grading using a non-lender-specific credit rating algorithm that is accepted by each of said plurality of lenders.

15. The system of claim 1, wherein some of the loan package data stored in the database and displayed via the second interface is provided by a third party that is not one of said lenders.

16. The system of claim 1, wherein the computer-implemented system is capable of pre-approving the borrower for the selected loan package on behalf of the lender without exposing any information about the borrower to the lender.

17. The system of claim 1, wherein the computer-implemented system is capable of fully approving the borrower for the selected loan package on behalf of the lender.

18. The system of claim 1, wherein the computer-implemented system reveals to the borrower monetary amounts the lenders are paying for the funds associated with the loan packages, such that the borrower can take said amounts into consideration in selecting a loan package.

19. A computer-implemented method, comprising:

receiving, over a computer network, personal data entered by a borrower, said personal data comprising loan evaluation data;

automatically generating or causing the generation of a credit grading for the borrower such that the credit grading is dependent upon the loan evaluation data entered by the borrower, said credit grading being distinct from a credit score obtained from a credit bureau, and being generated at least partly using underwriting criteria of one or more lenders;

identifying a set of loan packages for which the borrower qualifies based on said credit grading, each loan pack-

US 7,366,694 B2

19

age including home loan information provided by a lender, and including guaranteed closing cost information for closing services not provided by the lender, wherein the set of loan packages is identified without requiring the borrower to post a request to any lender;

outputting information regarding the set of loan packages, including the guaranteed closing cost information for closing services not provided by the lender, to the borrower via a user interface that enables the borrower to at least compare total costs of the loan packages for which the borrower qualifies, said user interface additionally providing functionality for the user to select and apply for one of said loan packages; and

in response to a request from the borrower in association with a selected loan package, communicating information of the borrower to a corresponding lender.

**20**. The method of claim **19**, wherein the method further comprises outputting to the borrower an indication of an amount a lender is paying for funds associated with at least one of the loan packages.

**21**. The method of claim **19**, wherein the credit grading is generated using a non-lender-specific grading algorithm.

**22**. The method of claim **19**, wherein the method is performed by a computer system operated by a third party evaluator that is independent of said lenders, and the method comprises automatically applying the underwriting criteria, at least in part, by executing software confidentially provided to the third party evaluator by at least one of said lenders.

**23**. The method of claim **19**, further comprising pre-approving the borrower for the selected loan package on behalf of the lender without exposing any information of the borrower to the lender.

**24**. The method of claim **19**, further comprising approving the borrower for the selected loan package on behalf of the lender.

**25**. The system of claim **1**, wherein the computer-implemented system communicates the personal loan evaluation information to the lender in association with an anonymous identifier of the borrower.

**26**. The system of claim **1**, wherein the computer-implemented system is configured to communicate credit information of the borrower to said lender while concealing the identity of the borrower.

**27**. The system of claim **1**, wherein the computer-implemented system additionally enables the borrower to obtain a pre-approval from the lender for the selected loan package while remaining anonymous to the lender, said pre-approval including guaranteed loan terms for the selected loan package.

**28**. The system of claim **27**, wherein the selected loan package is a mortgage-based home loan, and the pre-approval additionally includes guaranteed closing costs for the selected loan package.

**29**. The system of claim **1**, wherein the computer-implemented system is further capable of interacting with said lender to enable the borrower to anonymously obtain approval for the selected loan package.

20

**30**. The system of claim **1**, wherein the computer-implemented system additionally provides functionality for the borrower to select one or more third party vendors to provide closing services associated with the selected loan package.

**31**. A computerized method of reducing discriminatory lending, comprising:

obtaining personal and financial information of a borrower seeking a home loan;

generating a credit grading for the borrower, at least in part, via execution of software that automatically applies underwriting criteria of at least one lender to the financial information of the borrower, wherein the credit grading is generated without exposing any of said financial information of the borrower to any lender;

using at least the credit grading to identify a plurality of home loans for which the borrower qualifies, including home loans offered by multiple different lenders, without exposing any information of the borrower to any lender;

outputting information to the borrower regarding the plurality of home loans, said information including interest rates and total costs of said home loans, said total costs including costs of closing services not provided by the corresponding lenders; and

approving the borrower for a selected home loan of said plurality of home loans while the borrower remains anonymous to the lender offering the selected home loan;

wherein the method inhibits discriminatory lending by enabling the borrower to obtain approval for the selected home loan while remaining anonymous to the lender.

**32**. The method of claim **31**, wherein the step of approving the borrower comprises guaranteeing a total cost of the loan, including closing costs.

**33**. The method of claim **31**, wherein the step of approving the borrower comprises exposing the financial information of the borrower to the lender while concealing the identity of the borrower.

**34**. The method of claim **31**, wherein the step of outputting information to the borrower comprises offering guaranteed closing costs to the borrower in connection with particular home loans.

**35**. The method of claim **31**, wherein the method is performed by a third party evaluator entity that is not one of said lenders.

**36**. The method of claim **35**, wherein the step of generating the credit grading is performed via execution of software confidentially provided to the third party evaluated by at least one of said lenders.

**37**. The system of claim **1**, wherein the computer system is a distributed system.

* * * * *

ADDENDUM 5

US007680728B2

(12) **United States Patent** (10) **Patent No.:** US 7,680,728 B2

Lazerson (45) **Date of Patent:** Mar. 16, 2010

(54) **CREDIT/FINANCING PROCESS**

(75) Inventor: **Jeffrey M Lazerson**, Laguna Niguel, CA (US)

(73) Assignee: **Mortgage Grader, Inc.**, Laguna Niguel, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 2958 days.

(21) Appl. No.: **10/139,418**

(22) Filed: **May 6, 2002**

(65) **Prior Publication Data**

US 2003/0036995 A1 Feb. 20, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/312,919, filed on Aug. 16, 2001, provisional application No. 60/327,026, filed on Oct. 3, 2001, provisional application No. 60/362,314, filed on Mar. 5, 2002.

(51) **Int. Cl.**
  *G06Q 40/00* (2006.01)

(52) **U.S. Cl.** ........................................ **705/38**; 705/35

(58) **Field of Classification Search** ...................... None
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,940,812 A | 8/1999 | Tengel et al. | |
| 5,966,699 A | 10/1999 | Zandi | |
| 5,995,947 A | 11/1999 | Fraser et al. | |
| 6,014,645 A * | 1/2000 | Cunningham | 705/38 |
| 6,321,202 B1 * | 11/2001 | Raveis, Jr. | 705/1 |
| 6,385,594 B1 * | 5/2002 | Lebda et al. | 705/38 |
| 6,611,816 B2 * | 8/2003 | Lebda et al. | 705/38 |
| 2001/0005829 A1 | 6/2001 | Raveis, Jr. | 705/1 |
| 2001/0037230 A1 | 11/2001 | Raveis, Jr. et al. | 705/9 |
| 2001/0047282 A1 | 11/2001 | Raveis, Jr. | 705/7 |

| | | | |
|---|---|---|---|
| 2002/0049624 A1 | 4/2002 | Raveis, Jr. | 705/8 |
| 2002/0077964 A1 | 6/2002 | Brody et al. | |
| 2002/0077970 A1 | 6/2002 | Lebda et al. | |

(Continued)

OTHER PUBLICATIONS

e-Loan: home Purchase Options; http://web.archive.org/web/19980127150116/eloan.com/cgi-bin/qualselect E-Loan: A better way to get a loan; http://web.archive.org/web/20000622033215/http://eloan.com/Home Mortgages and Loans from E-Loan; http://web.archive.org/web/20040303144344/eloan.com/s/show/purchase?adjper=0&agent=....*

(Continued)

*Primary Examiner*—James Kramer
*Assistant Examiner*—Rajesh Khattar
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear LLP

(57) **ABSTRACT**

A method for a borrower to obtain and/or evaluate desired financial services is disclosed. Personal information from the borrower is obtained and recorded. The personal information includes reasons that the borrower wants to obtain the financing. Financing evaluation information based on pre-established and objective criteria used by at least one established financial institution that provides financing of the type sought by the borrower is obtained and recorded. A credit grading for the borrower is determined based on the personal information, and the financing evaluation information. The credit grading is determined by an independent entity that will not provide the financing to the borrower. The financing may be a loan, such as a mortgage loan or an auto loan or the financing may be the issuance of a credit card or a line of credit.

**6 Claims, 3 Drawing Sheets**



## US 7,680,728 B2
### Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2002/0103789 A1 | 8/2002 | Turnbull et al. |
| 2003/0208412 A1 | 11/2003 | Hillestad et al. |

OTHER PUBLICATIONS

E-Loan: Mortgage Rate: http://web.archive.org/web/20070402215055/http://eloan.com/cgi-bin/quoteinput?linksrc=sr...

E-Loan; http://web.archive.org/web/2007040221505/http://eloan.com/s/show/qualinput?context=pu...E-Loan: Pre-Qualifying for a Mortgage; http://web.archive.org/web/19980127150751/eloan.com/cgi-bin/qualinput?proptype=&pro....*

E-Loan: Description of the Loan Process; http://web.archive.org/web/19980127151111/eloan.com/cgi-bin/loanprocess?proptype=&p...myFICO-About Credit Scores; http://www.myfico.com/CreditEducation/CreditScores.aspx Credit Score; http://en.wikipedia.org/wiki/Credit__score.*

E-Loan; http://web.archive.org/web/19980127150039/http://eloan.com/E-Loan: http://web.archive.org/web/19981212013811/http://eloan.com/Internet Archive Wayback Machine; http://web.archive.org/web/*/www.eloan.com Internet Archive Wayback Machine; http://web.archive.org/web/*/http://www.lendingtree.com/.*

Internet Archive Wayback Machine; http://web.archive.org/web/*/www.bankrate.com.*

"LoansDirect Advances Online Lending Technology With the Industry's First 100% Online Mortgage," Business Wire, New York, Feb. 17, 2000, p. 1.

John Hagel III and Marc Singer, "*Net Worth: Shaping Markets When Customers Make the Rules*," Harvard Business School Press, pp. 10, 13-20, 23-30, 42, 43, 49-52, 112-170, 183-184, 231, 242 (1999).

Seth Godin, "*Permission Marketing-Turning Strangers into Friends, and Friends into Customers*," Simon & Schuster, Chapter Two, pp. 40-52 (1999).

Grant E. Mitchell, "Will RESPA Reforms Bring Bundling to Settlement Services?" *Mortgage Banking*, May 2002 issue, p. 87-90.

Complaint filed by Mortgage Grader, Inc., against BankLoans.com LLC, et al. on Oct. 15, 2009, alleging infringement of U.S. Pat. 7,366,694, which is a continuation-in-part of the present application.

* cited by examiner



START
OBTAIN AND RECORD PERSONAL INFORMATION INCLUDING FINANCIAL INFORMATION AND REASONS THAT THE BORROWER WANTS TO OBTAIN THE FINANCING
100
OBTAIN AND RECORD FINANCING EVALUATION INFORMATION USED BY AT LEAST ONE ESTABLISHED LENDER THAT MAY PROVIDE LOAN
102
DETERMINE CREDIT GRADING (BY AN INDEPENDENT AGENCY THAT WILL NOT PROVIDE LOAN TO BUYER) FOR BORROWER BASED ON PRE-ESTABLISHED AND OBJECTIVE CRITERIA, THE PERSONAL INFORMATION AND THE FINANCING EVALUATION INFORMATION
104
END

Fig. 1

Case 8:13-cv-00043-AG-AN   Document 66-2   Filed 09/24/14   Page 5 of 12   Page ID #:776



Fig. 2A

CONSUMER WANTS SOME TYPE OF FINANCING (E.G., MORTGAGE)

ONLINE 200
FAX
MAIL 202
PHONE
IN PERSON 204

CONSUMER ANSWERS A SERIES OF FINANCE RELATED QUESTIONS AND CONFIGURATION QUESTIONS (E.G., GOALS, NEEDS, WANTS, ETC.)

CONSUMER PROVIDES INFORMATION SUFFICIENT TO APPLY FOR A LOAN WITH COMMONLY USED UNDERWRITING STANDARDS, SYSTEMS AND CRITERIA

ALL LEGAL DISCLOSURES FROM CONSUMER'S STATE, DOWNLOADABLE FORMS, ELECTRONIC SIGNATURE AVAILABLE IN ADDITION TO MAIL, FAX OR IN PERSON APPLICATION

206 LOAN PROCESSOR ASSISTANCE

208 CREDIT CORRECTION

210 MORTGAGE LOAN APPROVAL OR CREDIT PRE-APPROVAL

LOAN # GIVEN
PIN # GIVEN

212 CONSUMER CAN INPUT DATA IN A COMPARABLE FORMAT (WRAPPING THE DATA) TO DETERMINE THE MOST BENEFICIAL LOAN (USUALLY LOWEST COST). CONSUMER MAY ALSO BE ABLE TO ACCESS A SURVEY OF COMPETITIVE INTEREST RATES/FEES FOR HIS/HER LOAN TYPE IN ADDITION TO LEARNING THE LENDERS COST OF FUNDS.

214
1. CONSUMER CAN NEGOTIATE ON HIS OWN FOR A MORTGAGE ARMED WITH PRE-APPROVAL/ APPROVAL
2. CONSUMER CAN SHOP ANONYMOUSLY THROUGH THE ASSISTANCE OF A SEARCH ENGINE (WITH PRE-APPROVAL/APPROVAL)
3. CONSUMER CAN SHOP OPENLY WITH PRE-APPROVAL THROUGH COOPERATING AGENCY

A

Case 8:13-cv-00043-AG-AN   Document 66-2   Filed 09/24/14   Page 6 of 12   Page ID #:777



Fig. 2B

US 7,680,728 B2

1

# CREDIT/FINANCING PROCESS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. provisional application No. 60/312,919, filed Aug. 16, 2001, the entire contents of which are hereby incorporated by reference, U.S. provisional application 60/327,026 filed Oct. 3, 2001, the entire contents of which are hereby incorporated by reference, and U.S. provisional application 60/362,314 filed Mar. 5, 2002, the entire contents of which are hereby incorporated by reference.

## BACKGROUND OF THE INVENTION

The present invention relates generally to financial transactions including a method for a borrower to evaluate and/or obtain financing, e.g., a loan or a credit card.

Shopping for financing (e.g., a loan, such as a mortgage) can be a complicated time-consuming process. The mortgage industry has been slow to empower borrowers in order to save them time, make their lives easier, and help them determine their best loan options. Because of this, borrowers, and in particular, credit-impaired borrowers, are often overcharged. The Coalition of Responsible Lending has stated that ten million borrowers have been overcharged up-front fees of $11,000,000,000, which equates to ten million borrowers being overcharged an average of $1,100 each. The practice of offering borrowers loans at rates that are higher than warranted by the credit history of the borrower is sometimes referred to as predatory lending. Predatory lending is a very difficult and challenging problem to recognize in practice as many lenders may use procedures that conceal the nature of the predatory practices.

There are newspaper or Internet referral sites which publish interest rates for one or more lenders. However, the user must interact individually with each prospective lender. It is very time consuming for a borrower to investigate each of the potential lenders. Furthermore, each prospective lender typically runs a credit report on the borrower, causing there to be multiple inquiries on the borrower's credit report. The basis for an adverse decision is often unknown.

There is thus a need for a way to help a borrower to avoid predatory lending and paying higher than justified loan rates.

## BRIEF SUMMARY OF THE INVENTION

One aspect of the present invention may be regarded as a method for reducing predatory lending when a borrower seeks financing. Personal information is obtained and recorded regarding the reasons that the borrower wants to obtain the financing. Loan evaluation information is obtained and recorded. The loan evaluation information is preferably based on, or the same as the criteria used by at least one established financial institution that may provide financing to the borrower. A credit grading is determined for the borrower based on pre-established and objective criteria, the personal information and the loan evaluation information. The credit grading is performed by an entity that is not loaning money to the borrower.

The financing sought by the borrower may be a loan. The loan may be, for example, a mortgage loan, a personal loan, an auto loan, or a student loan. The financing sought by the buyer may also be a credit card.

The credit grading information may be provided to the borrower so the borrower can use the information to evaluate his financing options, e.g., different loans.

2

The credit grading information may be provided to at least one financial institution. The financial institution evaluates providing financing to the borrower based on the credit grading information. The credit grading information may be provided to a plurality of financial institutions or to others authorized by the borrower. The information provided by the borrower is preferably, but optionally handled in a confidential manner and not disclosed to others. The credit score or grade is also preferably handled in a confidential manner and is not disclosed unless authorized by the borrower.

## BRIEF DESCRIPTION OF THE DRAWINGS

These, as well as other features of the present invention, will become apparent upon reference to the drawings, wherein:

FIG. 1 is a flow diagram illustrating an exemplary method for a user to obtain financing in accordance with the present invention; and

FIGS. 2A-2B shows a block diagram illustrating further detail of various aspects of the method illustrated in FIG. 1.

## DETAILED DESCRIPTION

An improved way for borrowers to shop for financing (e.g., loans, such as mortgage or auto loans or credit cards) is provided. A person or a group of people (borrower(s)) is interested in receiving financing, such as a mortgage for a home. The mortgage could be a purchase, refinance or cash-out refinance home loan. It could be first, second or third mortgage lien. For purposes of illustration herein, a mortgage will be used in illustrating and describing the present invention. However, it will be appreciated that the loan can be another type of loan, such as an auto loan, a personal loan, a student loan, etc. or that the financing may not be a loan at all, but may be directed to obtaining a credit card or arranging other types of financial credit, for example, a line of credit.

A series of questions are asked of the borrower in order to correlate the most appropriate financing with the borrower's desires. Credit and financial information is also acquired from the borrower. That information is compared with financing qualification criteria and/or credit qualifying criteria in order to provide a borrower with an impartial credit evaluation or loan evaluation based on the submitted information. That credit evaluation or loan evaluation can be used as a check against commercial lenders offering loans to the borrower to allow the borrower to compare against the loan rate or credit rating offered to the borrower by lenders in order to ensure the borrower receives the most desirable loan based on the credit available to that borrower.

Referring now to the drawings wherein the showings are for purposes of illustrating preferred embodiments of the present invention only, and not for purposes of limiting the same, FIG. 1 is a flow diagram illustrating an exemplary method for obtaining a mortgage. FIGS. 2A-2B are a block diagram illustrating in further detail various aspect of the method illustrated in FIG. 1.

The logic of FIG. 1 moves from a start block to block 100 where the user is asked a series of questions, either verbally, or visually, for example, in a written format. In exemplary embodiments, this process is performed over the Internet by viewing questions on a computer display and sending responsive information. The responsive information may be sent over the Internet, e.g., by filling out and submitting the information in an online form, via attached documents, via scanned documents, etc. It will be appreciated that the user could also answer the question in person, over the phone, via

3

facsimile, via postal mail, etc. In more detail, as shown in block **200** of FIG. **2A**, the borrower(s) answer a series of configurative questions. These questions relate to goals, needs, wants, etc. of the borrower. The precise questions will vary but are directed toward achieving one or more specific purposes. These questions are optional, but are preferred. The purpose of these questions is twofold. First, the questions allow the potential borrower(s) to focus on exactly what the borrower(s) is/are trying to accomplish. For example, the primary interest might be to obtain funds to purchase real or personal property, to improve monthly cash flow, to reduce payment, to obtain a different type of loan, to alter the monthly loan amount or other terms of the loan, or to refinance and obtain various amounts of cash. Second, the questions make clear to the loan processor and/or eventual lender exactly what the borrower(s) objectives are in seeking the financing so the most appropriate types of loans and terms can be offered to the borrower(s).

Prior to finalizing a loan amount, various items, such as points and fees being charged, type of loan product (conventional, F.H.A., V.A., etc.), lien position, purpose of loan, etc. can be verified with the borrower(s) to be certain that the loan being put in place is the loan most suitable to what the borrower(s) wants. As with the prior questions, these questions can be answered over the phone, on-line, through the mail, by fax, in person, etc.

The logic of FIG. **1** proceeds to block **102** where financial evaluation information is obtained and recorded from at least one financial institution from which the borrower may obtain the loan, financing, credit, etc.

In addition to providing the information from the configurative questions, the borrower(s) provide information sufficient to apply for a loan. This may alternatively comprise actually applying for a loan or financing independently and separately from any person or entity that is a mortgage credit grantor or mortgage arranger (block **202**). This application can be done over the phone, on-line or with a live customer service representative assisting the telephone applicant(s). It can also be done through the mail, in person, by fax, or through a global communications system, such as the Internet.

The loan application can also be done with the assistance of a loan processing service that helps answer questions of the borrower, acquire information, and generally assist the borrower in the application process (block **206**). There may or may not be a fee charged for this application portion of the service. Loan processors can help explain to potential lenders various aspects of the borrowers credit history that may appear undesirable. They may help consolidate prior loans, to remove or explain adverse credit ratings, or claims, and make the borrower's credit appear more desirable. Some of these aspect involve credit correction which is discussed in further detail later. While the assistance of a third party can be used in the loan application process, the borrower(s) may attempt to apply on his own. The information from this loan application is provided to the same entity having the responses to the configurative questions.

Often, the borrower(s) may be aware of something that needs to be corrected or questioned regarding the credit report of the individual borrower or borrower. The borrower(s) may be aware of this before or become aware of this during the mortgage application process. The borrower could go directly to a credit correction company or be referred by the loan processor to a credit correction company (block **208**). There may or may not be a fee charged for this service. The information given to any credit correction company is preferably,

4

but optionally, provided to the same entity that has the responses to the configurative questions.

The purpose of the credit correction is to resolve anything having an adverse effect on the consumer's credit and that is typically achieved by removing incorrect information, closing accounts that the borrower sees no useful purpose in keeping open, negotiating settlements of amounts owed to creditors as well as negotiating the reduction or removal of negative items on the credit report. The credit correction could also coordinate among creditors and the three major credit bureaus (Experian, Transunion and Equifax) to correctly portray outstanding balances, public records items, tax liens, judgments, collections, charge-offs and, in conjunction with Fair Isaac's Company (FICO), all to improve the credit scores of the borrower. Any results of the credit correction are preferably, but optionally, provided to the same entity that has the responses to the configurative questions, especially if the results alter the credit worthiness of the borrower.

The logic then moves to block **104** where a credit grade or score is determined. In conjunction with the previously answered configurative questions, the borrower's mortgage or other financial application will be evaluated based upon objective, pre-set underwriting criteria. One or more, and preferably all, of the credit history, credit score(s), equity, down payment, income, assets, job history and stability could be considered. The criteria need not be inclusive of all lender's criteria. The mortgage credit evaluation system is preferably based upon commonly used industry evaluation systems, including one or more of Fannie Mae, Freddie Mac, F.H.A., V.A., Ginnie Mae, private mortgage insurance companies, or combinations of those evaluation systems. It could also be based upon individual lender's evaluation systems if those are different from the above-mentioned systems. For example, Washington Mutual Bank has significant market share in the United States. The institution may have its own evaluation process, possibly not commonly used within the industry. The results of the evaluation are based on objective, pre-set underwriting criteria provided to the borrower. In exemplary embodiments of the invention, the borrower is provided with his or her credit report and credit grades or scores. The borrower could also be provided with an electronic appraisal of the property. This information could be provided to the borrower via the Internet or via another method, such as via facsimile or mail.

For other types of financing, other financial criteria will apply. For example, a bank's criteria for a credit card, for a line of credit. The criteria is preferably that criteria used by a recognized institution providing the financing desired by the borrower, and the criteria will vary with the institution and the type of criteria involved.

The purpose of would-be borrower(s) knowing independently of any interested mortgage credit grantor or arranger is for the borrower(s) to independently know their borrowing strength and ability. If the borrower(s) know that they have an excellent grade in the mortgage credit granting system, they are armed with valuable information that can help them to negotiate the most favorable terms, e.g., interest rates. See block **212** of FIG. **2A**. This may also allow the borrower(s) to receive a better loan suited to their particular needs, preferably, but optionally, as indicated by the borrower's responses to the personal configurative questions. This may not necessarily mean the most favorable interest rate. For example, while a borrower may be able to get 90% cash-out, it may be more valuable to the borrower to get only 80% cash-out. The 90% cash-out will probably carry a less favorable interest rate or more points, or both.

US 7,680,728 B2

The would-be borrower preferably receives a credit pre-approval from the entity having the responses to the configurative questions and the other above identified information. Alternatively, the would-be borrower receives a full loan approval from the entity having the responses to the configurative questions and the other above identified information. The difference between these two alternatives is that the pre-approval gives a loan amount and loan terms that the borrower is currently eligible for. The actual loan approval means that the borrower(s) have everything in place; a specific interest rate and loan amount, appraisal, title report, escrow/attorney (closing agent), paperwork, proof of income, assets (if needed), for that particular loan program, and any other required paperwork that might be needed to complete the transaction. The borrower(s) is/are issued a loan number and personal identification (PIN) number.

The approval or pre-approval will be good (locked) for a certain number of days. The number of days will vary based on a variety of circumstances. A loan number is preferably, but optionally, issued in conjunction with commonly used underwriting standards, systems, and criteria. For example, FANNIE MAE might issue a loan number. That loan number could be the loan number issued for the borrower(s) credit pre-approval or loan approval. A personal identification number (PIN) can be used for privacy protection. Preferably, but optionally, the borrower(s), through their PIN number, control who can look at their file. Thus, preferably the borrower's credit information can be owned by the borrower. No one has access to the borrower's identity or information without the borrower releasing the information.

Using this approval or pre-approval information, the borrower(s) can shop on their own. The borrower(s) can shop anonymously through a computerized search engine. Or, the borrower(s) can shop openly with the assistance of a cooperating agency. See block 214.

The borrower(s) may be able to access current interest rate and fee surveys of lender/mortgage companies to compare that information with what the applicant is being quoted by others. See block 212. The borrower(s) may also be able to find out how much the lender/mortgage company is paying for the money being loaned to the borrower or used to provide other financial services to the borrower or applicant. This is similar to finding out what a car dealer pays the manufacturer for the car. Additionally, the mortgage applicant(s) or borrower(s) can analyze the data in a comparable format (wrapping the data). This can help to determine the most beneficial loan or other financial arrangement. This usually, but not always means, the lowest interest rate, the lowest credit rate, etc. that meets the applicant's personal requirements.

After receiving the credit report, loan approval or loan pre-approval, the borrower can go to negotiate a loan on his or her own behalf with any mortgage originator(s) that may financially benefit by packaging and/or funding the borrower's loan. See block 214. The borrower authorizes the mortgage originator to pull-up the approval findings using the pre-approval/approval authorization number. The mortgage originator negotiates a rate and fees for the borrower to be charged, knowing that the loan is already pre-approved and in the belief that the information inputted from the loan application is accurate. The mortgage originator will likely make any mortgage or financing subject to verification of information inputted from the loan application. The rate and fees charged are typically based upon the credit grading of the approval.

With authorization from the borrower, the mortgage originator then collects the information needed from the loan

approval findings. The borrower(s) is/are simply handing over the package of required items that the pre-approval/approval has specified. See block 216. The lender formally examines the loan file. The lender locks in interest rate. Upon satisfactory receipt of accurate and valid information (quality control), the file is formally lender approved. The loan documents are drawn. The borrower(s) sign the loan documents. The loan is funded. See block 218. Other types of financial assistance will have different processes that vary with the nature of the transactions involved, such as a credit card, line of credit, etc.

The information compiled by the entity having the answers to the configurative questions can also be used for goods or services related to the purpose for which the borrower is obtaining financing or for helping the borrower obtain such goods or services. See block 220. Thus, the borrower(s) may also need other industry services. Some examples are a closing agent, title company, real estate agent, home inspector, termite company and utility hook-up, all of which are related to a home purchase. A system and method for identifying third party vendors for goods and services related to real estate transactions is disclosed in U.S. Pat. No. 6,321,202, the complete contents of which are incorporated by reference herein. The borrower(s) could find those needed services through this credit granting system, by having the entity with the answers to the configurative questions provide the information to the borrower, or provide the identity of the borrower to providers of the appropriate goods or services. It will be appreciated that these related services are dependent upon and vary with the type of loan or financing being obtained by the borrower. For example, in the case of an auto loan, related services might include auto security devices, etc. There may or may not be a charge for providing contact information for these needed goods and/or services.

After the borrower(s) go through the credit granting process, they may or may not have actually had a loan funded. Within this mortgage credit granting system, there is opportunity for providing future reminders or information on the borrowers' credit report and credit scores, property value, interest rates, borrowing power, etc. The borrower(s) may wish to access information about his/their own property(ies), credit, borrowing power, etc. This could be done by paying or not paying a fee for unlimited usage, periodically sent to borrower(s) (subscription service) or on a per transaction basis. See block 224.

Additionally, the borrower(s) may periodically receive informational bulletins for the purpose of maintaining a relationship between the borrower and the entity having the answers to the configurative questions. See block 226. This could be communicated by fax, Internet, e-mail, delivered mail or by phone, or other communication devices now existing or developed in the future.

The borrower could also access marketing services by giving permission to receive advertising, be contacted about a specific product or service related to home ownership. The borrower could also initiate communication with a related product or service (Agency Service) that can be accessed as part of this credit granting system. There may or may not be a fee charged for this service whether it is the borrower of vendor.

This above method is not designed to be used to actually negotiate mortgages. It could be used to do this, but preferably, it is designed to give the borrower information about their credit grading. If borrowers know that they are acceptable based on commonly used credit-granting standards/systems/criteria (e.g., Fannie Mae, Freddie Mac, F.H.A., V.A., etc.) that typically offer the lowest rates and fees, it makes

US 7,680,728 B2

7

them less vulnerable to be victimized by predatory lenders and/or mortgage originators that charge unreasonably high rates and fees to a good quality borrower. Similarly, this process allows an applicant to evaluate an aspect of their finances based on accepted criteria used in the trade for the particular financial aspect in question, and enables the applicant to use the resulting information to the advantage of the applicant

Borrower privacy is preferably, but optionally, an important critical component to this credit granting system. Preferably, no entity gains access to the borrowers' information without the clear consent of the borrower. Any entity that receives business through this system (e.g., loan processor, credit correction company) is thus preferably contractually obligated to maintain the borrower's privacy. Likewise, affiliated entities having access to borrower information are preferably precluded by agreement from releasing information about that borrower unless the borrower gives permission to do so. Preferably, the information may only be released as specifically instructed by the borrower(s).

There is thus advantageously provided a method by which an applicant seeking financing can provide information to a third party evaluator that will render an independent evaluation of the applicant for the requested financing based on objective criteria used by at least one established entity that can provide the financing sought by the applicant. The applicant can then use that independent evaluation for his/her/its own purposes. Preferably, the applicant will use the evaluation to obtain the desired financing, to negotiate more favorable terms on the financing, or to guard against terms less favorable than are believed to be otherwise available to a person having the independent evaluation.

More preferably, the applicant also provides information relating to the reasons for seeking the financing. That information is preferably, but optionally used by the third party evaluator to select criteria more applicable to the desires of the applicant, or to direct the applicant to financial institutions more likely to suit the applicant's needs or the applicant's desires, or to allow a financial institution to evaluate the applicant's financial requests, or any combination of these. Further, this information can be provided to third party providers who can provide goods or services to the applicant which goods or services are related to the use to which the applicant intends to put the financing.

There is thus provided a method by which a third party can acquire information from an applicant and compare the information with predetermined criteria and provide an evaluation relating to a financial matter. The evaluation can be used to avoid predatory lending, is preferably used to obtain financing in the form of financial assistance to the applicant, and is more preferably used to obtain a financial loan, and is still more preferably used to obtain home mortgage financing. In the mortgage context, the service will preferably provide persons seeking mortgages with information about the amount of money they should be able to borrow based upon current rates. By establishing appropriate arrangements between the third party evaluator and the person providing the mortgage or other financial service, a pre-approval could even be granted by the third party, such as a mortgage pre-approval. Such pre-approval would be subject to the later agreement by the lender or provider of other financial services after verification of the information provided by the borrower or other person seeking financial services.

The method described herein is advantageously implemented by inputting the information from the applicant into a computer, into an electronic device, or into another device which compares at least some of the information to predeter-

8

mined criteria used by an established entity, be it a person, business or organization, that provides financial services of the type sought or needed by the applicant. Preferably, the criteria is stored in memory and the applicable criteria is selected by the computer automatically or by a person manually, based in part upon personal information provided by the applicant as to the reasons for requesting the financial service. Advantageously, the evaluation also includes specifics on the financial services desired, such as appropriate fee and interest rate ranges based on the loan amount and loan program for a home loan mortgage. A tentative pre-approval can also be provided by the third party evaluator subject to verification of the accuracy of the information provided by the person seeking the financial services.

Advantageously the criteria for providing the requested financial service (e.g., mortgage) is obtained from several providers, preferably the major providers of the desired financial service (e.g., Freddie Mac, Fannie Mae, FHA, VHA, etc). The disclosure and use of the financial criteria will typically be confidential between the third party evaluator and the provider of the desired services. Moreover, the disclosure of the financial criteria preferably includes computer software allowing automated application of the criteria by the third party evaluator. If access to the actual criteria used by providers of the desired service is not available, then in appropriate circumstances software or criteria closely mimicking the desired service provider's criteria can be used. For example, in the home mortgage area if Freddie Mac loan criteria is not available, then loan criteria from Countrywide could be used.

Advantageously, but optionally, the configuration information is also provided to the third party evaluator, and that information is used to help select the financial service providers most likely to provide the service desired. The computer database that is preferably, but optionally used to assist in the evaluation is desirably programed to narrow the financial sources based on the requirements of the person seeking the financial services.

The comparison results in an evaluation that is preferably printed or provided in other tangible form or in a form visually perceptible by the applicant, as for example, a visual display on a computer screen or video monitor. Advantageously, the person seeking the financial services will be provided with an evaluation from the major suppliers of the desired financial services. For example, a credit rating from the three major providers (Experian, Transunion, Equifax) could be provided.

The method described herein can advantageously be used online, with the person seeking financial services filling out his or her own application and transmitting the information over the Internet. The third party evaluator will receive the information and use a computer to search for the requestor's best options based upon the information provided by the requestor and based upon the requestor's specific needs or special requests as identified by the configuration questions. The third party evaluation, in the home loan context, advantageously provides credit reports and scores, loan approval findings and an AVM (automated valuation model) if there is a specific property in question.

Because the requestor (the person seeking the financial services) owns all of the personal information provided to the third party evaluator, and because the information is provided over secured lines and methods of transmittal, the information is confidential and preferably will not be released without permission from the requester. This differs from many, if not all, of the current home loan situations in which the lender owns the application (and thus the information on the application) for a home loan. Indeed, having the lender own the

US 7,680,728 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

credit information is required by law in order to regulate lenders and inhibit fraud committed by lenders upon borrowers seeking home loans.

The requestor/borrower can then shop for a loan anonymously through any of a variety ways. Once the requestor/borrower finds an acceptable choice, the third party sends the evaluation and some or all of the financial information obtained from the requestor and some or all of the configuration information, to the provider selected by the requestor. This allows the confidential information to be sent only to the person or persons specifically identified by the requestor/borrower. This contrasts significantly with current Internet based loan systems in which financial information is simultaneously submitted to a plurality of predesignated, potential lenders in the hope that one of them will offer to make a loan after internally evaluating the loan request.

Upon receipt of the third party evaluation, the requestor/borrower may also decide to wait and attempt to improve the credit rating or evaluation. Credit problems can be cleared up, debt can be consolidated, etc. Because the evaluation is confidential, there is no adverse report to later hinder the requestor/borrower and there are fewer credit checks showing up on the requestor's credit. There are disadvantages to having a large number of credit checks on a person's credit.

The present method envisions that the person seeking the financial services will incur a legal obligation to pay, and will actually pay the third party for rendering an independent evaluation based on objective criteria. The payment by the person seeking the service is different than reimbursing appraisal fees or the costs of credit reports, and constitutes payment for services rendered. The payment is preferably an out-of-pocket payment by cash, check, money order, credit card etc.

But the payment can in some circumstances be made by the person providing the financial services. An example would be when the third party provides the person seeking the desired financial services with the identification of one or more providers of the desired financial services and the person desiring the financial services actually obtains the services from the provider. In that case, a preexisting arrangement may exist under which the person providing the financial services pays for the evaluation by the third party, gives a financial credit to the person seeking the service, or provides a separate payment to the third party. Moreover, the person providing the financial services may pay the third party evaluator for referring the person seeking the financial services. Because the third party is preferably independent, these payments from the providers are transfers between separate legal entities that have no ownership affiliation, and they must comply with regulatory disclosure requirements. Despite the existence of such financial reimbursements for providing leads to lenders or to other service providers, the third party evaluators are still considered independent. If the third party evaluator is a full time employee of an entity providing the desired financial services or if the third party evaluator receives a percentage commission from an affiliated company based on the loans funded through this program, then the third party would most likely not be considered independent. Either an independent third party, or an affiliated/interested third party could be used, but the affiliated/interested third party is less desirable.

The above description is given in the context of an individual obtaining financial services, using a home loan as an example. The method provided herein is equally applicable to any person, when person is understood to mean any human, as well as any legal entity such as a corporation, partnership, limited liability company, etc.

While an illustrative and presently preferred embodiment of the invention has been described in detail herein, it is to be understood that the inventive concepts may be otherwise variously embodied and employed and that the appended claims are intended to be construed to include such variations except insofar as limited by the prior art. Further, the various features of this invention can be used alone, or in varying combinations with each other and are not intended to be limited to the specific combination described herein.

What is claimed is:

1. A method of assisting a borrower in obtaining a loan, the method comprising:

(a) receiving, over a network, personal information of a borrower, said personal information including financial information of the borrower, and including information regarding objectives of the borrower in seeking a loan, said personal information obtained, at least in part, via an online form completed by the borrower;

(b) selecting, based on said information regarding objectives of the borrower, underwriting criteria to be used to generate a credit grading for the borrower;

(c) programmatically generating the credit grading for the borrower using the selected underwriting criteria, wherein the selected underwriting criteria includes objective criteria used by one or more lenders capable of providing the loan;

(d) outputting information regarding the credit grading, and information regarding a plurality of lenders capable of providing the loan, to the borrower; and

(e) subsequently to steps (a)-(d), in response to receiving authorization from the borrower, sending the credit grading and at least some of the personal information of the borrower to a particular one of said lenders selected by the borrower;

wherein steps (a)-(e) are performed by a third party evaluator that does not provide the loan, and is performed such that none of the received personal information of the borrower is released to any of the lenders without specific authorization from the borrower, whereby the method enables the borrower to assess its borrowing ability and to select a lender for providing the loan without exposing any personal information to any of the lenders, and wherein the method further comprises the third party evaluator receiving, from a lender, software that automatically applies the selected underwriting criteria to information of the borrower.

2. The method of claim 1, wherein the third party obtains said software under an obligation to maintain the selected underwriting criteria confidential.

3. A method of assisting a borrower in obtaining a loan, the method comprising:

(a) receiving, over a network, personal information of a borrower, said personal information including financial information of the borrower, and including information regarding objectives of the borrower in seeking a loan, said personal information obtained, at least in part, via an online form completed by the borrower;

(b) selecting, based on said information regarding objectives of the borrower, underwriting criteria to be used to generate a credit grading for the borrower;

(c) programmatically generating the credit grading for the borrower using the selected underwriting criteria, wherein the selected underwriting criteria includes objective criteria used by one or more lenders capable of providing the loan;

US 7,680,728 B2

11

(d) outputting information regarding the credit grading, and information regarding a plurality of lenders capable of providing the loan, to the borrower; and

(e) subsequently to steps (a)-(d), in response to receiving authorization from the borrower, sending the credit grading and at least some of the personal information of the borrower to a particular one of said lenders selected by the borrower;

wherein steps (a)-(e) are performed by a third party evaluator that does not provide the loan, and is performed such that none of the received personal information of the borrower is released to any of the lenders without specific authorization from the borrower, whereby the method enables the borrower to assess its borrowing ability and to select a lender for providing the loan without exposing any personal information to any of the lenders, and wherein the method further comprises the third party evaluator issuing a loan number to the borrower while the borrower remains anonymous to the lenders.

**4.** A method of assisting a borrower in obtaining a loan, the method comprising:

(a) receiving, over a network, personal information of a borrower, said personal information including financial information of the borrower, and including information regarding objectives of the borrower in seeking a loan, said personal information obtained, at least in part, via an online form completed by the borrower;

(b) selecting, based on said information regarding objectives of the borrower, underwriting criteria to be used to generate a credit grading for the borrower;

(c) programmatically generating the credit grading for the borrower using the selected underwriting criteria, wherein the selected underwriting criteria includes objective criteria used by one or more lenders capable of providing the loan;

(d) outputting information regarding the credit grading, and information regarding a plurality of lenders capable of providing the loan, to the borrower; and

(e) subsequently to steps (a)-(d), in response to receiving authorization from the borrower, sending the credit grading and at least some of the personal information of the borrower to a particular one of said lenders selected by the borrower;

wherein steps (a)-(e) are performed by a third party evaluator that does not provide the loan, and is performed such that none of the received personal information of the borrower is released to any of the lenders without specific authorization from the borrower, whereby the method enables the borrower to assess its borrowing ability and to select a lender for providing the loan without exposing any personal information to any of the lenders, wherein the method further comprises the third party providing a full loan approval to the borrower while the borrower remains anonymous to said lenders, said full loan approval provided in connection with a particular real estate property.

**5.** A method of assisting a borrower in obtaining a loan, the method comprising:

(a) receiving, over a network, personal information of a borrower, said personal information including financial information of the borrower, and including information regarding objectives of the borrower in seeking a loan, said personal information obtained, at least in part, via an online form completed by the borrower;

12

(b) selecting, based on said information regarding objectives of the borrower, underwriting criteria to be used to generate a credit grading for the borrower;

(c) programmatically generating the credit grading for the borrower using the selected underwriting criteria, wherein the selected underwriting criteria includes objective criteria used by one or more lenders capable of providing the loan;

(d) outputting information regarding the credit grading, and information regarding a plurality of lenders capable of providing the loan, to the borrower; and

(e) subsequently to steps (a)-(d), in response to receiving authorization from the borrower, sending the credit grading and at least some of the personal information of the borrower to a particular one of said lenders selected by the borrower;

wherein steps (a)-(e) are performed by a third party evaluator that does not provide the loan, and is performed such that none of the received personal information of the borrower is released to any of the lenders without specific authorization from the borrower, whereby the method enables the borrower to assess its borrowing ability and to select a lender for providing the loan without exposing any personal information to any of the lenders, wherein step (d) comprises outputting information to the borrower regarding specific loans offered by said lenders, and wherein the information about specific loans comprises an indication of an amount a lender is paying for money associated with a loan.

**6.** A method of assisting a borrower in obtaining a loan, the method comprising:

(a) receiving, over a network, personal information of a borrower, said personal information including financial information of the borrower, and including information regarding objectives of the borrower in seeking a loan, said personal information obtained, at least in part, via an online form completed by the borrower;

(b) selecting, based on said information regarding objectives of the borrower, underwriting criteria to be used to generate a credit grading for the borrower;

(c) programmatically generating the credit grading for the borrower using the selected underwriting criteria, wherein the selected underwriting criteria includes objective criteria used by one or more lenders capable of providing the loan;

(d) outputting information regarding the credit grading, and information regarding a plurality of lenders capable of providing the loan, to the borrower; and

(e) subsequently to steps (a)-(d), in response to receiving authorization from the borrower, sending the credit grading and at least some of the personal information of the borrower to a particular one of said lenders selected by the borrower;

wherein steps (a)-(e) are performed by a third party evaluator that does not provide the loan, and is performed such that none of the received personal information of the borrower is released to any of the lenders without specific authorization from the borrower, whereby the method enables the borrower to assess its borrowing ability and to select a lender for providing the loan without exposing any personal information to any of the lenders, wherein the method comprises the third party evaluator selecting and applying the underwriting criteria of a particular lender, as obtained confidentially from said particular lender.

* * * * *

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on    May 12, 2015
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
    (by email or CM/ECF)

Craig R. Kaufman                    /s/ Craig R. Kaufman

Name of Counsel                    Signature of Counsel

Law Firm    TechKnowledge Law Group LLP

Address    100 Marine Parkway, Suite 200

City, State, ZIP    Redwood Shores, CA 94065

Telephone Number    650 517 5225

FAX Number

E-mail Address    ckaufman@tklg-llp.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

The undersigned, an attorney of record, hereby certifies that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b). The brief contains 7,579 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman type style.

Date:  May 8, 2015

*/s/ Craig R. Kaufman*
Craig R. Kaufman

*Attorney for Appellant*
MORTGAGE GRADER, INC.